## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CHAPLAIN GORDON JAMES KLINGENSCHMITT | ) | |
| | ) | |
| Plaintiff, | ) | Civil No.: 06CV 1832 (HHK) |
| v. | ) | |
| DONALD C. WINTER | ) | |
| Defendant, | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR EXTENSION OF TIME TO FILE (1) DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR EXPEDITED DISCOVERY AND (2) OUT OF TIME DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, Chaplain Gordon James Klingenschmitt ("Chaplain Klingenschmitt"), opposes Defendant's (the "Navy" or "Defendant") motion because his motion for injunctive relief is pending and the Defendant has informed him that they will separate him from military service no later than January 31, 2007.

It is now imperative that Chaplain Klingenschmitt be permitted to have expedited discovery to gather the evidence to support his claims that the Navy has engaged in conduct which violates basic constitutional principles before the Defendant's separation date of January 31, 2007. There will be a grave injustice and a pall cast over all of the military if the Navy is permitted to separate Chaplain Klingenschmitt before the truth comes out. Other Chaplains will fear standing up for the Constitution and the Navy will continue with their creation of their secular religion.

1

If the Navy seeks more time, it should be enjoined from separating Chaplain Klingenschmitt until discovery has been taken so that this Court will have enough evidence to make a reasoned decision on the questions of whether the Navy's actions violate the Constitution and whether an injunction is necessary here.

## BACKGROUND

Chaplain Klingenschmitt prayed in the name of Jesus and then complained when the Navy ordered him to pray in its way. Chaplain Klingenschmitt also objected to the Navy establishing their new religion and ordering its Chaplains to pray in a way consistent with the Navy's religion. Chaplain Klingenschmitt also was punished for quoting the Bible in chapel during optional worship, for wearing his uniform while praying outside the chapel, and for exercising his rights as a whistleblower by appealing to the President.

After he exercised his constitutional rights, the Navy made Chaplain Klingenschmitt the first Navy Chaplain to be denied re-certification of an ecclesiastical endorsement from the Chaplaincy of Full Gospel Churches, or from any transfer between denominations. Chaplain Klingenschmitt filed a lawsuit because of the Navy's apparent Constitutional violations. Now the Navy is separating Chaplain Klingenschmitt just days after they informed the Court that they had no plans to separate him.

## ARGUMENT

Discovery will show whether, as plaintiff contends, this controversy is centered upon a religious orthodoxy mandated by the Navy. Klingenschmitt contends that the Navy is sanctioning a religious orthodoxy that they have deemed as appropriate for the military population which consists of diverse religious beliefs. If Chaplain Klingenschmitt is correct, his First Amendment claims raise

2

substantial and important constitutional issues. Plaintiff argues that the Navy has forced him from the pulpit and is separating him from military service for his failure to preach pluralism among religions and in a way that does not identify him as a Christian.

The Establishment Clause clearly forbids that there should be any official judgments about the correctness of religious beliefs. *See United Christian Scientists v. First Church of Christ, Scientist,* 829 F.2d 1152, 1167 (D.C.Cir.1987). To the same effect, the RFRA, 42 U.S.C. § 2000bb-1(a), (b), provides that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" except "if it demonstrates that the application of the burden to the person--(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."

### Main Arguments Raised and Addressed

1. Defendant's main argument is that "Defendant has not even decided whether to separate Plaintiff from service or retain him as a Navy chaplain." Def. Mot., pg. 4.

**Why this argument fails:** Defendant informed Chaplain Klingenschmitt that they will separate him from military service no later than January 31, 2007. A copy of the separation notice is attached here as Exhibit "A."

2. Defendant's second argument is that "there is no urgency requiring immediate action by this court." Def. Mot., pg. 4.

**Why this argument fails:** A citizen in uniform may not be stripped of their basic constitutional rights. First Amendment protections exist for the military as "aspects of military life do not, of course render entirely nugatory in the military context the guarantees of the First Amendment." *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986); *See also Chappell v. Wallace,*

462 U.S. 296, 304 (1983)(noting that " 'our citizens in uniform may not be stripped of basic rights simply because they have doffed their civilian clothes,'" quoting Earl Warren, The Bill of Rights and the Military, 37 N.Y.U.L.Rev. 181, 188 (1962)); *Brannum v. Lake*, 311 F.3d 1127, 1130 (D.C.Cir. 2002).

There is extensive evidence that serious constitutional violations occurred in the way Chaplain Klingenschmitt was treated by the Navy after he prayed in the name of Jesus and sought to have his constitutional rights enforced. The First Amendment to the United States Constitution guarantees that all citizens have a fundamental right to freely exercise their religious beliefs, and this includes members of the military. This lawsuit seeks to restore and secure the religious rights of Navy chaplains and servicemembers. All individuals in the Navy have a right to freely choose their own words of faith during prayer. Since 1860, federal law and Navy regulations have protected chaplains right to pray "according to the manner and forms of the church of which they are a member."

In 2006, the Navy issued a directive that prohibited Navy chaplains from using sectarian language in prayers in most situations other than formal worship settings. The policy placed the responsibility for determining what is and is not appropriate prayers with Navy commanders. The policy redefined "public worship" as only protected during "divine services" in Sunday chapel. By placing itself in the position of regulating prayer and interfering with the right of chaplains and servicepeople to freely express their consciences in matters of faith, the Navy is in violation of federal law and the First Amendment to the United States Constitution.

There is also evidence that the Navy is in violation of the constitution because they are creating a "non sectarian" civic religion in violation of the Establishment Clause. The Navy still

4

teaches lectures pressuring chaplains to pray "non-sectarian" prayers and enforces a 1998 prayer memo suggesting that chaplains who pray "in Jesus name" are insensitive or incompetent.  In creating one non-sectarian, Unitarian, Pluralistic religion and discouraging public expression of diverse faiths and religions, the Navy is in violation of the Establishment Clause of the First Amendment to the United States Constitution and it is  pressuring or forcing all Chaplains in the Navy to pray in the same way.

Since 1860, federal law allows Navy chaplains to conduct public worship according to the manner and forms of their respective religious beliefs. However, the Navy issued SECNAV INSTRUCTION 1730.7C, on February 21, 2006, reversing that historic military tradition in favor of ecumenical theism and/or deism. A copy of the Navy's 1730.7C Instruction is attached here as Exhibit "B."  The Navy's new prayer policy for chaplains states: "Other than Divine/Religious Services, religious elements for a command function, absent extraordinary circumstances, should be non sectarian in nature."  The instruction narrowly re-defined "public worship" and "religious observance" leaving Chaplain Klingenschmitt unprotected and vulnerable to religious oppression.

That policy was later rescinded by Congress, yet the Navy still has the policy defined as "a c t i v e"   o n   t h e   o f f i c i a l   m i l i t a r y   w e b s i t e   - http://neds.daps.dla.mil/Directives/Forms/CD%20CreationView.aspx.  The effect of 1730.7C is to chill religious expression, affecting religious expression on ships, in battle zones and on military bases and installations. The prayer policy undermines the express wishes of America's Founding Fathers, U.S. Supreme Court precedent and various acts of Congress, including the Religious Freedom Restoration Act.  That policy violates RFRA because it overtly and substantially interferes with the free exercise rights of chaplains and servicepeople.

5

Chaplain Klingenschmitt urged the military to remain neutral in matters of religion by allowing chaplains of various faiths to freely and openly present their religious points of view on a free and equal basis. Chaplain Klingenschmitt asked the Navy to change its policy to one that did not discriminate against religion by censoring all sectarian references. Chaplain Klingenschmitt's identification of the constitutional violation is a substantial reason for the Navy terminating him.

On February 18, 2005, Captain Carr gave a downgraded performance evaluation to Chaplain Klingenschmitt because of the content of his prayers and sermons, which in turn were based on his religious beliefs. Finally, the Navy informed Chaplain Klingenschmitt that his evaluations were downgraded because he put up a personal website (on his own time) in which Chaplain Klingenschmitt published the formal whistle blower complaints he had written to government officials.

All the information he posted on the Chaplain's personal web site was truthful and unclassified. There is no Navy regulation prohibiting the posting of this type of information. Rather than address its constitutional violations, the Navy attacked the messenger or whistleblower.

Discovery is required because if Chaplain Klingenschmitt's separation has been undertaken for unconstitutional purposes. The Navy is sending a critical message that it will terminate anyone who seeks to ensure his or her constitutional rights. In addition, the Navy has informed Chaplain Klingenschmitt that his performance was downgraded because he brought these unconstitutional matters to the President's attention.

There is urgency here because once he is separated, Chaplain Klingenschmitt will be irreparably harmed. *See e.g., Meinhold v. U.S. Dept. of Defense*, 34 F.3d 1469, 1474 (9th Cir.1994) (Irreparable harm standard).

3. **Chaplain Klingenschmitt was told that he was prosecuted for what the Navy characterized as a protest in uniform.** However, the Navy's Instruction 1730.7c restricted prayers that Navy chaplains could make to "Divine Services" in Sunday chapel, which has now been rescinded by an Act of Congress. When a military officer is notified that he is being processed for failure to conform to a regulation, it is a violation of due process if he discharged under some other regulation. U.S. Const. Amend. 14. *Crane v. Secretary of Army*, 92 F. Supp. 2d 155 (W.D.N.Y. 2000) (When Army officer, notified that he was being processed for involuntary discharge for failure to conform to regulation prescribing standards of dress, personal appearance and military deportment, was deprived of due process when discharged for violation of separate regulation requiring weight control.)

4. **The Defendant stated that they have initiated separation proceedings against Chaplain Klingenschmitt based upon his lack of ecclesiastical endorsement**. As stated in Chaplain Klingenschmitt's motion for discovery, there are significant reasons discovery is required to begin immediately: (1) there is no evidence that in its more than 200 year history the Navy has ever separated a chaplain who has a valid ecclesiastical endorsement (which Chaplain Klingenschmitt has from the Chaplaincy of Full Gospel Churches); (2) there needs to be discovery on whether any other chaplain in the Navy has faced separation based upon praying in their respective God's name, or quoting the Bible in the chapel, or filing whistleblower complaints to the President; (3) the treatment of the other Navy Chaplains who are similarly situated to Chaplain Klingenschmitt and are not being separated; (4) the actions by Naval officials and whether those actions violate Chaplain Klingenschmitt's civil rights; (5) the information contained in the 3,000+ pages of documents and emails about Chaplain Klingenschmitt that have been collected (but not

released, or heavily redacted) by Navy Freedom of Information Act officials which may shed light on the Constitutional challenges raised in his matter; and (6) other evidence which would entitle Chaplain Klingenschmitt to have an injunction entered.

**5. This is a First Amendment case.** The Supreme Court has provided examples of cases where military personnel have access to civilian courts for constitutional wrongs: *Brown v. Glines*, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980) (members of the military services are entitled to the protections of First Amendment); *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (any party may appeal to the Supreme Court from an interlocutory or final judgment, decree or order of any court of the United States holding an Act of Congress unconstitutional in any action, suit or proceeding to which the United States is a party).; *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (Violating the due process clause of the Fifth Amendment); and *United States v. Stanley,* 483 U.S. 669, 683, 107 S.Ct. 3054, 3063-64, 97 L.Ed.2d 550 (1987) (noting that other Supreme Court jurisprudence "referred to redress designed to halt or prevent the constitutional violation rather than the award of money damages."). Here, Chaplain Klingenschmitt has alleged, among other matters, First Amendment violations.

Chaplain Klingenschmitt is being discharged from the Navy because he expressed his objections to the Navy's creation of a religion, and he openly opposed the Navy's policy of banning a Chaplain's prayers in uniform, despite Naval Uniform Regulations which explicitly authorize chaplains to wear their uniform during any religious observance. Chaplain Klingenschmitt has claimed a First Amendment violation in that the Navy's policy has a practical effect of advancing a "non-sectarian" religion, the Navy's promotion and Establishment of that religion is likely to be perceived by reasonable observers as an endorsement of their favored religion while suppressing the

religious expression of other, less favored, diverse beliefs. That promotion constitutes a government preference for certain specific religious tenets and modes of worship over other religious tenets and modes of worship.

The unconstitutionality of Naval Directives as applied to Chaplain Klingenschmitt and other Chaplains is a key factor which requires discovery to be taken prior to the injunction hearing. *Steffan v. Perry*, 41 F.3d 677 (D.C. Cir. 1994) (No Judicial deference is required in this type of case.)

A.    **Expedited Discovery Will Permit the Court to Determine if a Restraining Order will be Issued Stopping the Navy's Violation of Constitutional Rights**

An expedited discovery schedule is proper in this matter because Chaplain Klingenschimtt will be separated and he will suffer irreparable harm if he is denied the evidence that his constitutional rights are being violated by the Navy.

In his complaint, Chaplain Klingenschmitt alleges that his separation will be based on an unconstitutional criteria. Chaplain Klingenschmitt alleges that his employer is seeking his separation for praying in the name of Jesus, for quoting the Bible in the chapel, and for voicing whistleblower complaints about religious oppression. Thus, if the protected speech is a substantial reason for the separation, it would be a constitutional violation as well as a violation of 10 U.S.C § 1034 and DoDD 7050.6 "Whistleblower Protection Act."

The Court will be required to analyze the parties diametric views in order to determine if Chaplain Klingenschmitt has evidence that will permit him to prevail in this action.

B. **Repercussions For Military Separation Prior to an Informed Injunctive Hearing**

There will be grave constitutional repercussions if Chaplain Klingenschmitt is separated from the Navy without inquiry into the Navy's establishment of a religion under which Jesus can not be

mentioned. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 302 (D.C.Cir. 2006) ("the pertinent liberty here is protection against government imposition of a state religion or religious preference.")

First, Chaplains continue to be denied their First Amendment rights. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. *See New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). Second, this Court must determine whether Chaplains who pray in the name of Jesus are or will be engaging in constitutionally protected behavior and determine whether the allegedly impermissible government action would chill allowable individual conduct.

Here, the pertinent liberty is protection against government imposition of a state religion or religious preference. The cloud of unconstitutional doom will descend upon the Chaplain corps and create an environment where Chaplains that speak up will be terminated.

### C. There are Grave Matters of Public Concern at Issue

Public employees may not be required to sacrifice their First Amendment free speech rights in order to continue their employment, *Rankin v. McPherson*, 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)(*citing Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). The Supreme Court has provided an three-step analytic framework for determining whether a public employer has violated the First Amendment by terminating a public employee for engaging in speech. First, does the relevant speech addresses a matter of public concern? *See Connick v. Myers*, 461 U.S. 138, 143, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). An affirmative response requires the court to balance the interests of the public employee, "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in

promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

Finally, and the reason discovery is of utmost importance here, the court must determine whether the employee's speech was a substantial or motivating factor in the employer's decision to take the adverse employment action against the employee. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

### 1. The Speech is a Matter of Public Concern

The Navy's directive that Chaplain Klingenschmitt could not wear his uniform during prayers, and then determining that the Chaplains' prayers were a protest, is a direct violation of the First Amendment. The Navy hired Chaplain Klingenschmitt as a Christian Chaplain. His Jesus is the name of the Christian God. To order Chaplain Klingenschmitt to pray in a non-Christian way is a violation of the Establishment Clause because it creates and enforces a "Navy Religion" where God is not revealed as the Christian doctrine of the Trinity (Father, Son (Jesus), and Holy Spirit in one God). Discovery is necessary to determine if the Navy had a legitimate constitutional reason for Establishing their religion.

### 2. The Protected Action did Not Disrupt the Navy

There is no evidence that Chaplain Klingenschmitt's prayers in any way disrupted the Navy's operations. Discovery would be required if the Navy disputes this point.

### 3. The Chaplains Speech is a Substantial Reason for the Separation

The Navy's Notification of Administrative Separation of Chaplain Klingenschmitt states that Chaplain Klingenschmitt was being separated for his "most recent fitness report." Exh. A, ¶ 3. That fitness report alleges that Chaplain Klingenschmitt in petitioning the president "[o]penly challenged

11

his chain of command." However, that challenge was Chaplain Klingenschmitt's speaking in public of the Navy's constitutional violations. Thus, the First Amendment protected speech is a substantial reason for the separation.

In addition, the Navy punished Chaplain Klingenschmitt for blowing the whistle on their conduct and he sought to have the president review their actions. In retaliation for the Chaplain's request, the Navy is now separating him from service.

In that the Navy punished Chaplain Klingenschmitt because he appealed to the President after the Navy forbid him from praying in the name of Jesus, that was violation of the Religious Freedom Restoration Act. In this district, it has been held that the Military violates the Religious Freedom Restoration Act when it forbids chaplains from encouraging their parishioners to petition Congress about pending legislation. In *Rigdon*, Judge Stanley Sporkin noted that "the compelling interests advanced by the military are outweighed by the military chaplains' right to autonomy in determining the religious content of their sermons especially because tile defendants have failed to show how the speech restrictions as applied to chaplains advances these interests." *Rigdon v. Perry*, 962 F.Supp. 150, 162 (D.D.C. 1997).

If the Navy contends otherwise, discovery is required prior to separating Chaplain Klingenschmitt because of the chill a separation based on impermissible constitutional violations would cast on others that brought unconstitutional issues to the public's attention. No Naval Chaplain who values his or her continued reputation and effectiveness in the military community would incur the Navy's displeasure by praying in Jesus' name. *See e.g., Lee v. Weisman*, 505 US 577 (1992).

**WHEREFORE**, Klingenschmitt respectfully requests that the Navy's motion be denied and

the Court issue an expedited scheduling order.  In addition, Klingenschmitt requests the Defendant

be ordered to comply with initial disclosures immediately.


Respectfully submitted,


   /s/ William P. Farley
William P. Farley 466280
Law Office of William P. Farley
900 17th Street, N.W.
Suite 1250
Washington, D.C. 20006
(202) 293-3200

Counsel for Plaintiff

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| ) | |
| CHAPLAIN GORDON JAMES KLINGENSCHMITT ) | |
| ) | |
| ) | |
| Plaintiff, ) | Civil No.: 06CV 1832 (HHK) |
| v. ) | |
| ) | |
| DONALD C. WINTER ) | |
| ) | |
| Defendant, ) | |
| _____ ) | |

**SCHEDULING ORDER**

Upon consideration of Defendant's Motion for Extension of Time to File (1) Defendant's Opposition to Plaintiff's Motion for Expedited Discovery and (2) out of Time Defendant's Brief in Opposition to Plaintiff's Motion for Preliminary Injunction from this Court, Plaintiff's opposition thereto, Defendant's Reply and the record herein, it is the ___ day of _____ 2006 hereby:

**ORDERED** that the Defendant's motion should be and hereby is **DENIED**; and it is further

**ORDERED** that this case shall be placed on an expedited schedule; and it is further

**ORDERED** that the parties shall comply with initial disclosures required by Rule 26(a)(1), F.R.Civ.P. within ten calendar days; and it is further

**ORDERED** that all discovery shall be completed within 60 days and prior to the separation from Naval Service of Chaplain Klingenschmitt; and it is further

**ORDERED** that Chaplain Klingenschmitt's separation from the Naval Service shall be delayed until at least 60 days after the discovered evidence is presented for due consideration by this court; and it is further

**ORDERED** that each party shall be permitted thirty depositions; and it is further

**ORDERED** that each party shall be permitted forty-five interrogatories to be served on each of the other respective parties; and it is further

**ORDERED** that all motions shall be filed no later than twenty days after the close of discovery; and it is further

**ORDERED** that the opposing party shall have 10 days to respond and to file any cross motion; and it is further

**ORDERED** that the party who filed the initial motion will then have five days to reply, and to oppose any cross-motion; and it is further

**ORDERED** that the other party will then have five days to file a reply; and it is further

**ORDERED** that the Pretrial Conference be held on _____, 2007.


_____
Judge Henry H. Kennedy
Federal District Court Judge - District of Columbia

Copies to:

William P. Farley
Farley@dccounselor.com
Counsel for Plaintiff

Michael P. Abate
Trial Attorney
United States Department of Justice
Federal Programs Branch
PO Box 883
Washington, DC 20530
Tel: (202) 616-8209
Fax: (202) 616-8470
michael.abate@usdoj.gov

Counsel for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Plaintiff's Opposition to Defendant's Motion for Extension of Time to File (1) Defendant's Opposition to Plaintiff's Motion for Expedited Discovery and (2) out of Time Defendant's Brief in Opposition to Plaintiff's Motion for Preliminary Injunction was served on all parties by delivering a copy thereof via the Court's electronic filing, on this 22nd day of November 2006 to:

Michael P. Abate
Trial Attorney
United States Department of Justice
Federal Programs Branch
PO Box 883
Washington, DC 20530
Tel: (202) 616-8209
Fax: (202) 616-8470
michael.abate@usdoj.gov

      /s/ William P. Farley
William P. Farley 466280
Law Office of William P. Farley
900 17th Street, N.W., Suite 1250
Washington, D.C. 20006
(202) 293-3200 (telephone)
(202) 429-1851 (fax)
farley@dccounselor.com
Counsel for Plaintiff



**DEPARTMENT OF THE NAVY**
NAVY PERSONNEL COMMAND
5720 INTEGRITY DRIVE
MILLINGTON TN 38055-0000

1920
Ser 48/04
16 Nov 06

From: Commander, Navy Personnel Command (PERS-48)
To:   LT Gordon J. Klingenschmitt, CHC, USNR, XXX-XX-0240/4105
Via:  Commanding Officer, Naval Station Norfolk

Subj: NOTIFICATION OF ADMINISTRATIVE SEPARATION

Ref:  (a) Your ltr of 14 Oct 06
      (b) 10 U.S.C. § 643
      (c) DODI 1304.28
      (d) SECNAVINST 1920.6C

1.  Your request for recertification of your professional
qualification to serve as a Navy Chaplain, reference (a), was
considered by the Assistant Secretary of the Navy (Manpower and
Reserve Affairs) and denied.  He has directed your administrative
separation from the naval service.  This action is taken pursuant to
references (b) through (d).  Orders directing you to separate from the
naval service not later than 31 January 2007, unless you request an
earlier date, will be issued within the next five working days.

2.  The Secretary determined you are professionally unsuited for
further service as a naval officer and chaplain.  Presentation of a
new ecclesiastical endorsement from a qualified religious organization
does not automatically mandate recertification of a chaplain's
professional qualification.  Rather, a new ecclesiastical endorsement
is just one factor to be considered in evaluating whether a chaplain's
professional qualification should be recertified.  Other factors
include the officer's record of professional performance and
accomplishment, disciplinary record, if any and chain of command
support.

3.  The Secretary concluded that your recent professional performance
has been unsatisfactory.  Your most recent fitness report, for the
period 23 July 2005 to 31 January 2006, graded you below average in
the area of "military bearing/character," and the narrative noted that
"he fails to meet standards of military bearing."  In addition, you
were convicted at a special court-martial on 14 September 2006 for
violating the lawful order a superior commissioned officer.  Further,
the Chief of Chaplains, your community leader, recommended denial of
recertification and processing you for administrative separation.  The
Secretary concluded that you do not possess the character, leadership,
or professional traits needed to successfully serve as a naval
officer.

Subj: NOTIFICATION OF ADMINISTRATIVE SEPARATION

4. Your point of contact at Navy Personnel Command for this matter is CDR Stephen Lepp, COMM (901) 874-4453, DSN 882-4453, or Fax (901) 874-2633.

G. S. PARKER
By direction

2



**DEPARTMENT OF THE NAVY**
OFFICE OF THE SECRETARY
1000 NAVY PENTAGON
WASHINGTON, DC 20350-1000

SECNAVINST 1730.7C
N097
February 21, 2006

SECNAV INSTRUCTION 1730.7C

From:   Secretary of the Navy

Subj:   RELIGIOUS MINISTRY WITHIN THE DEPARTMENT OF THE NAVY

Ref:    (a) Title 10, United States Code
        (b) U.S. Navy Regulations, 1990
        (c) DOD Directive 1304.19 of 11 Jun 2004
        (d) DOD Instruction 1304.28 of 11 Jun 2004
        (e) DOD Directive 5120.8 of 20 Mar 1995
        (f) Manual for Courts-Martial, United States 2005
        (g) DOD Directive 1300.17 of 3 Feb 1988
        (h) DOD Directive 7000.14-R, Vol. 7A
        (i) DOD Directive 5154.24 of 28 Oct 1986

Encl:   (1) Definitions
        (2) Confidential Communication to Chaplains and Religious
            Program Specialists
        (3) Accommodation of Religious Practices

1. <u>Purpose</u>.  To implement policy and procedures for religious
ministry and the accommodation of religious practices in the
Department of the Navy.  This instruction has been
administratively revised and should be reviewed in its entirety.

2. <u>Cancellation</u>.  SECNAVINST 1730.7B and SECNAVINST 1730.8A.

3. <u>Scope</u>.  This instruction applies throughout the Department
of the Navy (DON), including the Coast Guard when operating as a
service in the Navy under Title 14, U.S. Code, Section 3.

4. <u>Definitions</u>.  Enclosure (1) contains definitions of terms
used in this instruction.

5. <u>Organization and Role of Chaplain Corps</u>

    a.  The <u>Chief of Chaplains of the Navy</u> is appointed in
accordance with section 5142 of reference (a) and serves in the
grade of rear admiral (upper half) as principal advisor,
community leader, and sponsor on matters concerning Chaplain

SECNAVINST 1730.7C
February 21, 2006

Corps (CHC) officers and Religious Program Specialists (RP) per
Article 1009 of reference (b). As Director of Religious Ministry
for the DON, the Chief of Chaplains:

(1) Advises the <u>Secretary of the Navy</u> on all matters
pertaining to the free exercise of religion within the naval
service. The Chief of Chaplains shall provide regular and
frequent advice on:

(a) Religious, ethical, spiritual, and moral
implications of all DON policies and actions.

(b) Religious faith-group policies and positions
affecting the DON.

(c) All matters pertaining to the organization and
utilization of the CHC as a staff corps of the Navy.

(d) All matters pertaining to the organization and
utilization of RPs.

(e) Policy formulation and oversight pertaining to
the implementation of religious ministry plans, programs,
personnel, and facilities.

(2) Advises the <u>Chief of Naval Operations (CNO)</u> on all
matters pertaining to the free exercise of religion within the
Navy, serves as community leader for the Chaplain Corps and
Religious Program Specialists, and otherwise assists the CNO.
In this capacity, the Chief of Chaplains:

(a) Directs CHC officers, RPs, and all other
designated persons engaged in religious ministry within the
Navy, the USMC, and other governmental agencies receiving
religious ministry from Navy chaplains.

(b) Serves as program sponsor for the professional
development, education, and training of CHC officers and RPs.

(c) Provides technical advice for the acquisition,
operation, and maintenance of religious ministry support
facilities, collateral equipment, and other logistical support
both ashore and afloat.

(d) Reports to and is supported by the Chief of
Naval Personnel with respect to all duties pertaining to the

SECNAVINST 1730.7C
February 21, 2006

2

procurement, distribution, and support of CHC officers and RP
personnel.

    (3) Serves on the <u>Armed Forces Chaplains Board (AFCB)</u> per
reference (e).  As a member of the AFCB, the Chief of Chaplains
represents the Secretary of the Navy to:

        (a) The Department of Defense (DOD).

        (b) The Chiefs of Chaplains/Chaplain Services of
other DOD components.

        (c) The nation's religious organizations.

    (4) Advises the <u>Commandant of the Coast Guard</u> on
religious ministry matters relative to the use of Navy chaplains
in the Coast Guard.

    b.  The <u>Deputy Chief of Chaplains</u> is an officer selected by
a board to the billet, from officers of the Chaplain Corps, who
serves in the grade of rear admiral (lower half) and performs
such duties as prescribed by the Secretary of the Navy and law.
The Deputy Chief of Chaplains:

    (1) Serves as principal assistant to the Chief of
Chaplains and Deputy Director for Religious Ministry for the
DON.

    (2) Serves as Chaplain of the Marine Corps, advising the
Commandant of the Marine Corps (CMC) on religious ministry
matters in reference to support, plans, programs, policy,
personnel, and facilities within the USMC.

    (3) In accordance with reference (e), serves as a member
of the AFCB.

    c.  The <u>Deputy Chief of Chaplains for Reserve Matters</u> is an
officer selected by a board to the billet, from reserve officers
of the Chaplain Corps, who serves in the grade of rear admiral
(lower half), in the reserve component, and performs such duties
as prescribed by the Secretary of the Navy and law. The Deputy
Chief of Chaplains for Reserve Matters:

    (1) Serves as the principal assistant to the Chief of
Chaplains for Reserve Matters.

    (2) Advises the Chief of Chaplains on religious ministry

SECNAVINST 1730.7C
February 21, 2006

3

matters in reference to administration, supervision, training, and mobilization of chaplains and Religious Program Specialists in the Reserve component.

    d. <u>Chaplains</u>

    (1) Chaplains are Qualified Religious Ministry Professionals (RMPs) endorsed by a Department of Defense (DOD)-listed Religious Organization (RO) and commissioned as CHC officers.

    (2) As a condition of appointment, every RMP must be willing to function in a pluralistic environment in the military, where diverse religious traditions exist side-by-side with tolerance and respect. Every RMP must be willing to support directly and indirectly the free exercise of religion by all military members of the DON, their family members, and other persons authorized to be served, in cooperation with other chaplains and RMPs. Chaplains are trained to minister within the specialized demands of the military environment without compromising the tenets of their own religious tradition.

    (3) In providing religious ministry, chaplains shall strive to avoid the establishment of religion to ensure that free exercise rights are protected for all authorized personnel.

    (4) Chaplains will provide ministry to those of their own faith, facilitate ministry to those of other faiths, and care for all service members, including those who claim no religious faith. Chaplains shall respect the rights of others to their own religious beliefs, including the right to hold no beliefs.

    (5) Chaplains advise commands in matters of morale, morals, ethics, and spiritual well-being. They also serve as the principal advisors to commanders for all issues regarding the impact of religion on military operations.

    (6) Chaplains are non-combatants. Chaplains are not authorized to obtain weapons qualifications, warfare qualifications, or bear arms; however, chaplains who attained weapons or warfare qualifications during prior service as a combatant are authorized to wear their awards and/or warfare qualifications. Chaplains are eligible to qualify for and to wear the insignia of qualification designations such as Fleet Marine Force, Basic Parachutist, and Navy/Marine Parachutist.

4

6. <u>Responsibilities of Commanders</u>

a.  Commanders shall provide a Command Religious Program (CRP) in support of religious needs and preferences of the members of their commands, eligible family members and other authorized personnel.  The CRP is supported with appropriated funds at a level consistent with other personnel programs within DON.

b.  Chaplains will not be compelled to participate in religious activities inconsistent with their beliefs.

c.  Commanders retain the responsibility to provide guidance for all command functions.  In planning command functions, commanders shall determine whether a religious element is appropriate.  In considering the appropriateness for including a religious element, commanders, with appropriate advice from a chaplain, should assess the setting and context of the function; the diversity of faith that may be represented among the participants; and whether the function is mandatory for all hands.  Other than Divine/Religious Services, religious elements for a command function, absent extraordinary circumstances, should be non-sectarian in nature.  Neither the participation of a chaplain, nor the inclusion of a religious element, in and of themselves, renders a command function a Divine Service or public worship. Once a commander determines a religious element is appropriate, the chaplain may choose to participate based on his or her faith constraints.  If the chaplain chooses not to participate, he or she may do so with no adverse consequences. Anyone accepting a commander's invitation to provide religious elements at a command function is accountable for following the commander's guidance.

d.  Commanders shall, when in a combat area, only assign, detail, or permit chaplains, as non-combatants under the Geneva Convention, to perform such duties as are related to religious ministry under Art. 1063 of reference (b).

e.  Commanders shall not assign chaplains collateral duties that violate the religious practices of the chaplain's religious organization or that require services in a capacity in which the chaplain may later be called upon to reveal privileged or sensitive information.

f.  Commanders shall not assign chaplains duties to act as director, solicitor, or treasurer of funds, other than administrator of a Religious Offering Fund; or serve on a court-martial; or stand watches other than that of duty chaplain.

SECNAVINST 1730.7C
February 21, 2006

5

7.  Confidential Communication to Chaplains and Religious
Program Specialists.  Enclosure (2), hereby incorporated by
reference, sets forth DON policy on confidential communication
to chaplains and RPs.

8.  Accommodation of Religious Practices.  Enclosure (3), hereby
incorporated by reference, sets forth DON policy on
accommodation of religious practices.

9.  Responsibilities

    a.  The CNO shall exercise oversight to ensure compliance
with this instruction and shall implement the policy in this
instruction throughout the Navy.  The CNO shall initiate action
with the Commandant of the Coast Guard and the Administrator of
the Maritime Administration to implement this policy when Navy
Chaplains provide religious ministry to those agencies.

    b.  The CMC shall issue orders to implement this instruction
throughout the Marine Corps.


                          Donald C. Winter
                          Secretary of the Navy


Distribution:
Electronic only, via Navy Directives Website
http://neds.daps.dla.mil

SECNAVINST 1730.7C
February 21, 2006

6

SECNAVINST 1730.7C
February 21, 2006

DEFINITIONS

1.  Command Religious Program (CRP).  The comprehensive program
of Religious Ministry that is planned, programmed, budgeted, and
implemented to meet identified Religious Ministry requirements
of a command.

2.  Contract Religious Ministry Professional.  A civilian RMP
endorsed by a specific DOD-listed RO and contracted on a non-
personal services basis using competitive procedures.  These
RMPs provide religious ministries for members of the military,
their dependents, and other authorized persons of the contract
RMP's religious organization.  Commands shall assign a
contracting officer's technical representative (COTR) to monitor
contract RMP performance.

3.  Divine Services.  A term of art used in Section 6031 of
reference (a) and Article 0817 of reference (b) to refer to
public worship and religious services conducted afloat, in the
field, or on military bases and installations by a military
chaplain.  Under reference (a), Commanders "shall cause divine
services to be performed" and a chaplain has the right to
conduct divine services "according to the manner and forms" of
his or her religious organization.  Divine Services are command
functions, which take place according to the manner and forms of
religious organizations.  Participation in Divine Services shall
be voluntary, with the exception of personnel present in an
official support capacity.

4.  Ecclesiastical Endorsing Agent.  An individual authorized by
an RO to provide or withdraw ecclesiastical endorsements on its
behalf.  Each RO is limited to a single Ecclesiastical Endorsing
Agent.  Policy regarding their visits to commands is provided in
reference (d).

5.  Public Worship.  A term of art used in section 6031 of
reference (a) that consists of Divine Services and Religious
Services exclusively.  Command functions, other than
Divine/Religious Services, that include religious elements do
not constitute public worship.

6.  Religious Elements.  Includes prayers, invocations,
reflections, meditations, benedictions, or other religious or
faith-based features traditionally or customarily incorporated
in command functions other than Divine or Religious Services.

SECNAVINST 1730.7C
February 21, 2006

7.  <u>Religious Ministry</u>.  The entire spectrum of professional duties performed by Navy chaplains, Religious Program Specialists (RPs), and designated personnel; to include providing for and/or facilitating required religious needs and practices.

8.  <u>Religious Ministry Professional (RMP)</u>.  An individual endorsed by a DOD-listed RO, per reference (d), to represent the organization and to conduct its religious observances or ceremonies.  An RMP is a fully qualified member of the clergy for those religious organizations that have a tradition of professional clergy or their equivalents.

9.  <u>Religious Organization</u> – Under reference (d), an entity that is organized and functions primarily to perform religious ministries to a non-military lay constituency and that has met the religious purposes test of Section 501(c)(3) of Title 26, U.S. Code [2000], and holds current status as a Section 501(c)(3) Schedule "A" organization.  Religious Organizations possess ecclesiastical authority to endorse and withdraw endorsement for Religious Ministry Professionals serving under their authority.

10.  <u>Religious Program Specialists (RP)</u>.  RPs support chaplains in the planning, programming, administration, and coordination of the CRP.  RPs are combatants who provide force protection and physical security for chaplains in operational environments.

11.  <u>Religious Services</u>.  Worship events conducted in the manner and forms of Religious Organizations and led by Lay Leaders, Contract Civilian Religious Ministry Professionals, or other authorized personnel.  Participation in Religious Services shall be voluntary, with the exception of personnel present in a support capacity.

Enclosure (1)

SECNAVINST 1730.7C
February 21, 2006

CONFIDENTIAL COMMUNICATION TO CHAPLAINS
AND RELIGIOUS PROGRAM SPECIALISTS

1. <u>Discussion</u>.  The unconstrained ability to discuss personal
matters in complete privacy encourages full and complete
disclosure by personnel and family members seeking chaplain
assistance.  Such disclosure establishes a sacred trust,
facilitates increased morale and mission readiness, and benefits
both the individual and the institution.  The DON benefits from
having personnel and family members who trust chaplains.  The
institution profits from the pastoral care given to its people.
Pastoral care can only be done properly under the protection of
confidential communications.

2. <u>Definitions</u>

   a.  Confidential Communication

      (1) Confidential communication includes acts of
religion, matters of conscience, and any other information
conveyed to a chaplain in the chaplain's capacity as a spiritual
adviser or to an RP in the RP's official capacity and is not
intended to be disclosed to third persons other than those to
whom disclosure is in furtherance of the purpose of the
communication or to those reasonably necessary for the
transmission of the communication.

      (2) The confidential relationship extends beyond the end
of the counseling relationship and beyond the death of the
person making the disclosure.

      (3) Confidential communication can be conveyed through
oral or written means, including, but not limited to, letters
and electronic media.

      (4) All chaplains and RPs have the professional
obligation to keep private all confidential communication
disclosed to them in their official capacities, intended to be
held in confidence, and made as an act of religion or a matter
of conscience.

      (5) Confidential communications can be made only to
chaplains or RPs in their support role.  Communication with Lay
Leaders, Directors of Religious Education, and other support
personnel are not confidential and are not included in this
policy.  Lay Leaders, Directors of Religious Education, and
support personnel who inadvertently become aware of confidential

Enclosure (2)

SECNAVINST 1730.7C
February 21, 2006

communications must keep such matters confidential, and immediately refer the matter to a chaplain.

b. Privileged Communications. Privileged communications, a subset of confidential communications, is a legal term of art. The scope of the clergy-penitent privilege is defined in Military Rule of Evidence (MRE) 503 in reference (f).

3. Policy

a. The term "confidential communications" includes the legal recognition of the clergy-penitent privilege, all communications between uniformed chaplains and those who confide in them as an act of religion, a matter of conscience, or in their capacity as spiritual advisors. Commanders and chaplains are required to honor the confidential relationship between service personnel and military chaplains. This protection and obligation extends to military chaplains. This protection and obligation extends to RPs acting in their supporting role.

b. The unique role of military chaplains includes a sacred trust of maintaining absolute confidentiality. Therefore, chaplains and RPs are bound by this inviolable trust. Neither the holding of additional professional credentials, nor requirements imposed by state law, relieve the chaplain of this responsibility. Any authorized person who has access to a military chaplain or RP is covered by this policy.

c. In all relationships, including counseling and advisory, chaplains will inform all parties, including counselees and commanders, of the ramifications of this policy on confidentiality and privileged communication. Counselees have the right to make decisions pertaining to disclosure, free from coercion. If a chaplain recommends a referral to another agency, the chaplain will inform the counselee s/he may not have the same degree of confidentiality as with the chaplain.

d. Referrals. Consultation with and referral to another chaplain is permissible only with the written consent of the counselee.

e. Multiple Counselees. When multiple counselees (e.g., marriage and family) are parties to the same counseling session, chaplains will preserve confidentiality unless all parties consent to disclosure.

SECNAVINST 1730.7C
February 21, 2006

f. Conscientious Objection. Conscientious objection assessment interviews directed by the Commanding Officer, are administrative functions, not counseling relationships. Therefore, they are not confidential communications and the interviewee shall be so informed. A chaplain who has a prior existing counseling relationship with a service member requesting designation as a conscientious objector shall not be appointed to evaluate that service member.

g. Supervisory Role. Chaplains may have responsibilities that involve administrative and disciplinary action with those whom they supervise. To safeguard confidential and privileged communication, chaplains in supervisory roles are to avoid entering into such communications with personnel they supervise. At the onset of the supervisory relationship, supervisors will inform those they supervise of these limitations on pastoral relationships. Personnel under the supervision of a chaplain are encouraged to make their confidential communication to a chaplain outside their chain of command.

h. Counseling Records. Records or notes compiled by a chaplain in his/her counseling duties are "work product" and considered confidential. As such, chaplains must secure any such records, in whatever medium or format, containing confidential communication. When no longer needed, they will be destroyed. When current or former counselees are referenced in consultation, supervision, or education, their identities must be thoroughly protected.

i. Subpoena of Records. If a subpoena or other demand for documents or media containing confidential communication is received, the chaplain or a representative will immediately contact, at a minimum, the servicing legal office, the chain of command, and the Chief of Chaplains.

4. <u>Responsibilities</u>

a. The Chief of Naval Operations and the Commandant of the Marine Corps shall implement the policies in this enclosure.

b. The Chief of Chaplains shall ensure that training occurs at entry level and periodically thereafter. Such training will enable chaplains to:

(1) Regularly brief their command structure on the ramifications of this policy.

SECNAVINST 1730.7C
February 21, 2006

     (2) Train personnel under their supervision including those not bound by this policy (such as volunteers, contractors, etc.).

    c.  Commanders are required to honor the confidential relationship between service personnel and military chaplains. Commanders shall:

     (1) Not penalize a chaplain or RP for abiding within the parameters of this policy.

     (2) Upon the death of a chaplain, appoint only a chaplain to review the decedent's files and destroy any confidential communications.

5.  <u>Action</u>.  Actions inconsistent with this policy may result in administrative or disciplinary action.  Consequences may include, but are not limited to, loss of chaplain or RP credentials, and/or action under applicable provisions of the Uniform Code of Military Justice or the Military Personnel Manual.

Enclosure (2)

SECNAVINST 1730.7C
February 21, 2006

ACCOMMODATION OF RELIGIOUS PRACTICES

1. <u>Purpose</u>.  To provide policy and guidance for the accommodation of religious practices within the DON under reference (g).

2. <u>Applicability</u>.  The policies and procedures in this instruction apply solely to the accommodation of religious practices within the DON and no other context.

3. <u>Definitions</u>

   a. <u>Department of the Navy</u>.  The DON, for purposes of this enclosure, includes applicants for entry to and members of the Navy, Navy Reserve, Marine Corps, Marine Corps Reserve, as well as midshipmen at the U.S. Naval Academy and Reserve Officer Training Corps, and officers and officer candidates in all officer accession programs.

   b. <u>Religious Observance</u>.  Religious observances include participating in worship services and following other doctrinal requirements on Sabbath and holy days.

   c. <u>Religious Dietary Observances</u>.  Religious dietary observances include doctrinal or traditional requirements on types of foodstuffs or the means of preparation.

   d. <u>Religious Apparel</u>.  Religious apparel is defined as articles of clothing worn as part of the doctrinal or traditional observance of the religious faith practiced by the service member.  Hair and grooming practices required or observed by religious groups are not included within the meaning of religious apparel.

   e. <u>Religious Medical Practices</u>.  Religious medical practices include doctrinal or traditional objections to receiving immunizations and providing Deoxyribonucleic Acid (DNA) specimen samples.

4. <u>Policy</u>.  DON policy is to accommodate the doctrinal or traditional observances of the religious faith practiced by individual members when these doctrines or observances will not have an adverse impact on military readiness, individual or unit readiness, unit cohesion, health, safety, discipline, or mission accomplishment.

SECNAVINST 1730.7C
February 21, 2006

a.  Accommodation of a member's religious practices cannot be guaranteed at all times but must depend on military necessity.  Determination of necessity rests entirely with the commanding officer.

b.  The guidelines in this instruction shall be used in the exercise of command discretion concerning the accommodation of religious practices.  Nothing in these guidelines, except as expressly provided herein, shall be interpreted to require a specific form of accommodation in individual circumstances.

5.  Religious observances shall be accommodated, except by reason of necessity, as provided in reference (b).  Except by reason of necessity commanders should avoid scheduling conflicts with major religious observances.

6.  <u>Dietary Observance</u>.  Commanders normally accommodate religious dietary requirements through subsistence in kind. Subsistence in kind includes serving of appropriate meals or issuing of Meals Ready to Eat, Religious, specifically designed to meet religious requirements.  Commanders may authorize separate rations within the guidelines of reference (h).  In acting on requests for separate rations, the religious doctrines and traditions of the member's religious faith should be considered on the same basis as other personal reasons for separate rations.  To the extent that health, safety, or readiness in the unit is not compromised, commanding officers may authorize individuals to provide their own supplemental food rations at sea or in the field environment to accommodate the doctrinal or traditional observances of their religious faith.

7.  <u>Immunizations</u>.  Immunization requirements may be waived when requested by the member based on the doctrinal or traditional practices of the religious faith practiced by the service member.

a.  The religious objection of the service member must be balanced against the medical risk to the member and the military unit, and military requirements such as alert status, deployment potential, and availability of the member for reassignment to units requiring full medical readiness.  To provide for consistent application of these guidelines, immunization waivers will be decided by the Surgeon General of the Navy or headquarters level designee.  Individual requests shall be submitted to Chief, Bureau of Medicine and Surgery (MEDCOM-24), via the commanding officer and Chief of Naval Operations (CNO) (N1/NT) or Commandant of the Marine Corps (CMC) (DCS (M&RA)), as appropriate.

SECNAVINST 1730.7C
February 21, 2006

b.  Commanding officers may subsequently revoke waivers for service members at imminent risk of disease due to exposure or to conform to international health regulations incident to foreign travel or unit deployment.  The guidance in paragraph 11.b on irresolvable differences must be considered in such circumstances.

8.  Deoxyribonucleic Acid (DNA) Specimen Sampling

a.  Requests for waiver of the DNA specimen sample requirement will be decided by CNO (N1/NT) or CMC (DCS (M&RA)). Individual requests shall be submitted to CNO (N1/NT) or CMC (DCS (M&RA)), as appropriate, via the commanding officer.

b.  When determining whether to grant a request for waiver on religious grounds, the five factors contained in paragraph 11.a as supplemented by the following shall be considered:

(1) DNA analysis fulfills the military requirement of quickly and accurately identifying the remains of service members under reference (i).  DNA analysis is not conducted on the specimen unless necessary for identification of remains or for other narrowly defined purposes.  The specimen sample will be destroyed at the request of the member upon completion of service.

(2) Regarding the cumulative impact of repeated accommodations of a similar nature and previous treatment of similar requests, consider whether granting an accommodation sets a precedent that could adversely impact on other Department of Defense medical policies and programs, including mandatory pre-deployment processing, medical screening activities, HIV testing and medical surveillance program serum collection.

9.  Uniforms

a.  Religious items or articles not visible or otherwise apparent may be worn with the uniform, provided they do not interfere with the performance of the member's military duties or interfere with the proper wearing of any authorized article of the uniform.

b.  Visible items of religious apparel may be authorized for wear with the uniform, except when the item is not neat and conservative, its wearing will interfere with the performance of the member's military duties or is specifically prohibited in

SECNAVINST 1730.7C
February 21, 2006

subparagraphs 10d and 10e.  In the context of the wearing of a
military uniform, "neat and conservative" items or religious
apparel are those that:

(1) Are discreet, tidy, and not dissonant or showy in
style, size, design, brightness or color.

(2) Do not replace or interfere with the proper wearing
of any authorized article of the uniform.

(3) Are not temporarily or permanently affixed or
appended to any article of the uniform.

c.  The standards in subparagraph 10b, and the prohibitions
in subparagraphs 10d and 10e, are intended to serve as a basis
for determining a service member's entitlement to wear religious
apparel with the uniform.  For example, unless prohibited by
subparagraph 10d or 10e, religious headgear of a style and size
that can be completely covered by standard military headgear may
be worn with the uniform whenever a military cap, hat, or other
headgear is not prescribed.  It may also be worn underneath
military headgear as long as it does not interfere with the
proper wearing, functioning, or appearance of the prescribed
headgear.

d.  Whether an item of a religious apparel interferes with
the performance of the service member's military duties depends
on the characteristics of the item, the circumstances of its
intended wear, and the particular nature of the member's duties.
Factors in determining if an item of religious apparel
interferes with the military duties include, but are not limited
to, whether the item may;

(1) Impair the safe and effective operation of weapons,
military equipment, or machinery.

(2) Pose a health or safety hazard to the wearer or
others.

(3) Interfere with the wearing or proper functioning of
special or protective clothing or equipment (e.g., helmets, flak
jackets, flight suits, camouflage uniforms, gas masks, wet
suits, and crash and rescue equipment).

(4) Otherwise impair the accomplishment of the military
mission.

SECNAVINST 1730.7C
February 21, 2006

e.  Visible items of religious apparel shall not be worn
while wearing historical or ceremonial uniforms; participating
in review formations, parades, honor or color guards and similar
ceremonial details and functions.

f.  Jewelry bearing religious inscriptions or otherwise
indicating affiliation or belief may be worn subject to the same
uniform regulations prescribed for jewelry that is not of a
religious nature.

g.  Chaplains may wear any religious apparel required by
their religious organizations with the uniform while conducting
worship services and during the performance of rites and rituals
distinct to their faith groups.

h.  Service members may wear any required religious apparel
distinct to their faith group with the uniform while in
attendance at organized worship services.

i.  To ensure consistency of application, the CNO and CMC
may authorize visible items of religious apparel, within the
guidelines in this instruction.  This authority may be delegated
within their headquarters staffs.  Requests to authorize a type
of religious apparel not previously authorized shall be
submitted to service headquarters for approval under procedures
specified by CNO or CMC.  CNO and CMC will provide an
information copy of the approval or denial to the Assistant
Secretary of the Navy (Manpower and Reserve Affairs) (ASN
(M&RA)).

j.  Subject to the guidelines in subparagraph 4d, and the
limitations in subparagraphs 10b, 10d, 10e and 10i, commanding
officers may approve individual requests for wearing authorized
visible religious apparel with the uniform.  In any case in
which a commanding officer denies a request to wear an item of
religious apparel with the uniform, the member shall be advised
of the right to request a review of that refusal by CNO or CMC,
as appropriate, via the chain of command.  When such review is
requested, the review shall occur within 30 days following the
date of request for cases arising in the United States, and
within 60 days for all other cases.  Exceptions to these
deadlines shall be limited to unusual circumstances.  Visible
items of religious apparel may not be worn with the uniform
until approved.

10.  Responsibilities

a.  Commanders will respond to requests for accommodation in
a just and timely manner, supporting religious freedom and

SECNAVINST 1730.7C
February 21, 2006

respect for religious diversity within the Sea Services.

b. Commanders and commanding officers may approve requests for religious accommodation within the guidelines of this instruction. To promote standard procedures for resolving difficult questions involving accommodation of religious practices, commanding officers shall consider the following factors:

(1) The importance of military requirements, including individual readiness, unit readiness, unit cohesion, health, safety, morale, and discipline.

(2) The religious importance of the accommodation to the requester.

(3) The cumulative impact of repeated accommodations of a similar nature.

(4) Alternative means available to meet the required accommodation.

(5) Previous treatment of the same or similar requests, including treatment of similar requests made for other than religious reasons.

c. When requests are precluded by military necessity, commanders should seek reasonable alternatives.

d. When requests for accommodation are not in the best interests of the unit but continued tension between the unit's requirements and the individual's religious beliefs is apparent, administrative action is authorized, but not limited to:

(1) Reassignment, reclassification or separation consistent with Secretary of the Navy (SECNAV) and Service regulations.

(2) Nothing in this instruction precludes action under the Uniform Code of Military Justice in appropriate circumstances.

11. Information and Education

a. The CNO and CMC shall provide DON policy on accommodation of individual religious practices and military requirements in paragraphs 5 and 5a of this enclosure to

SECNAVINST 1730.7C
February 21, 2006

applications for commissioning, enlistment and reenlistment, and
shall require the member's signature acknowledging the DON
policy.

b.  The CNO and CMC shall incorporate relevant materials on
religious traditions, practices, policies, this instruction, and
reference (a), in curricula for command, judge advocate,
chaplain and similar courses of instruction and orientations.

12.  Action

a.  ASN (M&RA) is responsible for overall policy control and
program execution.

b.  The CNO and CMC shall implement the policies and
procedures in this enclosure.

c.  The CNO and CMC shall revise Service regulations
governing uniforms, food service, separate rations,
immunizations, and DNA sampling to conform to this instruction
within 90 days from the date of this instruction.  Provide
copies of each such regulation revision to ASN (M&RA).