# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| CHAPLAIN GORDON JAMES KLINGENSCHMITT, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Civil Action No. 06-01832 (HHK) |
| DONALD C. WINTER ) In his Official Capacity as Secretary, ) DEPARTMENT OF THE NAVY, ) ) | |
| Defendant. ) ) | |

## DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

PETER D. KEISLER
Assistant Attorney General

JEFFERY A. TAYLOR
United States Attorney

VINCENT M. GARVEY
Deputy Branch Director

Of Counsel:
Lieutenant Commander Thomas Leary
Lieutenant Katy Pasieta
Office of the Judge Advocate General
Department of the Navy
Washington Navy Yard, Bldg 33
1322 Patterson Ave., S.E., Suite 3000
Washington, D.C.  30274-5066

MICHAEL P. ABATE
Attorney, Civil Division
U.S. Department of Justice
P.O. Box 883
20 Massachusetts Ave., N.W., Room 7302
Washington, D.C. 20530
Telephone: (202) 616-8209

Attorneys for Defendants

# TABLE OF CONTENTS

Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.    Plaintiff Is Not Entitled To A Preliminary Injunction Ordering the Navy
Not To Separate Him From Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.    Plaintiff's Allegations That He Will Lose His Job And Suffer Damage
to His Reputation Are Insufficient to Constitute Irreparable Injury . . . . . . . . . . 7

    B.    Plaintiff Cannot Show A Likelihood Of Success On The Merits
Because His Separation Was Consistent With Navy Regulations and
Practice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        1.    Defendant Was Required to Institute Separation Proceedings
Against Plaintiff After he Voluntarily Resigned his Ecclesiastical
Endorsement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        2.    Plaintiff's New Ecclesiastical Endorsement Did Not Automatically
Entitle Him To Reinstatement as a Navy Chaplain . . . . . . . . . . . . . . . . 15

        3.    Plaintiff's Claim That He Was Punished For His Speech, in
Violation of the First Amendment, is Meritless . . . . . . . . . . . . . . . . . . . 19

        4.    Plaintiff's Other "Merits" Arguments are Not Properly Before The
Court and Are Meritless . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    C.    Preliminary Injunctive Relief Will Substantially Injure The Military
And the Public Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

II.   Plaintiff Is Not Entitled to An Injunction Against the Navy's Regulation
Concerning Religious Elements at Command Functions . . . . . . . . . . . . . . . . . . . . . 24

    A.    Plaintiff's Request For an Injunction Against SECNAVIST 1730.7C is
Moot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        1.    The Navy No Longer Requires that Religious Elements at
Command Functions be "Nonsectarian" . . . . . . . . . . . . . . . . . . . . . . . 25

2.      The Rescinding of SECNAVINST 1730.7C Moots Plaintiff's
        Request for Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

B.    Plaintiffs Lacks Standing to Seek An Injunction Against the Asserted First
      Amendment Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

C.    Even if the Regulation Were Still Operative, Plaintiff Would Not Have Been
      Entitled to a Preliminary Injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      1.    The Relief Plaintiff Sought was Not Temporary . . . . . . . . . . . . . . . . . . 28

      2.    Plaintiff Failed to Meet His Burden of Demonstrating a First
            Amendment Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      3.    SECNAVINST 1730.7C Did Not Violate The Establishment or
            Free Exercise Clauses of the First Amendment . . . . . . . . . . . . . . . . . . 29

      4.    Enjoining the Use of Nonsectarian Prayers at Command Functions
            Would Injure Other Service Members and the Public Interest  . . . . . . . 33

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

# TABLE OF AUTHORITIES

**CASES**                                                                        **PAGE(S)**

Al-Fayed v. C.I.A.,
    254 F.3d 300 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

Animal Legal Def. Fund, Inc. v. Espy,
    23 F.3d 496 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

Bank of Commerce of Laredo v. City Nat. Bank of Laredo,
    484 F.2d 284 (5th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

Boivin v. US Airways, Inc.,
    297 F. Supp. 2d 110 (D.D.C. 2003)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

Bonds v.  Heyman,
    950 F. Supp. 1202 (D.D.C 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8, 9, 10

Calhoun v. United States,
    22 Fed. Cl. 400 (Fed. Cl. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Chaplaincy of Full Gospel Churches v. England,
    454 F.3d 290 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12, 13

Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,
    467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

Chilcott v. Orr,
    747 F.2d 29 (1st Cir. 1984)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7, 9

Citizens to Preserve Overton Park, Inc. v. Volpe,
    401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

City of Los Angeles v. Lyons,
    461 U.S. 95 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

Crager v. United States,
    25 Cl. Ct. 400, 406 (Cl. Ct. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

Cutter v. Wilkinson,
    544 U.S. 709 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

Dorfmann v. Boozer,
    414 F.2d 1168 (D.C. Cir. 1969)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Experience Works, Inc. v. Chao,
    267 F. Supp. 2d 93 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.,
    28 F.3d 1268 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Farris v. Rice,
    ___ F. Supp. 2d ___, 2006 WL 2724066 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . 9

Fire Fighters Ass'n, District of Columbia v. Barry,
    742 F. Supp. 1182 (D.D.C. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Florida Power & Light Co. v. Lorion,
    470 U.S. 729 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Granite State Outdoor Advertising, Inc. v. City of Clearwater, Fla.,
    351 F.3d 1112 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Guerra v. Scruggs,
    942 F.2d 270 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 24

Guitard v. U.S. Secretary of Navy,
    967 F.2d 737 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9, 10, 11

Hartikka v. United States,
    754 F.2d 1516 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Huynh v. Carlucci,
    679 F.Supp. 61 (D.D.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Jung v. Association of American Medical Colleges,
    300 F.Supp.2d 119 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Justus v. Zimny,
    250 F.Supp. 719 (N.D. Cal. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Katcoff v. Marsh,
    755 F.2d 223 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33, 34

Lee v. Weissman,
    505 U.S. 577 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 31

May v.  Gray,
    708 F. Supp. 716 (E.D.N.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Mazurek v. Armstrong,
    520 U.S. 968 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 28

McCormick v. Claytor,
    441 F. Supp. 622 (D. Or. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

McCreary County, Ky. v. American Civil Liberties Union of Ky.,
    U.S.  125 S.Ct. 2722 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Morgan Stanley DW Inc. v. Rothe,
    150 F. Supp. 2d 67 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 29

Morgan v. Perry,
    142 F.3d 670 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Mullin v. Gettinger,
    450 F.3d 280 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

National Black Police Ass'n v. District of Columbia,
    108 F.3d 346 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

New v. Cohen,
    129 F.3d 639 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Parrish v. Brownlee,
    335 F. Supp. 2d 661 (E.D.N.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Sampson v. Murray,
    415 U.S. 16 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Saunders v. George Washington University,
    768 F.Supp. 843 (D.D.C. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Schlesinger v. Councilman,
        420 U.S. 738 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Sebra v. Neville,
        801 F.2d 1135 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 7, 24

Serono Labs., Inc. v. Shalala,
        158 F.3d 1313 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5, 6

Simmons v. Brown,
        497 F. Supp. 173 (D. Md. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

Stewart v. Potts,
        126 F. Supp. 2d 428 (S.D. Tex. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Sullivan v. Stroop,
        496 U.S. 478 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

Turner v. Department of Navy,
        325 F.3d 310 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

United States Dep't of the Treasury v. Galioto,
        477 U.S. 556 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

United States v. Garde,
        848 F.2d 1307 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

Univ. of Texas v. Camenisch,
        451 U.S. 390 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

Veitch v. Danzig,
        135 F. Supp. 2d 32 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7, 27

Village of Willowbrook v. Olech,
        528 U.S. 562 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

Wisconsin Gas Co. v. F.E.R.C.,
        758 F.2d 669 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

Zirkle v. District of Columbia,
        830 A.2d 1250 (D.C. Ct. App. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

## **STATUTES**

5 U.S.C. § 551(1) (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

5 U.S.C. § 702 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

5 U.S.C. § 706(a)(2) (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

10 U.S.C. § 643 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

10 U.S.C. § 860(b)(1) (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

10 U.S.C. § 864 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

10 U.S.C. § 869 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

10 U.S.C. §1552(a) (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

10 U.S.C. §6031 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 32

32 C.F.R. § 723.3(e)(4) (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**STATEMENT**

Plaintiff Gordon Klingenschmitt ("Plaintiff"), a chaplain in the United States Navy, sought a temporary restraining order ("TRO") and a preliminary injunction ("PI") barring the Navy from separating him from service. This Court denied Plaintiff's request for a TRO in an order dated November 1, 2006. Plaintiff's request for a preliminary injunction should similarly be denied.

Plaintiff's motion for a preliminary injunction, which takes a scattershot approach by alleging myriad violations of Plaintiff's constitutional rights, really seeks two separate preliminary injunctions. First, Plaintiff seeks to prevent the Navy from separating him from service. Second, Plaintiff seeks to prevent the Navy from enforcing a regulation concerning the inclusion of "religious elements" at official command functions open to all Navy servicembers. The first claim is a specific challenge to the facts of his separation; the second, in essence, a facial challenge to a Navy regulation. Both requests should be denied.

In attempting to collapse the two requests into a single claim, Plaintiff alleges that his pending separation is due to the Navy's allegedly unconstitutional restrictions on the way he prays and its decision to "establish" an official, Unitarian religion. This assertion misses the mark. Plaintiff's separation proceedings were the automatic consequence of his own actions, and were not voluntarily instituted by the Navy. Plaintiff resigned his ecclesiastical endorsement with the Evangelical Episcopalian Church in order to obtain a new ecclesiastical endorsement. Under Navy regulations – which have been consistently enforced – the loss of Plaintiff's endorsement automatically triggered separation proceedings. As part of those proceedings, Plaintiff was entitled to reapply for reinstatement with a new ecclesiastical endorsement. He was

-1-

not, however, automatically entitled to reinstatement; Defense Department regulations commit

that decision the discretion of the Secretary of the Navy.  In this case the Secretary, acting

through the Assistant Secretary of the Navy for Manpower and Reserve Affairs ("ASN M&RA"),

exercised that discretion not to reinstate Plaintiff because (1) Plaintiff was convicted in a special

court martial of disobeying a superior officers' order, (2) Plaintiff's most recent fitness reports

showed below average ratings for "military bearing," and (3) Plaintiff lacked the support of his

chain of command.  See Exh. 1.  Even if this process were improper – which it is not – Plaintiff

still would not be entitled to preliminary injunctive relief because his honorable discharge does

not rise to the heightened standard for irreparable injury required by Sampson v. Murray, 415

U.S. 16 (1974).  Additionally, Plaintiff's attempt to enjoin that honorable discharge poses a

substantial threat to the Navy's interest and to public policy.

　　　　Nor is plaintiff entitled to a preliminary injunction against the application of the Navy's

regulation concerning religious elements at command functions.  Indeed, that facial challenge is

moot because the Navy has rescinded the regulation that Plaintiff attacks.  See Exh. 5.

Moreover, because Plaintiff is being separated from military service, he lacks standing to seek

prospective, injunctive relief against such a regulation.  Even if the Navy were not discharging

Plaintiff, he would not have standing to challenge the Navy's alleged restrictions on the way he

prays because he cannot demonstrate, in light of the regulation's recision, that the Navy is likely

to apply the same policy to him in the future.  Finally, Plaintiff's underlying Free Exercise and

Establishment Clause claims are simply meritless.

　　　　In light of all these considerations, this court should deny Plaintiff's request for a

preliminary injunction.  Moreover, for these same reasons and others included in Defendant's

Opposition to Plaintiff's Motion for an Expedited Discovery Schedule, filed along with this brief,

this court should also deny Plaintiff's overbroad and untimely request for immediate discovery.

Defendant believes that, when viewed under the appropriate legal standard, there are no material

facts in dispute, and that this entire matter can be resolved through the dispositive motion that the

Secretary plans to file within the time alloted for responding to Plaintiff's Complaint ("Compl.").

## BACKGROUND

All military chaplains must maintain "an endorsement from a qualified Religious

Organization." See Exh. 2, Department of Defense Instruction ("DODI") 1304.28 ¶ 6.1. At the

time he entered the Navy Chaplain Corps in September 2002, Plaintiff possessed the

endorsement of the Evangelical Episcopalian Church. See Parker Decl. ¶ 4.[1] Plaintiff

voluntarily resigned that endorsement, however, on September 25, 2006. Id. ¶ 9. As it is

required to do by DODI 1304.28 ¶ 6.5, the Evangelical Episcopal Church notified the Chief of

Naval Personnel on or about September 27, 2006, that it was withdrawing Plaintiff's

ecclesiastical endorsement. Id.; Parker Decl. ¶ 4. Under Defense Department regulations, this

endorsement withdrawal automatically triggered separation proceedings. See DODI 1304.28 ¶

6.5 ("If a chaplain . . . has ecclesiastical endorsement to serve as a chaplain withdrawn, the

appropriate Religious Organization shall provide written notification to the Military Department

concerned. Processing for separation . . . shall be initiated immediately upon such notification."

(emphasis added)).

_____

[1] Captain Parker submitted two declarations in this matter. The first declaration, submitted at the Oct. 30, 2006 hearing on Plaintiff's request for a temporary restraining order, is cited as "Parker Decl." The second declaration, appended to this Brief as Exhibit 3, is cited as "Second Parker Decl."

The Navy initiated those proceedings on September 29, 2006 by sending Plaintiff a Letter of Notification informing him of his rights – including the right to request that the Navy approve a new ecclesiastical endorsement. Parker Decl. ¶ 9. The Navy informed Plaintiff that if he made such a request, "the Chief of Chaplains will convene a board . . . to make a recommendation whether [he] should be recertified." Parker Decl., Exh. C ¶ 5. The board would consider Plaintiff's "official service record" as well as the results of his Special Court-Martial.[2] The Navy further notified Plaintiff that such a recommendation would be forwarded to the Secretary of Navy, who would make the final determination on whether to approve Plaintiff's request for recognition of a new ecclesiastical endorsement. Id.

On October 14, 2006, Plaintiff availed himself of this option by reapplying for certification with an endorsement from the Chaplaincy of Full Gospel Churches. See Parker Decl ¶ 12; Compl. ¶ 19. The Chief of Navy Chaplains then convened a Chaplain Appointment and Recall Eligibility ("CARE") advisory group to evaluate Plaintiff's professional qualifications. That CARE board recommended that Plaintiff not be reinstated as a Naval chaplain. See Parker Decl. ¶ 16. The Chief of Navy Chaplains concurred, and recommended to the ASN M&RA that Plaintiff not be retained. Id. ¶ 17. The ASN M&RA decided not to approve Plaintiff's request for approval of a new ecclesiastical endorsement. In a letter presented to Plaintiff on November 17, 2006, the ASN M&RA advised Plaintiff that his request for reinstatement was denied due to (1) his most recent fitness report, which indicated below average ratings for "military bearing," (2) his conviction by Special Court Martial, and (3) the lack of

_____

[2] On September 14, 2006, a Special Court-Martial found that Plaintiff violated a lawful order not to make any media appearances in uniform without first obtaining permission when he wore his uniform, without permission, at a press conference in front of the White House.

support from Plaintiff's chain of command. Considering all those factors, the Secretary

determined that Plaintiff does "not possess the character, leadership, or professional traits needed

to successfully serve as a Naval Officer." See Exh. 1. Plaintiff was informed that, unless he

chooses a sooner date, he will be separated on January 31, 2007. Id.; see also Second Parker

Decl., Exh. 3 ¶ 5.[3]

## ARGUMENT

Preliminary injunctive relief is "an extraordinary measure, and . . . the power to issue

such exceptional relief 'should be sparingly exercised.'" Experience Works, Inc. v. Chao, 267 F.

Supp. 2d 93, 96 (D.D.C. 2003) (quoting Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C. Cir.

1969)) (internal quotes omitted); accord Boivin v. US Airways, Inc., 297 F. Supp. 2d 110, 116

(D.D.C. 2003) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that

should not be granted unless the movant, by a clear showing, carries the burden of persuasion.")

(quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam)) (emphasis in original) .

In considering a plaintiff's request for a preliminary injunction, a court weighs four factors: "(1)

whether the plaintiff has a substantial likelihood of success on the merits; (2) whether the

plaintiff would suffer irreparable injury were an injunction not granted; (3) whether an injunction

would substantially injure other interested parties; and (4) whether the grant of an injunction

would further the public interest." Al-Fayed v. C.I.A., 254 F.3d 300, 303 (D.C. Cir. 2001);

accord Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998).

---

[3] In his complaint, Plaintiff discusses numerous interactions with superior officers and on
the circumstances surrounding his court martial. Because those events took place before Plaintiff
resigned his ecclesiastical endorsement, thereby giving rise to the separation proceedings at issue
in this case, his allegations – even if true – are not material. Moreover, as explained infra,
plaintiff cannot use this civil action to collaterally attack his court martial conviction.

"These factors interrelate on a sliding scale and must be balanced against each other." Serono Labs, Inc., 158 F.3d at 1318. Thus, if a movant "makes a particularly weak showing on one factor . . . the other factors may not be enough to compensate." Morgan Stanley DW Inc. v. Rothe, 150 F. Supp. 2d 67, 73 (D.D.C. 2001) (quotation marks omitted). Conversely, where the interests of the nonmoving party are so substantial – as in this case, which implicates the Navy's autonomy over its personnel decisions – the movant must make a heightened showing of irreparable injury and likelihood of success on the merits. See, e.g., Hartikka v. United States, 754 F.2d 1516, 1518 (9th Cir. 1985) ("The necessity of making this stronger showing is implicit in the magnitude of the interests weighing against judicial interference in the internal affairs of the armed forces.") (citing Sampson v. Murray, 415 U.S. 16, 83- 84 (1974) and Orloff v. Willoughby, 345 U.S. 83, 93-94 (1953)); see also Sebra v. Neville, 801 F.2d 1135, 1139 (9th Cir. 1986) ("[T]he test for injunctive relief is much more stringent for a government military employee than the normal test for an injunction."); Crager v. United States, 25 Cl. Ct. 400, 406 (Cl. Ct. 1992) ("[W]hen reviewing the professional judgment of the military, trial courts are directed to, and should give deference to, the findings and conclusions of the armed services.") (citing Wronke v. Marsh, 787 F.2d 1569, 1576 (Fed. Cir. 1986)).

As noted above, Plaintiff's motion for a preliminary injunction really seeks to enjoin two separate things – a personnel decision, and a regulation concerning religious elements at command functions. Because those injunctions implicate different interests and are governed by differing legal standards, each request is addressed separately below.

I.    **PLAINTIFF IS NOT ENTITLED TO A PRELIMINARY INJUNCTION ORDERING THE NAVY NOT TO SEPARATE HIM FROM SERVICE**

<u>        </u>**A.    Plaintiff's Allegations That He Will Lose His Job and Suffer Damage to His Reputation Are Insufficient to Constitute Irreparable Injury**

"[T]he basis of injunctive relief in the federal courts has always been irreparable harm." <u>Sampson</u>, 415 U.S. at 88 (quotation marks omitted).  That element is even more important in cases where the Plaintiff seeks to enjoin a personnel decision of a government or military agency because "the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs."  <u>Sampson</u>, 415 U.S. at 83 (quotation marks omitted).  Courts are not to "routinely apply[] . . . the traditional standards governing more orthodox 'stays,'" but should demand, instead, "a showing of irreparable injury sufficient in kind and degree to override these factors cutting against the general availability of preliminary injunctions in Government personnel cases."  <u>Id.</u> at 83-84.  Put simply, a preliminary injunction against termination from Government service is appropriate only in a "genuinely extraordinary situation."  <u>Id.</u> at 92 n.68.

While <u>Sampson</u> involved a civilian government employee, an equally, if not more, heightened standard for alleging irreparable injury applies in the military context.  <u>See, e.g.</u>, <u>Guitard v. U.S. Secretary of Navy</u>, 967 F.2d 737, 742 (2d Cir. 1992); <u>Guerra v. Scruggs</u>, 942 F.2d 270, 274 (4th Cir. 1991); <u>Hartikka</u>, 754 F.2d at 1518; <u>Chilcott v. Orr</u>, 747 F.2d 29, 32 (1st Cir. 1984); <u>see also</u> <u>Sebra</u>, 801 F.2d at 1139 (applying <u>Sampson</u> to injunction sought by "employee who performs both civilian and military functions"); <u>Veitch v. Danzig</u>, 135 F. Supp. 2d 32, 37 (D.D.C. 2001).  Indeed, "the policy underlying the <u>Sampson v. Murray</u> rule is, if

anything, more compelling" in the military context.  <u>Simmons v. Brown</u>, 497 F. Supp. 173, 176 (D. Md. 1980).[4]

Plaintiff's allegations of harm do not meet <u>Sampson</u>'s heightened injury standard. Plaintiff alleges that he is facing two types of injury: injury to his career, and injury to his reputation.  He contends that his separation will result in loss of "his job, income, pension, and other benefits" and that he will be deprived of "the professional interaction that his career demands."  TRO Mot. at 18-19.  Plaintiff also alleges that separation will cause him to "lose his professional reputation, opportunity for advancement, professional standing and self-esteem" and will place him under a "cloud that he failed in his Naval duties."  <u>Id.</u> at 19.  These contentions suffer from three fatal flaws.

First, Plaintiff's alleged injuries do not constitute irreparable harm under <u>Sampson</u>. <u>Sampson</u> rejected nearly identical arguments, holding that even if the employee "had made a satisfactory showing of loss of income and had supported the claim that her reputation would be damaged as a result of the challenged agency action, we think the showing <u>falls far short</u> of the type of irreparable injury which is a necessary predicate to the issuance of a preliminary injunction in this type of case."  <u>Sampson</u>, 415 U.S. at 91-92 (emphasis added); <u>see also id.</u> at 92 n.68 ("[E]xternal factors common to most discharged employees . . . will not support a finding of

_____

[4] Plaintiff's contrary argument – that <u>Sampson</u> does not apply because that case involved a probationary employee whereas this case involves a "fifteen-year military man," <u>see</u> Plaintiff's Motion For a Temporary Restraining Order and/or Preliminary Injunction and for an Emergency Hearing (hereinafter "TRO Mot.") at 20 – is meritless.  That distinction is irrelevant, as this court recognized in the case on which Plaintiff bases his irreparable harm argument.  <u>See</u> <u>Bonds v. Heyman</u>, 950 F. Supp. 1202, 1211 (D.D.C 1997) ("<u>Sampson</u>'s unequivocal, general language, and its expression of policy concerns suggests that the Court was speaking of all federal employees, not simply probationary employees or those with limited safeguards.").

irreparable injury, however severely they may affect a particular individual."); <u>Farris v. Rice</u>, ___
F. Supp. 2d ___, 2006 WL 2724066 at *3 (D.D.C. 2006) ("[C]ases are legion holding that loss of
employment does not constitute irreparable injury.").

      "This reasoning applies with as much or greater force in the case of a military discharge."
<u>Guitard</u>, 967 F.2d at 742 (citing <u>Sampson</u>).  Thus, courts have not hesitated to reject claims of
irreparable injury from plaintiffs facing military discharge – especially those, like Plaintiff,
whose separation would be under honorable conditions.[5]  "[T]he prospect of a general discharge
under honorable conditions is not an injury of sufficient magnitude to warrant an injunction."
<u>Chilcott</u>, 747 F.2d at 34; <u>see also</u> <u>McCormick v. Claytor</u>, 441 F. Supp. 622, 624 (D. Or. 1977)
("[S]ome courts have held that where a serviceman is honorably discharged there is a lack of the
irreparable harm generally required for a preliminary injunction."); <u>Justus v. Zimny</u>, 250 F.Supp.
719, 720 (N.D. Cal. 1965) ("The same injury and stigma are not present when an honorable
discharge is involved.").

      Plaintiff maintains, of course, that his separation is no routine injury.  He attempts to
analogize his pending dismissal to the plight of the employee in <u>Bonds v. Heyman</u>, 950 F. Supp.
1202, 1214 (D.D.C. 1997), where this court found that the plaintiff's dismissal from public
employment would constitute an extraordinary irreparable injury sufficient to meet <u>Sampson</u>'s
demanding injury requirement.  Plaintiff's reliance on that case – which has been characterized
as "an exception, not a rule," <u>Farris</u>, 2006 WL 2724066 at *4, and "a truly extraordinary

---

    [5]  <u>See</u> Parker Decl. ¶ 20; SECNAVINST 1920.6C, Encl. 5 ¶ 1.a. (separation for loss of
ecclesiastical endorsement must be honorable), <u>available at</u> http://doni.daps.dla.mil/Directives
/01000%20Military%20Personnel%20Support/01-900%20Military%20Separation%20Services/1
920.6C.pdf (last visited November 20, 2006).

situation," Zirkle v. District of Columbia, 830 A.2d 1250, 1257 (D.C. Ct. App. 2003) – is misplaced. Bonds was an employee with no college education that had worked her way up from a typist position to a job as a program analyst over 40 years of service at the Smithsonian. The court found that if she were discharged, it "is unlikely she could ever find work approaching what she now does, if she could find work at all." Id. at 1215. Plaintiff, by contrast, has not alleged that he will be unable to find employment after his separation. Moreover, the Bonds court observed, that employee chose to stay in her job even though she could retire with over 80 percent of her salary and full health and life benefits. Id. "Rather than merely proffering or alleging injury to her livelihood" – which is all that Plaintiff here has done – "Bonds has demonstrated it by her very actions." Id.

Second, the other avenues of relief available to Plaintiff "weigh[] heavily against a claim of irreparable harm." Sampson, 415 U.S. at 90 (quoting Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n, 259 F.2d 921, 925 (D.C. Cir.1958)). If he is denied injunctive relief, Plaintiff may seek relief from three separate sources. First, Plaintiff may petition the Board for the Correction of Naval Records ("BCNR"), which is empowered to "correct any military record . . . when the Secretary considers it necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a) (2000). "When the Corrections Board determines that either an error or injustice has occurred, it may make a recommendation to the Secretary of the Navy," including recommending reinstatement. Guitard, 967 F.2d at 741. The BNCR's jurisdiction extends to claims of "constitutional, statutory and/or regulatory violations." Id.; 32 C.F.R. § 723.3(e)(4) (2005). Second, Plaintiff may seek redress from the Naval Discharge Review Board. While this Board "does not have the power to recommend reinstatement," it does retain "the power to grant some

-10-

pertinent relief," such as the power to "change a discharge or dismissal, or issue a new discharge, to reflect its findings." Guitard, 967 F.2d at 741. Finally, Plaintiff may seek relief from this court in the normal course of litigation. This court could, for example, invalidate his separation thereby resulting in his reinstatement in the Navy.

Third, Plaintiff utterly fails to demonstrate that these alleged injuries will actually occur. It is not enough for Plaintiff to claim that separation will harm his future career prospects and reputation; he bears the burden of actually establishing these asserted injuries. In Sampson, the Supreme Court went out of its way to note that it was "somewhat puzzled about" the district court's finding of irreparable harm, as the record in that case "indicates that no witnesses were heard on the issue of irreparable injury, that respondent's complaint was not verified, and that the affidavit she submitted . . . did not touch in any way upon considerations relevant to irreparable injury." Sampson, 415 U.S. at 88-89. As in Sampson, Plaintiff has utterly failed to substantiate his claims of injury. In this way, his case is easily distinguishable from the cases he relies upon, where the plaintiffs actually produced evidence demonstrating the injury that would occur absent a preliminary injunction. See, e.g., Saunders v. George Washington University, 768 F.Supp. 843, 845 (D.D.C. 1991) (Plaintiff's affidavits "provided unrebutted evidence" of irreparable harm); May v. Gray, 708 F. Supp. 716, 719 (E.D.N.C. 1988) (affidavits demonstrated irreparable harm); Huynh v. Carlucci, 679 F.Supp. 61, 63 (D.D.C. 1988) (affidavits established that harm already occurred).

Even if Plaintiff were correct that an honorable discharge were a sufficient injury, he would not be entitled to a preliminary injunction at this time. "[T]he party seeking injunctive relief must show that '[t]he injury complained of [is] of such imminence that there is a clear and

-11-

present need for equitable relief to prevent irreparable harm.'" Wisconsin Gas Co. v. F.E.R.C.,
758 F.2d 669, 674 (D.C. Cir. 1985) (internal quotation marks and citation omitted). Plaintiff can
not show that kind of imminence in this case, because his notice of separation states that he
cannot be separated from Navy service before January 31, 2007, unless he himself chooses an
earlier date to leave. See Exh. 1; Exh. 3 ¶ 5. Moreover, the Secretary plans to file, within its
time for responding to the complaint, a dispositive motion that could resolve the entire case
without the need for discovery.

Finally, Plaintiff's arguments concerning the D.C. Circuit's holding in Chaplaincy of Full
Gospel Churches v. England, 454 F.3d 290, 293 (D.C. Cir. 2006) (holding that allegations of
Establishment Clause violations are sufficient to meet the irreparable harm standard for a
preliminary injunction), are entirely inapposite to his request for a preliminary injunction against
his dismissal. Plaintiff's arguments concerning the Establishment Clause – that SECNAVINST
1730.7C unconstitutionally establishes a Unitarian religion – are entirely separate from the
arguments concerning his allegedly improper separation. Plaintiff has advanced no coherent
argument that the application of DODI 1304.28 (requiring separation proceedings upon loss of
endorsement) is itself a violation of the Establishment Clause. As such, CFGC's presumption of
irreparable harm cannot be applied to his pending separation. If CFGC were applied, as Plaintiff
wishes, it would utterly eviscerate the rule laid down in Sampson v. Murray – and studiously
observed ever since – that a movant must establish that he will he suffer an extraordinary injury
before a court will intrude into the personnel decisions of a government or military employer. In
Plaintiff's view, all a movant must do is allege an Establishment Clause violation somewhere in

the complaint, even if he cannot make a credible showing that the employment decision was taken because of that alleged violation, to escape Sampson. CFGC cannot be read so broadly.

Moreover, even CFGC makes clear that an allegation of an Establishment Clause violation does not eliminate the need to satisfy all prongs of the preliminary injunction standard. "The mere allegation that the government is violating the Establishment Clause may suffice to satisfy the irreparable harm prong, but a preliminary injunction will not issue unless the moving party also shows, on the same facts, a substantial likelihood of success on the merits, that the injunction would not substantially injure other interested parties, and that the public interest would be furthered by the injunction." CFGC, 454 F.3d at 304 (emphasis added). Because Plaintiff cannot meet any of those three other requirements for a preliminary injunction, his request should be denied even if CFGC were applicable to his request to enjoin his separation.

**B.    PLAINTIFF CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS BECAUSE HIS SEPARATION WAS CONSISTENT WITH NAVY REGULATIONS AND PRACTICE**

Even if Plaintiff's alleged injuries are "irreparable," he is not entitled to injunctive relief because he has not shown a likelihood of success on the merits. Plaintiff's separation is not, as he contends, retaliation for his religious beliefs or his desire to pray "in Jesus's name." Rather, it is the culmination of the normal course of events that the Navy is required to undertake when a chaplain voluntarily resigns his ecclesiastical endorsement before obtaining a different one. That process includes two distinct components. Immediately upon learning that the endorsement is withdrawn, the Navy is required to begin separation proceedings against the chaplain and notify him of his options, including the right to seek a new ecclesiastical endorsement. Then, if the chaplain does seek approval of a new ecclesiastical endorsement, the Secretary of the Navy will

exercise his discretion in deciding whether to recertify the chaplain.  Both steps were properly

performed in this case.

<p style="text-align:center"><strong>1.    Defendant Was Required to Institute Separation Proceedings Against Plaintiff After He Voluntarily Resigned his Ecclesiastical Endorsement</strong></p>

Department of Defense Instruction 1304.28 states that the Navy must begin separation

proceedings against a chaplain that loses his ecclesiastical endorsement.  "If a chaplain . . . has

ecclesiastical endorsement to serve as a chaplain withdrawn, the appropriate Religious

Organization shall provide written notification to the Military Department concerned.  Processing

for separation . . . <u>shall be initiated immediately</u> upon such notification."  <u>See</u> DODI 1304.28 ¶

6.5.  The Navy must then inform the chaplain of several options then available to him: he may

"seek another ecclesiastical endorsement," apply for "non-chaplain duties" or "voluntary

retirement," or resign.  <u>Id.</u> ¶ 6.5.1.3.  None of these requests are automatically granted, however.

The Secretary of the relevant military department – in this case, the Navy – "<u>may</u> . . . [a]pprove a

request for a new ecclesiastical endorsement for a serving chaplain."  <u>Id.</u> ¶ 6.5.3.1 (emphasis

added).  In the event that the request is disapproved – a possibility specifically contemplated by

the regulation – the chaplain will be discharged.  <u>Id.</u> ¶ 6.5.2.

The Navy precisely followed these regulations in regards to Chaplain Klingenschmitt.  On

or about September 27, 2006, the Navy received notice that the Evangelical Episcopalian Church

withdrew Plaintiff's ecclesiastical endorsement and immediately instituted separation

proceedings against him.  Parker Decl. ¶¶ 4-5.  The Navy sent Plaintiff a letter on September 29,

2006, indicating that it had instituted separation proceedings against him due to his loss of

ecclesiastical endorsement.  <u>Id.</u> ¶ 9.  As required, the Navy notified Plaintiff of the options made

<p style="text-align:center">-14-</p>

available by DODI 1304.28 ¶ 6.5.1.3, including the right to seek another ecclesiastical

endorsement.  See Parker Decl., Exh. C ¶ 4.  Consistent with DODI 1304.28, the Navy advised

Plaintiff that reinstatement as a Navy chaplain would not be automatic.  Id. ¶ 5.  The Chief of

Navy Chaplains would convene a CARE board to evaluate Plaintiff's professional qualifications

and fitness in light of his new endorsement and make a recommendation to the Secretary of the

Navy.  Id.  That same day, the Navy received notice of a new endorsement from the Chaplaincy

of Full Gospel Churches.  Id. ¶ 11.

These separation proceedings instituted against Plaintiff automatically ensued after he

voluntarily resigned his ecclesiastical endorsement.  The Secretary had no discretion not to

institute the proceedings under the regulations.  See DODI 1304.28 ¶ 6.5 ("Processing for

separation . . . shall be initiated immediately").  Plaintiff's contrary claims that the Navy began

these proceedings in retaliation for his speech or religious views are thus unfounded and

meritless.  See Compl. ¶ 100-02 (claiming that the Navy is using SECNAVINST 1730.7C – the

regulation governing religious elements at command functions – as the basis for instituting

proceedings against Plaintiff).

## 2. Plaintiff's New Ecclesiastical Endorsement Did Not Automatically Entitle Him to Reinstatement as a Navy Chaplain

Plaintiff incorrectly asserts that a new ecclesiastical endorsement automatically entitled

him to reinstatement as a chaplain.  See TRO Mot. at 9-10.  DODI 1304.28 puts the decision of

whether to reinstate Plaintiff entirely within the discretion of the Secretary.  See DODI 1304.28 ¶

6.5.3.1.  Plaintiff's contrary argument rests on the corresponding Navy regulation concerning the

appointment and dismissal of chaplains.  That regulation states that it is the Chief of Chaplains'

-15-

duty to "recertify a Chaplain's professional qualifications upon receipt of a new ecclesiastical endorsement."  See Parker Decl., Exh. A, OPNAVINST 1120.9 ¶ 5(b)(3)(a).  Plaintiff maintains that this provision requires the Chief of Chaplains to reinstate any chaplain that obtains a new endorsement.  In so arguing, Plaintiff assumes that the word "recertify" prescribes a specific outcome.  That assumption is unsupportable.

The word "receritfy" is best read as requiring the Chief of Chaplains to undertake the process of reevaluating a chaplain's professional credentials.  That is the only interpretation that accords with DODI 1304.28, on which OPNAVINST 1120.9 is modeled.  See OPNAVINST 1120.9 ¶ 1 (noting that the Navy regulation was based on DODI 1304.28).  If Plaintiff is correct that he was entitled to reinstatement immediately upon receipt of his new endorsement, then instruction 1120.9 would render inoperative the provision in DODI 1304.28 giving the Secretary the ultimate discretion as to whether to approve Plaintiff's new ecclesiastical endorsement.

Moreover, instruction 1120.9 itself precludes Plaintiff's argument that he was automatically entitled to reinstatement.  In addition to directing the Chief of Chaplains to "recertify" the professional qualifications of a chaplain that obtains a new ecclesiastical endorsement, instruction 1120.9 also directs the Chief to "[r]ecommend to [Chief of Navy Personnel] a chaplain's continuance, based on needs of the Navy."  OPNAVINST 1120.9 ¶ 5(b)(3)(b).  Plaintiff's interpretation of the word "recertify" would render this additional duty of the Chief completely meaningless – he would have no reason to consider the "needs of the Navy" because he would be required to order reinstatement.

Plaintiff's interpretation of instruction 1120.9 would also violate the canon that "identical words used in different parts of the same act are intended to have the same meaning."  Sullivan v.

-16-

Stroop, 496 U.S. 478, 484 (1990) (quotation marks omitted).  Paragraph 5(b)(2) of the same

regulation – which immediately precedes the language Plaintiff relies upon – states that the Chief

of Chaplains must "[c]ertify professional qualifications and calculate entry grade credit based on

these qualifications" for new applicants to the Chaplain Corps.  In that instance, the word

"certify" undeniably refers to a process of certification rather than a right to be "certified"; the

Chief of Chaplains must first convene a CARE board and hear its recommendation before

making his recommendation to the secretary.  See Parker Decl, Exh. B, COCINST 1110.1G.

Thus, if plaintiff were correct, the word "recertify" would require a the Chief to reach a specific

outcome, whereas the word "certify" would require the Chief to undertake a set process.[6]  There

is no basis for giving the same word two different meanings in instruction 1120.9, especially

where the Defense Department regulation on which the Navy instruction is based makes clear

that reinstatement is only at the discretion of the Secretary.

 Plaintiff is also incorrect in his assertion that the Navy's use of a CARE board to

evaluate his professional credentials was "wholly unprecedented."  TRO Mot. at 10.  On at least

forty five prior occasions dating back to 1983, the Navy has convened a CARE board to examine

the professional qualifications of a chaplain that obtained a new endorsement.  See Exh. 4

("Berto Decl.") ¶ 3.  Despite the fact that the use of a CARE board accords with consistent Navy

practice, Plaintiff maintains that the convening of the board was improper because the regulation

_____

 [6] This illustrates that, at the very least, the word "recertify" is ambiguous.  Because that
word is part of a regulation promulgated by the Secretary pursuant to a specific Congressional
grant of rule making authority, see 10 U.S.C. § 643 (granting Secretary authority to enact
regulations concerning the discharge of an officer who "fails to maintain the qualifications
needed to perform his professional function"), his interpretation is "given controlling weight
unless [it is] arbitrary, capricious, or manifestly contrary to the statute."  Chevron U.S.A., Inc. v.
Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984).

that requires its use for new chaplains says nothing about chaplains who previously served in the

Navy. See TRO Mot. at 7. The regulation is indeed silent on this point. But that does not render

its use in such situations improper. If anything, the use of the CARE board only affords Plaintiff

more process than he would otherwise be entitled to receive.

The Navy precisely followed these normal procedures when considering Plaintiff's

application for approval of his new ecclesiastical endorsement. As indicated, the Chief of

Chaplains convened a CARE board to evaluate Plaintiff's professional qualifications. After that

CARE board recommended denial of Plaintiff's application for reinstatement, the Chief of

Chaplains concurred and forwarded that recommendation to the ASN M&RA. Parker Decl. ¶

15-17.[7] The ASN M&RA, in an exercise of his discretion, denied Plaintiff's request for

recertification. He concluded that Plaintiff's "recent professional performance has been

unsatisfactory." See Exh. 1. This conclusion was based on the fact that Plaintiff's "most recent

fitness report, for the period 23 July 2005 to 31 January 2006, graded [him] below average in the

area of 'military bearing/character,' and the narrative noted that 'he fails to meet standards of

military bearing.'" Id. Moreover, the ASN M&RA observed that Plaintiff was "convicted at a

Special Court Martial on 14 September 2006 for violating a lawful order [of] a superior

commissioned officer." Id. Thus, the ASN M&RA concluded Plaintiff "[did] not possess the

character, leadership, or professional traits needed to successfully serve as a Naval Officer." Id.

[7] The Secretary of the Navy delegated to the ASN M&RA the authority to make a final
decision regarding recertification. Parker Decl. ¶ 18(b).

As he had no automatic right to be reinstated, and as the Secretary's decision is supported by objectively verifiable evidence, Plaintiff cannot show a likelihood of success on his claim that the Navy wrongfully attempted to separate him due to his religious beliefs or speech.

>       **3.    Plaintiff's Claim That He Was Punished for His Speech, in Violation of the First Amendment, Is Meritless**

Plaintiff attempts to cast this case as one about speech by a public employee. See TRO Mot. at 12-13. That is simply not true. As detailed above, Plaintiff's separation proceedings resulted from his decision to voluntarily resign his ecclesiastical endorsement and pursue another one. The employee speech cases that Plaintiff cites – where it is clear that the employee was punished because of his speech see, e.g., Fire Fighters Ass'n, District of Columbia v. Barry, 742 F. Supp. 1182, 1189 n.14 (D.D.C. 1990) ("The first amendment is implicated whenever a government employee is disciplined for his speech.") (emphasis added and quotation marks omitted) – are therefore inapposite.

What Plaintiff argues, in essence, is that the Secretary did not really separate him for the reasons stated in the Secretary's letter. But this unsupported allegation of pretext is insufficient to warrant a preliminary injunction. Plaintiff bears the burden of proving a likelihood of success on his First Amendment pretext claim, which means that he must produce "evidence that the defendants' stated reasons for an employment action were factually baseless, were not the actual motivation for the adverse employment action, or were insufficient to motivate the adverse employment action." Mullin v. Gettinger, 450 F.3d 280, 286 (7th Cir. 2006). Plaintiff simply cannot meet that burden. There is no doubt that Plaintiff was convicted at a court martial,

-19-

received a below average fitness report, and lacked the support of his chain of command.[8]  Nor

can Plaintiff demonstrate that these factors were insufficient to support the Secretary's decision

not to reinstate him – a decision entirely committed to his discretion.

Plaintiff's only hope, then, is to argue that these reasons were not the Secretary's actual

motivation.  This argument cannot succeed, however.  This court does not review the Secretary's

decision de novo, but, instead, under the standard set forth by the Administrative Procedures Act,

which asks whether the agency's decision was "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(a); see also Turner v. Department of

---

[8] To the extent that Plaintiff seeks to use this proceeding to collaterally attack his court martial conviction – as he seems to want to do with the allegations in his complaint concerning the events that occurred at the White House on March 30, 2006, see Compl. ¶¶ 70-72, 81-83, 85-90, 92-96 – that effort must fail.  A military member convicted at a court-martial must first exhaust all avenues of appeal open to him before he can initiate a civil action seeking to overturn the result of that proceeding.  See, e.g., Schlesinger v. Councilman, 420 U.S. 738, 758 (1975); New v. Cohen, 129 F.3d 639, 643 (D.C. Cir. 1997) ("In connection with court-martial proceedings, the exhaustion requirement is particularly important, because, given the reality that the military must 'prepare for and perform its vital role' of fighting wars, it 'must insist upon a respect for duty and a discipline without counterpart in civilian life.'") (quoting Councilman).
Plaintiff still may challenge his conviction in several ways.  Once he receives the authenticated record of trial, he may ask the convening authority to review the proceedings.  See 10 U.S.C. § 860(b)(1) (2000).  After the convening authority has reviewed the conviction, it will automatically be reviewed by a judge advocate, who may send the case back to the convening authority for corrective action.  See id. § 864.  Finally, if Plaintiff does not obtain relief in the mandatory § 864 review, he may appeal his conviction to the Judge Advocate General, who may set aside the conviction or send the case to the Navy-Marine Corps Court of Criminal Appeals (NMCCA).  See id. § 869.  As it is too soon for Plaintiff to have exhausted any of these options, he may not attempt to collaterally attack the fact of conviction in this civil action.
Moreover, even if Plaintiff had exhausted his appeals on his special court martial, this attempt to collaterally attack that conviction must be brought separately from an APA claim questioning the basis of the Secretary's decision.  Decisions of "courts martial and military commissions" may not be reviewed in APA actions.  See 5 U.S.C. § 551(1)(F) (2000).  Plaintiff cannot smuggle his request to set aside the court martial conviction into an APA challenge to the Secretary's decision.  See infra (explaining why challenge to Secretary's stated reasons for dismissing Plaintiff should have been brought under the APA).

Navy, 325 F.3d 310, 313-14 (D.C. Cir. 2003) ("We review the decisions of the Secretary under the arbitrary and capricious standard of the APA." (citing 5 U.S.C. § 706)) (analyzing claim that Secretary of Navy wrongfully rejected recommendation of the Administrative Discharge Board); Morgan v. Perry, 142 F.3d 670, 687 n.33 (3d Cir. 1998) ("[E]ach branch of the military is an agency within the meaning of the Administrative Procedures Act.").

Identifying the appropriate cause of action for reviewing the Secretary's decision – the APA – illustrates the fatal flaw in Plaintiff's "pretext" argument. Court review of an agency's decision under the arbitrary and capricious standard must generally be conducted "on the basis of the agency record compiled in the course of informal agency action in which a hearing has not occurred. The factfinding capacity of the district court is thus typically unnecessary to judicial review of agency decisionmaking." Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985) (citations omitted). Thus, in order to prove a likelihood of success on the merits of his "pretext" claim, Plaintiff would have to show that the evidence of pretext is obvious from the record in front of the Secretary.

This Plaintiff cannot do, which is, of course, why he proposes to undertake an expedited fishing expedition – to depose up to 30 witnesses and to propound 45 interrogatories – in the hope that he might adduce enough evidence to survive a motion to dismiss. But under the APA, he is not entitled to do that. In APA actions, "[w]hen findings of fact, rendered contemporaneously with the concomitant administrative decision, are subsequently available, a reviewing court may not require the agency officials who participated in that decision to give testimony explaining their action unless there has been a strong showing of bad faith or improper behavior." Bank of Commerce of Laredo v. City Nat. Bank of Laredo, 484 F.2d 284, 288 (5th

-21-

Cir. 1973) (citing <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 420 (1971));

<u>see also</u> <u>Stewart v. Potts</u>, 126 F. Supp. 2d 428, 434 (S.D. Tex. 2000) (emphasis added).  Because

Plaintiff's allegations of retaliation and pretext are contradicted by the fact that DOD regulations

<u>required</u> the Navy to institute separation proceedings against Plaintiff, he has not made a "strong

showing" and is not entitled to extra-record discovery on the Secretary's decision making

process.[9]

### 4.    Plaintiff's Other "Merits" Arguments are Not Properly Before the Court and Are Meritless

Plaintiff also contends that he is likely to succeed on the merits of his claim of wrongful

separation because the Navy violated Plaintiff's (1) procedural due process, (2) substantive due

process, and (3) equal protection rights.  Those contentions cannot form the basis of relief

because Plaintiff never asserted them in his complaint.  <u>Cf.</u> <u>Jung v. Association of American</u>

<u>Medical Colleges</u>, 300 F. Supp. 2d 119, 163 (D.D.C. 2004) ("It is 'axiomatic that the complaint

may not be amended by the briefs in opposition to a motion to dismiss.'") (quoting <u>Car Carriers,</u>

<u>Inc. v. Ford Motor Co.</u>, 745 F.2d 1101, 1107 (7th Cir.1984)).[10]

---

[9] Plaintiff's failure to bring this case under the APA has ramifications beyond the standard of review.  Merely alleging a violation of the First Amendment does not entitle Plaintiff to seek injunctive relief; he must also allege a specific cause of action that validly abrogates the United States' sovereign immunity.  <u>See</u> <u>Calhoun v. United States</u>, 32 Fed. Cl. 400, 405 (Fed. Cl. 1994) ("[C]ontrary to plaintiff's contentions, the First Amendment to the Constitution is not a general waiver of sovereign immunity for citizens to petition the government in any regard in the federal courts of the United States.").  The necessary waiver of sovereign immunity for Plaintiff's preliminary injunction request exists under the APA.  <u>See</u> 5 U.S.C. § 702 (2000).

[10] Plaintiff also alleges that he is likely to succeed on the merits of a "liberty interest" claim. <u>See</u> TRO Mot. at 11.  That claim, too, is absent from the complaint and thus is not before the court.  But the more fundamental problem with this claim is that it is not a merits claim at all.  The arguments contained in that section pertain to the irreparable harm Plaintiff alleges he will suffer.  As noted <u>supra</u>, arguments concerning "stigma" are factually inapplicable to an honorable

-22-

These allegations, in addition to being absent from the complaint, are without merit.  As explained above, the procedures used by the Navy in considering Plaintiff's request for reinstatement afforded him more process than the regulations require.  Thus, Plaintiff cannot succeed on his procedural due process claim.  Plaintiff's substantive due process claim must also fail, because it merely repeats the allegations made under the procedural due process heading.  Finally, Plaintiff's "equal protection class of one" claim must fail, because he has not demonstrated that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).  Nor could he make such a showing.  As noted above, the Navy employed the same procedures to fifteen prior chaplains that obtained new ecclesiastical endorsements, and in the present case the Secretary gave cogent reasons for failing to reinstate Plaintiff as a chaplain.

## C.   PRELIMINARY INJUNCTIVE RELIEF WILL SUBSTANTIALLY INJURE THE MILITARY AND THE PUBLIC INTEREST

Enjoining Plaintiff's dismissal would significantly intrude upon the Secretary's exercise of discretion in a matter committed to his decision making authority.  Courts have consistently recognized that military personnel decisions implicate interests of unusual importance.  "'[T]he public has an interest, particularly in light of current events, in seeing that the Army's discretionary decision making with respect to personnel decisions is effectuated with minimal judicial interference.'"  Parrish v. Brownlee,  335 F. Supp. 2d 661, 675 (E.D.N.C. 2004) (quoting Irby v. United States, 245 F. Supp. 2d 792, 798 (E.D.Va. 2003)).  The recognition of the harm

---

military discharge and are insufficient, in any event, to constitute irreparable harm under the stringent Sampson test.

that necessarily results from interference in military personnel decisions is exactly why courts have applied the heightened <u>Sampson</u> standard in such situations.  <u>See, e.g.</u>, <u>Guerra</u>, 942 F.2d at 275 ("[S]econd-guessing the military . . . 'would be a disruptive force as to affairs peculiarly within the jurisdiction of the military authorities.'" (citation omitted)); <u>Sebra</u>, 801 F.2d at 1139 (alleged injury must be "weighed against the hardship to the military of judicial scrutiny of every military personnel decision" (citation omitted)).

## II.    PLAINTIFF IS NOT ENTITLED TO A PRELIMINARY INJUNCTION AGAINST THE NAVY'S REGULATION CONCERNING RELIGIOUS ELEMENTS AT COMMAND FUNCTIONS

Plaintiff's second and third requests for a preliminary injunction are of a piece.  Plaintiff asks this Court to enjoin the Navy from "instructing Chaplain Klingenchmitt how to pray in a way that is offensive to his religion" and "creating one non sectarian, Unitarian, Pluralistic religion and discouraging public expression of diverse faiths and religions in violation of the Establishment clause."  TRO Mot. at 1.  These prayers for relief constitute, essentially, a facial attack on the regulation governing religious elements at official command functions, Secretary of Navy Instruction ("SECNAVINST") 1730.7C, cited repeatedly in Plaintiff's complaint.  <u>See</u> Compl. ¶ 67-68, 85, 88, 93-94, 97, 99-102.

This claim can form no basis for a preliminary injunction.  On November 21, 2006, the Navy rescinded SECNAVINST 1730.7C.  <u>See</u> Exh. 6.  In light of that recision, Plaintiff can no longer claim to be threatened with the injuries he alleges.  Indeed, the decision to rescind the regulation, along with Plaintiff's pending separation, denies Plaintiff standing to challenge the regulation and moots his underlying claim.  But even if Plaintiff had standing to challenge the

regulation, and that challenge was not moot, Plaintiff would not have been entitled to a preliminary injunction.

    **A.    PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION AGAINST SECNAVINST 1730.7C IS MOOT**

        **1.    The Navy No Longer Requires that Religious Elements at Command Functions Be "Nonsectarian"**

On November 20, 2006, pursuant to the recommendation made by the Conference Committee of the House in Senate in passing the 2007 Defense Appropriations Act, the Navy rescinded SECNAVINST 1730.7C.  See Exh. 5 (order rescinding); Exh. 6 (rescinded regulation).[11]  In its place, the Navy reinstated two regulations that existed prior to the passage of 1730.7C.  The Navy reinstated (1) SECNAVINST 1730.7B, see Exh. 7 (setting forth rules for religious ministry support within the Navy), originally issued October 12, 2000, and (2) SECNAVINST 1730.8A, see Exh. 8 (setting forth Navy's position on religious accommodation), originally issued December 31, 1997.

The effect of this change, in short, is that the Navy no longer has a unified policy for including religious elements at command functions.  The language in the now-rescinded 1730.7C that Plaintiff complained of – ¶ 6.c., which stated that religious elements at command functions should be "nonsectarian" – no longer exists.  Each individual commander now controls whether a religious element is appropriate in his or her command functions, and how that element should be carried out.

---

[11] The Navy's decision to rescind the regulation relieves this court of the burden of evaluating Plaintiff's completely unsupported assertion that the language of a Conference Committee report, combined with the President's signature on the bill that Committee reported, actually operates to repeal an existing regulation – despite the fact that the bill in question was silent on the issue.  See Compl. ¶ 97-100.

2.    **The Rescinding of SECNAVINST 1730.7C Moots Plaintiff's Request for Injunctive Relief**

The Navy's decision to rescind SECNAVINST 1730.7C moots Plaintiff's request for a preliminary injunction against that regulation.  See, e.g., United States Dep't of the Treasury v. Galioto, 477 U.S. 556, 559-60 (1986) (repeal of challenged regulation rendered case moot). Because Plaintiff is only seeking declaratory and injunctive relief – not damages – the withdrawal of the regulation moots both his Free Exercise and Establishment clause claims against that regulation.  C.f. Granite State Outdoor Advertising, Inc. v. City of Clearwater, Fla., 351 F.3d 1112, 1119 (11th Cir. 2003) ("Because Granite State has requested damages, however, the changes made to the ordinance do not make this case moot.").  There is no additional prospective relief this court could award, even if it agreed with Plaintiff's assertion that the regulation violated those constitutional provisions.  See, e.g., United States v. Garde, 848 F.2d 1307, 1309 (D.C. Cir. 1988) ("Insofar as there is no relief that could be granted by this court, the appeal must be dismissed as moot.").

The Navy's decision to cancel the regulation does not fall into the "voluntary cessation" exception to the mootness doctrine.  "That exception applies if (1) there is a reasonable expectation that the challenged action will recur, and (2) the action's effects are not completely and irrevocably eradicated by the interim events."  Garde, 848 F.2d at 1309 n.5 (citing County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)).  "[T]he mere power to reenact a challenged law is not a sufficient basis on which a court can conclude that a reasonable expectation of recurrence exists.  Rather, there must be evidence indicating that the challenged law likely will be reenacted."  National Black Police Ass'n v. District of Columbia, 108 F.3d 346, 349 (D.C.

-26-

Cir. 1997). Here, Plaintiff has adduced no evidence that the regulation will likely be reenacted.

Because Plaintiff's allegations concerning OPNAVINST 1120.9 are now moot, his claim for injunctive relief against applying that regulation to him must be dismissed.

**B.    Plaintiff Lacks Standing to Seek a Preliminary Injunction Against The Asserted First Amendment Violations**

Irrespective of the fact that the Navy rescinded the challenged regulation, Plaintiff lacks standing to seek a prospective injunction challenging its application to him. Because he is being separated from the Navy on January 31, 2007, Plaintiff cannot allege a credible fear that any purportedly illegal policy will ever again be applied to him. Thus, he cannot show the type of "injury in fact" necessary to confer Article III standing. See, e.g., City of Los Angeles v. Lyons, 461 U.S. 95, 102-03 (1983) ("The plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." (quotation marks omitted)); Veitch, 135 F. Supp. 2d at 37-38 (discharged chaplain could not show injury because "[n]ow out of uniform, plaintiff can preach as he chooses, unconstrained by military discipline or protocol").

Even if Plaintiff were not being separated, the repeal of SECNAVINST 1730.7C would deny him standing to challenge the Navy's policy concerning nonsectarian religious elements at command functions. Absent the now-rescinded regulation, the Navy has no uniform policy regarding the inclusion of religious elements at command functions. To show a sufficiently concrete injury, Plaintiff must now demonstrate that his commander actually adopted a policy that operated in the same way as the now-rescinded SECNAVINST 1730.7C. Without such a

-27-

showing, his claims of injury would be too speculative to support Article III standing.  See, e.g.,

Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp., 28 F.3d 1268,

1274 (D.C. Cir. 1994) ("Indeed, besides its oblique statement that BMC's treatment of the testers

reflects 'a pattern, practice and policy of employment discrimination on the basis of race', the

complaint does not even address the likelihood that BMC may discriminate against the individual

plaintiffs in the future. . . .  The tester plaintiffs therefore lack standing to seek prospective

relief."); Animal Legal Def. Fund, Inc. v. Espy, 23 F.3d 496, 500 (D.C. Cir. 1994) (alleged harm

that might occur "at some undefined future time" is not sufficient to confer Article III standing).

     **C.**    **Even if the Regulation Were Still Operative, Plaintiff Would Not Have Been Entitled to a Preliminary Injunction**

         **1.**    **The Relief Plaintiff Sought was Not Temporary**

"The purpose of a preliminary injunction is merely to preserve the relative positions of

the parties until a trial on the merits can be held."  Univ. of Texas v. Camenisch, 451 U.S. 390,

395 (1981).  But that is not what Plaintiff attempted to do.  His used his motion for preliminary

injunctive relief to ask this court to evaluate his Free Exercise and Establishment Clause claims

against SECNAVINST 1730.7C on an expedited basis.  "[I]t is generally inappropriate for a

federal court at the preliminary injunction stage to give a final judgment on the merits."  Id.

         **2.**    **Plaintiff Failed to Meet His Burden of Demonstrating a First Amendment Violation**

A preliminary injunction "should not be granted unless the movant, by a clear showing,

carries the burden of persuasion."  Mazurek, 520 U.S. at 972 (citation omitted).  That burden of

persuasion cannot be carried without a showing that Plaintiff is likely to succeed on the merits.

"Indeed, absent a substantial indication of likely success on the merits, there would be no

-28-

justification for the court's intrusion into the ordinary processes of administration and judicial review." Morgan Stanley, 150 F. Supp. 2d at 73 (internal quotation marks omitted).  Plaintiff has not even attempted to articulate exactly how SECNAVINST 1730.7C or the policy it embodied violated the First Amendment.  Indeed, his motion for a preliminary injunction never even cites to that regulation or any case that explains how he is likely to succeed on the merits of his religion clause challenges.[12]  This fact alone would have provided sufficient reason to deny Plaintiff's requested injunctive relief against the now-repealed regulation.

### 3.    SECNAVINST 1730.7C Did Not Violate The Establishment or Free Exercise Clauses of the First Amendment

Even if Plaintiff had attempted to articulate a cognizable argument, he could not have shown a likelihood of success on the merits.  SECNAVINST 1730.7C did not – as Plaintiff summarily alleges – deny him "the right to practice his religion" or otherwise create a new faith. See TRO Mot. at 18.  The regulation simply allowed commanders to "determine whether a religious element is appropriate" at a command function.  See SECNAVINST 1730.7C ¶ 6.c. That decision was to be made "with appropriate advice from a chaplain" after the commander assessed "the setting and context of the function; the diversity of faith that may be represented among the participants; and whether the function is mandatory for all hands."  Id.  If the command function was not a Divine Service or a Religious Service – services, conducted

---

[12] In discussing the harm that will come from his separation, Plaintiff summarily cites one line of Establishment Clause cases.  See TRO Mot. at 17 (citing Lee v. Weissman, 505 U.S. 577 (1992)).  But those cases do establish that SECNAVINST 1730.7C violated the Establishment Clause.  Defendant explains below why even those cases do not establish a likelihood of success on the merits.

-29-

according to the dictates of a particular religious organization, at which attendance is voluntary[13] – the regulation provided that "religious elements . . . absent extraordinary circumstances, should be non-sectarian in nature." The regulation specifically exempted a chaplain from compliance if he believed his faith dictates otherwise: "Once a commander determines a religious element is appropriate, the chaplain may choose to participate based on his or her faith constraints. If the chaplain chooses not to participate, he or she may do so with no adverse consequences." Id.

Plaintiff's claims that this regulation ran afoul of the Free Exercise clause are frivolous. The regulation did not tell Plaintiff "how to pray" or otherwise prevent him from conducting his public worship[14] in a manner required by his religious convictions. Nor could Plaintiff be punished if he chose not to comply with his commander's request to offer such a prayer. If anything, this last clause significantly enhanced a chaplain's right to free exercise, because it removed from his mind any fear that a failure to follow orders could result in his discipline. Plaintiff's contrary claim that this regulation constrained his right to free exercise of religion can

---

[13] Divine Service are defined as "command functions, which take place according to the manner and forms of religious organizations." SECNAVINST 1730.7C, Encl. 1 ¶ 3. Attendance at such Divine Services is voluntary (except for those "present in official support capacity"). See id.. Commanders are required to "cause Divine Services to be performed." 10 U.S.C. § 6031(a) (2000). Religious Services are defined as "[w]orship events conducted in the manner and forms of Religious Organizations and led by Lay Leaders, Contract Civilian Religious Ministry Professionals, or other authorized personnel." SECNAVINST 1730.7C, Encl. 1 ¶ 11. Like Divine Services, attendance at a Religious Service is entirely voluntary (except for official support personnel). Id.

[14] Public Worship is defined by the regulation as "[a] term of art used by [10 U.S.C. § 6031] that consists of Divine Services and Religious Services exclusively." SECNAVINST 1730.7C, Encl. 1 ¶ 5. This definition of "public worship" illustrates why Plaintiff is simply incorrect to assert that the Navy regulation violated § 6031; that statute concerns only "public worship services." It does not guarantee chaplains the right to preach according to the dictates of their own faith at official command functions that all Navy personnel – regardless of their faith – are required to attend.

-30-

only be true if Plaintiff had a right to pray according to the tenets of his religion at an official command function, thereby imposing his beliefs on service members of all (or no) religious persuasions; he does not.

Nor did the regulation violate the Establishment Clause by allowing commanders to include a neutral religious element at command functions. The only case Plaintiff cites that even arguably supports this proposition is Lee v. Weissman, 505 U.S. 577 (1992), where the Supreme Court held that inclusion of a nonsectarian benediction before a middle school graduation ceremony violated the Establishment Clause. There is good reason to doubt that the standards for judging establishment clause violations in the context of school prayer also apply in the military context, however. The Supreme Court has repeatedly recognized that the First Amendment's two religion clauses are in great tension in the context of the military. "The First Amendment has not one but two clauses tied to 'religion' . . . and sometimes, the two clauses compete: spending government money on the clergy looks like establishing religion, but if the government cannot pay for military chaplains a good many soldiers and sailors would be kept from the opportunity to exercise their chosen religions." McCreary County, Ky. v. American Civil Liberties Union of Ky., ___ U.S. ___, 125 S.Ct. 2722, 2742 (2005). Similarly, in holding that the Religious Land Use and Institutionalized Persons Act ("RLUIPA") did not run afoul of the Establishment Clause, the Court approved of the fact that RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." Cutter v. Wilkinson, 544 U.S. 709, 721 (2005). In condoning this legislative objective, the Court

-31-

favorably cited "the Federal Government's accommodation of religious practice by members of the military." Id. at 722 (citing Katcoff v. Marsh, 755 F.2d 223, 225-29 (2d Cir. 1985)).

The Second Circuit case that the Court relied on in Cutter succinctly explained the complex balancing the military faces in designing policies for religious exercise:

> The primary function of the military chaplain is to engage in activities designed to meet the religious needs of a pluralistic military community, including military personnel and their dependents. In view of the Army's huge size (some 788,000 soldiers and 1,300,000 dependents in 1981) and its far-flung distribution (291,000 soldiers stationed abroad and many in remote areas of the United States) the task is an important and formidable one. The Army consists of a wide spectrum of persons of different ethnic, racial and religious backgrounds who go into military service from varied social, economic and educational environments. The great majority of the soldiers in the Army express religious preferences. About 80% are under 30 years of age and a large number are married. As a result it has become necessary to provide religious facilities for soldiers of some 86 different denominations

Katcoff, 755 F.2d at 226.  Faced with limited resources and a great demand for religious services, it is easy to see why the military – unlike, for example, the middle school at issue in Lee – has a need to allow its commanders leeway to accommodate the religious practice of its service members.  When combined with the requirement that commanders cause religious services to be held according to the dictates of specific religions, see 10 U.S.C. § 6031, the policy of allowing a nonsectarian religious element at official command functions is an eminently reasonable balance between the military's need to allow free exercise by its soldiers without subjecting any soldier to an unconstitutional establishment of religion.  Plaintiff has not acknowledged the unique interplay of the First Amendment's religion clauses in the military context.  He has utterly failed to demonstrate how the policy of allowing commanders to include nonsectarian prayers at

-32-

command functions violated the Establishment clause.  Thus, he has failed to carry his burden of demonstrating a likelihood of success on the merits on this claim.

Finally, it must be noted that Plaintiff's reliance on Lee – even if it did apply in the military context – is curious.  If Lee does apply, then it is the inclusion of a prayer at the command function, and not the fact that the prayer is nonsectarian, that offends the Establishment Clause.  Plaintiff challenges the regulation because he wants to pray "in Jesus' name" at command functions, but that act would be no less prohibited under the test in Lee. Plaintiff's failure to recognize that his legal arguments would foreclose the very relief he seeks seriously undermines the credibility of his Establishment Clause argument.

### 4.    Enjoining the Use of Nonsectarian Prayers at Command Functions Would Injure Other Service Members and the Public Interest

Finally, in considering a request for a preliminary injunction, courts must consider the harm that granting the relief would cause to other people and to the public interest.  Here, those countervailing concerns are great.  As noted above, "The great majority of the soldiers in the Army express religious preferences." Katcoff, 755 F.2d at 226.  However, if the court were to enjoin the use of all nonsectarian prayers, that might result in commanders avoiding religion altogether at command ceremonies out of the fear that an overtly sectarian religious element would pose too great an establishment clause risk.  Such a result would work to the decided disadvantage of countless service members who often "experience increased needs for religion as the result of being uprooted from their home environments, transported often thousands of miles to territories entirely strange to them, and confronted there with new stresses that would not otherwise have been encountered if they had remained at home." Id. at 227.  That harm to the

service members, in turn, threatens the public interest. Indeed, the military chaplaincy program itself is predicated on "the premise that having uprooted the soldiers from their natural habitats it owes them a duty to satisfy their Free Exercise rights, especially since the failure to do so would diminish morale, thereby weakening our national defense." Id. at 228.

* * * *

In light of the fact that Plaintiff's Free Exercise and Establishment clause claims are moot, that he lacks standing to pursue them in any event, that he is unlikely to succeed on the merits of either claim, and that the interests of other service members and the public interest weighs heavily against his cause, this court should deny Plaintiff's second request for preliminary injunctive relief.

## CONCLUSION

For the foregoing reasons, the Plaintiff's request for a preliminary injunction should be denied.

Dated: <u>November 22, 2006</u>                              Respectfully submitted,

                                                PETER D. KEISLER
                                                Assistant Attorney General

                                                JEFFERY A. TAYLOR
                                                United States Attorney

                                                VINCENT M. GARVEY
                                                Deputy Branch Director


Of Counsel:                                     <u>**/s/ Michael P. Abate**</u>
Lieutenant Commander Thomas Leary               MICHAEL P. ABATE
Lieutenant Katy Pasieta                         Attorney, Civil Division
Office of the Judge Advocate General            U.S. Department of Justice

Department of the Navy
Washington Navy Yard, Bldg 33
1322 Patterson Ave., S.E., Suite 3000
Washington, D.C.  30274-5066

P.O. Box 883
20 Massachusetts Ave., N.W., Room 7302
Washington, D.C. 20530
Telephone: (202) 616-8209

Attorneys for Defendants

# Exhibit 1



**DEPARTMENT OF THE NAVY**
NAVY PERSONNEL COMMAND
5720 INTEGRITY DRIVE
MILLINGTON TN 38055-0000

1920
Ser 48/04
16 Nov 06

From:    Commander, Navy Personnel Command (PERS-48)
To:      LT Gordon J. Klingenschmitt, CHC, USNR, XXX-XX-0240/4105
Via:     Commanding Officer, Naval Station Norfolk

Subj:    NOTIFICATION OF ADMINISTRATIVE SEPARATION

Ref:     (a) Your ltr of 14 Oct 06
         (b) 10 U.S.C. § 643
         (c) DODI 1304.28
         (d) SECNAVINST 1920.6C

1.  Your request for recertification of your professional
qualification to serve as a Navy Chaplain, reference (a), was
considered by the Assistant Secretary of the Navy (Manpower and
Reserve Affairs) and denied.  He has directed your administrative
separation from the naval service.  This action is taken pursuant to
references (b) through (d).  Orders directing you to separate from the
naval service not later than 31 January 2007, unless you request an
earlier date, will be issued within the next five working days.

2.  The Secretary determined you are professionally unsuited for
further service as a naval officer and chaplain.  Presentation of a
new ecclesiastical endorsement from a qualified religious organization
does not automatically mandate recertification of a chaplain's
professional qualification.  Rather, a new ecclesiastical endorsement
is just one factor to be considered in evaluating whether a chaplain's
professional qualification should be recertified.  Other factors
include the officer's record of professional performance and
accomplishment, disciplinary record, if any and chain of command
support.

3.  The Secretary concluded that your recent professional performance
has been unsatisfactory.  Your most recent fitness report, for the
period 23 July 2005 to 31 January 2006, graded you below average in
the area of "military bearing/character," and the narrative noted that
"he fails to meet standards of military bearing."  In addition, you
were convicted at a special court-martial on 14 September 2006 for
violating the lawful order a superior commissioned officer.  Further,
the Chief of Chaplains, your community leader, recommended denial of
recertification and processing you for administrative separation.  The
Secretary concluded that you do not possess the character, leadership,
or professional traits needed to successfully serve as a naval
officer.

Subj:  NOTIFICATION OF ADMINISTRATIVE SEPARATION

4.  Your point of contact at Navy Personnel Command for this matter is
CDR Stephen Lepp, COMM (901) 874-4453, DSN 882-4453,
or Fax (901) 874-2633.

G. S. PARKER
By direction

# Exhibit 2



Department of Defense

# INSTRUCTION

NUMBER 1304.28
June 11, 2004

USD(P&R)

SUBJECT: Guidance for the Appointment of Chaplains for the Military Departments

References: (a) DoD Directive 1304.19, "Appointment of Chaplains for the Military
Departments," June 11, 2004
(b) Sections 533(a)(1), 643, 827, 3353(a)(1), 5600(a)(1) of title 10,
United States Code
(c) Assistant Secretary of Defense (Force Management Policy)
Memorandum, "Educational Requirements for Military Chaplain
Applicants," April 2, 2002 (hereby canceled)
(d) Principal Deputy Under Secretary of Defense (Personnel and
Readiness) Memorandum, "Assignment of Chaplains for Military
Service," October 14, 2003 (hereby canceled)
(e) through (i), see enclosure 1

## 1. PURPOSE

This Instruction:

1.1. Implements reference (a) and Section 643 of reference (b).

1.2. Cancels reference (c), (d), and DD Form 2741, "Department of Defense
Ecclesiastical Endorsing Organization Verification/Reverification Information."

1.3. Assigns responsibilities appointing chaplains for the Military Departments and
identifies the educational and ecclesiastical requirements for appointment of military
chaplains.

1.4. Modifies requirements and procedures for Religious Organizations to endorse
religious ministry professionals for the chaplaincy.

1

1.5.  Implements and establishes the criteria and procedures for the administrative separation and loss of professional qualifications of chaplains of the Military Departments.

## 2. APPLICABILITY AND SCOPE

This Instruction applies to the Office of the Secretary of Defense, the Military Departments, (including the Coast Guard when it is operating as a Military Service in the Navy) the Chairman of the Joint Chiefs of Staff, the Combatant Commands, the Defense Agencies, the DoD Field Activities, and all other organizational entities in the Department of Defense (hereafter referred to collectively as the "DoD Components"). The term "Military Departments," as used herein, refers to the Department of the Army, the Department of the Navy, and the Department of the Air Force.   The term "Military Services" as used herein refers to the Army, the Navy, the Air Force, and the Marine Corps.

## 3. DEFINITIONS

Terms used in this Instruction are defined in enclosure 2.

## 4. POLICY

This Instruction implements policy established in reference (a).   The guidance in enclosure 3 shall apply.

## 5. RESPONSIBILITIES

5.1.  The Under Secretary of Defense for Personnel and Readiness shall develop overall policy for the appointment of chaplains to the Military Departments, establish professional qualification requirements for chaplains, and shall ensure Religious Organizations endorsing Religious Ministry Professionals (RMPs) to serve as military chaplains shall maintain all requirements as prescribed in enclosure 3.

5.2.  The Secretaries of the Military Departments shall adhere to DoD policy in sections 4. and 6. of this Instruction to ensure that persons appointed as chaplains meet the minimum professional and educational qualifications prescribed in this Instruction. The Secretaries of the Military Departments may impose additional professional requirements.

*DODI 1304.28, June 11, 2004*

6. <u>PROCEDURES</u>

    6.1. To be considered for appointment to serve as a chaplain, an RMP shall receive an endorsement from a qualified Religious Organization verifying:

        6.1.1. The RMP is a fully qualified RMP of a Religious Organization that meets the administrative requirements of this Instruction.

        6.1.2. An RMP's application shall include the endorsement of the person's ecclesiastical credentials on a DD Form 2088, "Statement of Ecclesiastical Endorsement," (enclosure 6).

        6.1.2.1. If a Religious Organization has not previously endorsed military chaplains, it shall file the administrative documents required by enclosure 3 in conjunction with the endorsement of its first fully qualified RMP in an application for appointment as a chaplain for a Military Department.

        6.1.2.2. The Armed Forces Chaplains Board (AFCB) shall accept the required documents only when the applicable Military Department has determined the RMP is fully qualified in all ways other than ecclesiastical endorsement. The AFCB shall notify the Military Departments of Religious Organizations that have filed the prerequisite documents and whose packets have been found administratively complete.

        6.1.2.3. The Military Departments may evaluate RMPs from Religious Organizations that are submitting the administrative filing requirements for the first time and are pending determination of the fully qualified status of their prospective chaplain. The Military Departments shall consult with the AFCB to determine if the administrative requirements are pending acceptance in such cases.

        6.1.3. The RMP is willing to function in a pluralistic environment as defined in this Instruction and to support directly and indirectly the free exercise of religion by all members of the Military Services, their family members, and other persons authorized to be served by the military chaplaincies.

        6.1.4. The RMP has 2 years of religious leadership experience for an active component appointment. Religious leadership experience shall be compatible with the duties of RMPs in their respective Religious Organization and relevant to the settings of military chaplaincy.

*DODI 1304.28, June 11, 2004*

6.1.5. The RMP is educationally qualified for appointment as a chaplain. The educationally qualified applicant shall possess a baccalaureate degree with not less than 120 semester hours (180 quarter hours) from a qualifying educational institution. The educationally qualified applicant shall also possess a post-baccalaureate graduate degree in the field of theological or related studies from a qualifying educational institution. A qualifying graduate degree program shall require no fewer than 72 semester hours (108 quarter hours) of graduate-level work. Related studies may include graduate courses in pastoral counseling, social work, religious administration, and similar disciplines when one-half of the earned graduate credits include topics in general religion, world religions, the practice of religion, theology, religious philosophy, religious ethics, and/or the foundational writings from the applicant's religious tradition.

6.2. A qualifying RMP-producing educational institution is an accredited college, university, or school of theology listed in the current edition of the American Council on Education (ACE), Accredited Institutions of Post-secondary Education and relevant ACE supplements to that publication (reference (e)), or any unaccredited institution that meets the requirements of subparagraphs 6.2.1. through 6.2.4., below.

6.2.1. An unaccredited educational institution may obtain designation as a qualifying RMP-producing educational institution for a specific applicant to the chaplaincy who graduated from that educational institution by providing certification from registrars at three accredited educational institutions that maintain programs for the preparation of clergy. Each registrar shall certify that his or her educational institution would have accepted at least 90 percent of the credit hours earned and courses leading to the awarding of the post-graduate degree in theological or related studies earned by that applicant at the unaccredited educational institution, as of the year of graduation.

*DODI 1304.28, June 11, 2004*

6.2.2.  An unaccredited educational institution may be designated as a qualified RMP-producing educational institution by providing the AFCB certification from the registrars of three different accredited educational institutions that maintain programs for the preparation of RMPs.  Each registrar shall certify the list of the major areas of study that that educational institution would accept at least 90 percent of the credit hours earned by a student who is awarded a post-graduate degree in theological or related studies at the unaccredited educational institution.  A designation as a qualified RMP-producing educational institution may apply to any year in which the unaccredited educational institution produced graduates or the institution may request this designation for a period of up to 5 years.  The unaccredited educational institution shall submit the required documentation no later than the beginning of the academic year if designation for future years is sought.  Applications for renewal of this status shall be for periods not to exceed 5 years.

6.2.3.  The required documentation shall be submitted to the AFCB.  The AFCB shall review and approve the documentation for completeness prior to forwarding to the Office of the Deputy Under Secretary of Defense for Military Personnel Policy for inclusion on the list of qualifying educational institutions for Reserve Officers. The required documentation shall be sent to the following:  Office of the Under Secretary of Defense for Personnel and Readiness, ATTN:  OUSD(P&R)MPP-AFCB, 4000 Defense Pentagon (Room 2E341), Washington, DC 20301-4000.

6.2.4.  Applications containing the required documentation may also be submitted at any time from unaccredited educational institutions requesting designation as a qualifying educational institution for prior school years.

6.3.  A new DD Form 2088 shall be required at each change of career status, as defined by the Military Departments, to re-endorse the qualifications of the chaplain concerned.

6.4.  Requirements for applicants for the chaplaincy:

6.4.1.  Applicants for appointment as a chaplain shall meet physical standards in accordance with DoD Directive 6130.3 (reference (f)) and be otherwise qualified to serve as a commissioned officer in accordance with reference (b) and DoD Directive 1310.2 (reference (g)).

6.4.2.  Applicants shall affirm that, if appointed, they shall abide by applicable laws, and all applicable regulations, directives, and instructions of the Department of Defense and the Military Department that the appointment is made.

DODI 1304.28, June 11, 2004

6.5. Administrative separation of chaplains upon loss of professional qualifications. If a chaplain loses ecclesiastical authority to function as an RMP or has ecclesiastical endorsement to serve as a chaplain withdrawn, the appropriate Religious Organization shall provide written notification to the Military Department concerned. Processing for separation in accordance with Section 643 of reference (b) shall be initiated immediately upon such notification. This Instruction does not preclude separation in accordance with other regulations of the Military Department concerned (i.e., when separation for reasons other than loss of ecclesiastical endorsement is appropriate).

6.5.1. When a separation action is initiated under this Instruction, the chaplain shall be notified in writing of the following:

6.5.1.1. The chaplain has a right to consult with military counsel or with civilian counsel obtained at no expense to the Government, and to submit statements in response to the notice.

6.5.1.2. The chaplain has lost ecclesiastical endorsement.

6.5.1.3. Under conditions established by the Secretary of the Military Department concerned, the chaplain may:

6.5.1.3.1. Seek another ecclesiastical endorsement within the time frame allotted by the Military Department involved.

6.5.1.3.2. Apply for non-chaplain duties with the understanding that the officer shall be discharged voluntarily as a chaplain on one day and appointed in a non-chaplain capacity on the next day.

6.5.1.3.3. Apply for voluntary retirement, if eligible for such retirement; or

6.5.1.3.4. Tender a voluntary resignation.

6.5.2. If a request is not submitted under subparagraph 6.5.1.3., above, or if such a request is disapproved, the chaplain shall be separated with an appropriate discharge. Chaplains of the Army National Guard and the Air National Guard shall not be administratively separated without the consent of the Governor of the State or territory or his or her designated representative.

*DODI 1304.28, June 11, 2004*

6.5.2.1. The chaplain shall be provided a reasonable period of time consistent with the policies of the Military Department that the chaplain serves to respond to the notice. If the chaplain states that action under subparagraph 6.5.1.3., above, is requested, the chaplain shall be notified in writing of the date and manner by which such request shall be submitted.

6.5.2.2. If the chaplain does not respond to the notice in a timely manner, separation processing shall be completed in accordance with subparagraph 6.5.3., below.

6.5.3. The Secretary of the Military Department concerned may:

6.5.3.1. Approve a request for a new ecclesiastical endorsement for a serving chaplain submitted in accordance with this Instruction; or

6.5.3.2. Approve a voluntary resignation, if tendered, and direct an appropriate discharge; or

6.5.3.3. Approve a voluntary retirement, if requested by an eligible applicant; or

6.5.3.4. Approve a request for assignment to non-chaplain duties through voluntary resignation and appointment in accordance with regulations implementing Chapters 36 or 1205 of reference (b); or

6.5.3.5. Direct an appropriate discharge if an action in subparagraph 6.5.1.3., above, is not requested and/or approved.

6.6. Visits of Endorsing Agents to military installations in overseas areas are encouraged to enhance the spiritual welfare of military personnel, particularly at seasons of special religious significance.

6.6.1. Such visits shall keep the religious organization aware of the ministry of the organization's chaplains and the spiritual and religious activities of the military community and permit Ecclesiastical Endorsing Agents to maintain their professional relationships with endorsed chaplains.

6.6.2. Such visits shall be at the discretion of the commander(s) of the installations involved.

*DODI 1304.28, June 11, 2004*

6.6.3. The Ecclesiastical Endorsing Agents who visit installations representing their Religious Organizations shall do so at no expense to the Government. The Ecclesiastical Endorsing Agent shall be afforded protocol privileges appropriate to those of a civilian employee in the grade of GS-15.

6.6.4. The Military Departments may establish procedures governing the visits of Ecclesiastical Endorsing Agents to overseas installations. The AFCB may provide administrative assistance in arranging such visits.

6.7. The chaplain candidate programs exist within the Military Departments for the purpose of familiarizing graduate students of religion with religious support activities in the military environment. Participants in this program serve as commissioned officers in the Reserve components of the Military Departments. Chaplain candidates are not authorized to serve as or in place of chaplains.

6.7.1. Upon successful completion of their academic and religious training, participants in the Chaplain Candidate Programs may seek appointment as chaplains.

6.7.2. Each Military Department is responsible for implementing this program in accordance with Department-specific policies and regulations.

6.7.3. At a minimum, applicants and participants in the Chaplain Candidate Program shall:

6.7.3.1. Be approved by a Religious Organization recognized as able to provide ecclesiastical endorsements for chaplains in accordance with the provisions of this Instruction.

6.7.3.2. Be a matriculated student in graduate-level degree-granting religious studies programs of qualifying educational institutions. Such programs and institutions shall comply with criteria in paragraph 6.2. of this Instruction for educational requirements for Chaplains. Subparagraph 6.2.1. of this Instruction does not apply for chaplain candidates.

6.7.3.3. Be able to complete educational, ecclesiastical, and professional experience requirements for appointment as chaplains prior to reaching the age limitation for such original appointments, as established by the Military Department to which the applicant is applying.

6.7.3.4. Be able to meet all other appointment eligibility criteria of the Military Department to which the applicant is applying.

7. <u>EFFECTIVE DATE</u>

This Instruction is effective immediately.

Charles S. Abell
**Principal Deputy Under Secretary of Defense
for Personnel and Readiness**

Enclosures - 6
    E1.  References, continued
    E2.  Definitions
    E3.  Administrative Filing Requirements for a Religious Organization Desiring to
        Endorse Religious Ministry Professionals for the Military Chaplaincy
    E4.  Format for Providing Required Information to Meet Administrative
        Requirements to Endorse Chaplains to the Military Departments
    E5.  Format for Providing Required Information to Endorse RMPs as Chaplains to
        the Military Departments
    E6.  DD Form 2088, "Statement of Ecclesiastical Endorsement"

*DODI 1304.28, June 11, 2004*

## E1. ENCLOSURE 1

### REFERENCES, continued

(e) American Council on Education, "Accredited Institutions of Post Secondary Education," current edition

(f) <u>DoD Directive 6130.3,</u> "Physical Standards for Appointment, Enlistment, and Induction," December 15, 2000

(g) <u>DoD Directive 1310.2,</u> "Appointing Commissioned Officers," May 28, 1996

(h) <u>DoD Directive 5120.8,</u> "Armed Forces Chaplains Board Charter," March 20, 1995

(i) Section 501(c)(3) of the title 26, United States Code (Internal Revenue Code)

*DODI 1304.28, June 11, 2004*

E2. ENCLOSURE 2

DEFINITIONS

E2.1. TERMS

Terms used in this Instruction are defined as follows:

E2.1.1. Change of Career Status. Includes, but is not limited to, initial application for the chaplaincy, change from Reserve to active status or the opposite, and extension on active duty beyond the initial obligated period of service. This term is further defined by the various Military Services. A change of career status requires endorsement or re-endorsement by the Religious Organization endorsing the chaplain.

E2.1.2. Chaplain. A commissioned officer of the Chaplain Corps of the Army, a commissioned officer of the Chaplain Corps of the Navy, or a commissioned officer in the Air Force designated for duty as a chaplain.

E2.1.3. Counsel. A lawyer qualified under Section 827 of title 10, United States Code (Article 27(b)(1) of the Uniform Code of Military Justice) (reference (b)) or a civilian lawyer retained at no expense to the Government.

E2.1.4. Ecclesiastical. The forms and practices related to Religious Organizations.

E2.1.5. Ecclesiastical Endorsement. Written documentation from a Religious Organization that complies with the administrative requirements of this Instruction that an applicant for the military chaplaincy is fully and professionally qualified and endorsed to perform all offices, functions, sacraments, ordinances, and ceremonies required of a RMP for that Religious Organization, and is capable and authorized to minister as required within a pluralistic environment.

E2.1.6. Ecclesiastical Endorsing Agent. An individual authorized to provide or withdraw Ecclesiastical Endorsements on behalf of a Religious Organization.

E2.1.7. Endorsement. The internal process that Religious Organizations use when designating RMPs to represent their Religious Organizations to the Military Departments and confirm the ability of their RMPs to conduct religious observances or ceremonies in a military context.

E2.1.8. Pluralistic Environment. A descriptor of the military context of ministry. A plurality of religious traditions exist side-by-side in the military.

ENCLOSURE 2

*DODI 1304.28, June 11, 2004*

E2.1.9.  <u>Religious Ministry Professional (RMP)</u>.  An individual endorsed to represent a Religious Organization and to conduct its religious observances or ceremonies.  An RMP is a fully qualified member of the clergy for those Religious Organizations that have a tradition of professional clergy or their equivalents.  The Religious Organization's endorsement verifies that an RMP is professionally qualified to serve as a chaplain in the military and meets the graduate education and religious leadership requirements of this Instruction.

E2.1.10.  <u>Religious Organization</u>.  An entity that is organized and functions primarily to perform religious ministries to a non-military lay constituency and that has met the religious purposes test of Section 501(c)(3) of title 26, United States Code (reference (i)), and holds current status as a Section 501(c)(3) Schedule "A" organization.  Religious Organizations possess ecclesiastical authority to endorse and withdraw endorsement for Religious Ministry Professionals serving under their authority.

E2.1.11.  <u>Separation</u>.  Discharge or retirement from military service.

ENCLOSURE 2

*DODI 1304.28, June 11, 2004*

## E3. ENCLOSURE 3

### ADMINISTRATIVE FILING REQUIREMENTS FOR A RELIGIOUS ORGANIZATION DESIRING TO ENDORSE RELIGIOUS MINISTRY PROFESSIONALS FOR THE MILITARY CHAPLAINCY

E3.1.1.  Religious Organizations that choose to participate in the Military Chaplaincies recognize the chaplaincies of the Military Departments serve a religiously diverse population and that military commanders are required to provide comprehensive religious support to all authorized individuals within their areas of responsibility. Religious Organizations participating in the military chaplaincies therefore express willingness for their RMPs to perform their professional duties as Chaplains in cooperation with Chaplains from other religious traditions and that:

E3.1.1.1.  Chaplains shall wear the appropriate insignia in accordance with uniform regulations of their respective Military Services.

E3.1.1.2.  The Religious Organization shall complete and maintain all administrative requirements of this Instruction (enclosure 3) as a prerequisite to being able to endorse applicants for the chaplaincies.

E3.1.1.3.  Endorsement by a Religious Organization meeting the administrative qualifications of this Instruction (enclosure 3) is an essential element of a chaplain's professional qualifications.  A chaplain whose endorsement is withdrawn shall be processed for separation in accordance with paragraph 6.5.

E3.1.2.  A Religious Organization desiring to provide an RMP to serve as a chaplain in the Military Departments shall meet the administrative filing requirements of this Instruction and maintain the required information for that purpose on file with the Department of Defense.  The Religious Organization shall submit the required documentation to the AFCB in the format specified in enclosure 4.  Submission of the required documents may be made through secure and verified electronic media.  The Religious Organization shall be able to submit documents to permit endorsement of chaplains for the first time only when they are endorsing a fully and professionally qualified candidate, without requirement for waivers of the standards specified by the applicable Military Department.  See paragraph 6.1.

E3.1.3.  The Religious Organization shall submit documents verifying the following information with regard to such organization:

E3.1.3.1.  That the Religious Organization is organized as an entity functioning primarily to perform religious ministries to a non-military lay constituency and currently holds a Section 501(c)(3) exempt status (reference (i)) as a church for Federal tax purposes from the Internal Revenue Service (IRS) (note "church" is used by the IRS not to denote a belief system, but to distinguish "churches" from other types of religious organizations; see IRS Instructions for Form 1023 Schedule A).  Such rules stipulate that the particular religious beliefs of the organization are truly and sincerely held and that the practices and rituals associated with the organization's religious belief or creed are not illegal or contrary to clearly defined public policy.  In order to determine whether a particular Religious Organization has properly acquired, and currently maintains, an IRS tax exempt status and does not engage in practices that are illegal or contrary to defined public policy, the USD(PR) shall take appropriate steps to verify with the DoD Components and other Federal Agencies compliance with these requirements.

E3.1.3.2.  That it possesses ecclesiastical authority to grant and withdraw initial and subsequent ecclesiastical endorsement for ministry in the Armed Forces.

E3.1.3.3.  That it verifies the Religious Organization shall provide chaplains who shall function in a pluralistic environment, as defined in this Instruction, and who shall support directly and indirectly the free exercise of religion by all members of the Military Services, their family members, and other persons authorized to be served by the military chaplaincies.

E3.1.3.4.  That it agrees to abide by all DoD Directives, Instructions, and other guidance and with Military Department regulations and policies on the qualification and endorsement of RMPs for service as military chaplains.

E3.1.4.  The Religious Organization shall supply the name, title, mailing address, electronic contact, the Employer Identification Number assigned to the organization by the IRS, and telephone number of the agent authorized to represent the Religious Organization to the Military Departments to include authority to grant and withdraw ecclesiastical endorsements.  This agent may not be a currently serving military Chaplain (active duty, National Guard, or Reserve).

E3.1.5.  A Religious Organization shall immediately notify the AFCB when changes occur in the status of the organization, designated endorsing agent, or the contact addresses and telephone numbers of either.

E3.1.6.  A Religious Organization shall re-verify that it meets the requirements in paragraph E3.1.2., above, if chaplains endorsed by it are unable to gain re-endorsement at times of change of career status.

E3.1.7.  Religious Organizations that are currently able to endorse RMPs for Military Service as chaplains under earlier versions of this Instruction may continue to endorse RMPs as long as they continue to meet the requirements in effect when they originally began to endorse RMPs for the military chaplaincies.  Such organizations shall affirm in writing to the AFCB by January 31st of each year that they continue to meet such requirements.  This provision applies equally to Religious Organizations that endorse chaplains directly to the Department of Defense through an embedded endorsing organization; Religious Organizations that, under previous versions of this Instruction, were extended the privileges of endorsing chaplains through representation by external endorsing organizations; and larger organizations that have acted on behalf of member Religious Organizations.

E3.1.8.  By January 31st of each year, each Religious Organization shall provide to the AFCB a complete list of Chaplains endorsed for military chaplaincy.  Chaplains shall be listed alphabetically by name and Military Department.

E3.1.9.  In accordance with DoD Directive 5120.8 (reference (h)), the AFCB shall inform Religious Organizations that endorse Chaplains that they no longer meet the administrative requirements of paragraphs E3.1.2. through E3.1.5., above, and may no longer endorse Chaplains for Military Service.  Before taking such action, the AFCB shall give written notice stating the reasons for lack of compliance and shall allow the Religious Organization concerned a reasonable opportunity to provide a written reply that shall be carefully considered in making a final decision.  Review of administrative compliance may be initiated if the Religious Organization fails to respond to requests by endorsed chaplains for assistance or re-endorsement at times of change of career status or if the AFCB cannot contact the Religious Organization in a reasonable period of time.  Religious Organizations informed that they may no longer endorse chaplains due to lack of administrative compliance may resubmit their required documents.  The AFCB shall not review the compliance of a Religious Organization with reference (a) and this Instruction again until the Religious Organization completes all administrative requirements.  If a Religious Organization is no longer able to endorse chaplains under this Instruction, all ecclesiastical endorsements issued by that Organization shall be considered withdrawn.  Serving chaplains endorsed by that Organization shall be considered to have had their endorsements revoked (paragraph 6.5. applies).

*DODI 1304.28, June 11, 2004*

E4. ENCLOSURE 4

FORMAT FOR PROVIDING REQUIRED INFORMATION TO MEET ADMINISTRATIVE REQUIREMENTS TO ENDORSE CHAPLAINS TO THE MILITARY DEPARTMENTS

E4.1.1. Religious Organizations desiring to endorse RMPs to the military to serve as military chaplains shall forward written notification of such intent to the AFCB in accordance with paragraph E3.1.2., above.

E4.1.1.1. The written notification may be submitted through traditional hard copy or secure electronic means with verifiable signature.

E4.1.1.2. The written notification shall be submitted on organization letterhead or from an official electronic account capable of secure electronic signature.

E4.1.1.3. The written notification shall include, at a minimum, a statement that meets the requirements of paragraph E3.1.3. and provides the following information in the following order:

E4.1.1.3.1. Name of organization.

E4.1.1.3.2. Address of organization.

E4.1.1.3.3. Name, address, telephonic, and electronic contact for endorsing official.

E4.1.1.3.4. Statement verifying ability of the designated endorsing official to endorse and withdraw endorsement of candidates and Chaplains.

E4.1.1.3.5. Statement verifying the Religious Organization shall immediately notify the AFCB when changes occur in the status of the organization, designated endorsing agents, or the contact addresses and telephone numbers of either.

E4.1.1.3.6. Signature of responsible official with authority to make such statements on behalf of the organization.

E4.1.1.4. The written statement shall include as enclosures verification of current status as an IRS Section 501(c)(3) exempt organization in accordance with subparagraph E3.1.3.1., above, the Employer Identification Number assigned to the organization by the IRS, and all other enclosures to support this status.

*DODI 1304.28, June 11, 2004*

## E5.  ENCLOSURE 5

## FORMAT FOR PROVIDING REQUIRED INFORMATION TO ENDORSE RMPS AS CHAPLAINS TO THE MILITARY DEPARTMENTS

E5.1.1.  Religious Organizations submitting required documentation of their first fully qualified RMP to a specific Military Department shall forward the applicant's documentation in accordance with paragraph 6.1. of this Instruction.  The written documentation shall, at a minimum include:

E5.1.1.1.  Application for Appointment:  DA Form 61; AF Form 24/Addendum; Navy: NC1100/11.

E5.1.1.2.  Application for Active Duty: DA Form 160; AF Form 125, EAD Application (AF Reserve/Guard; Navy Reserve Recall: NP1131/5.

E5.1.1.3.  Application Letter requesting Appointment by applicant; (Navy: include in form of applicant "Motivational Statement" if not included in NC1100/11).

E5.1.1.4.  Official copy of each Undergraduate and Graduate Transcript.

E5.1.1.5.  Statement verifying date of latest National Agency Check or check in progress; SF Form 86, Questionnaire for Security Positions.

E5.1.1.6.  Standard Form 88 (Navy: DD2808), Report of Medical Examination and SF Form 93- Report of Medical History (Certified true copies; Navy: DD2807-1); DD Form 2807-2 Medical Pre-screen-AF.

E5.1.1.7.  DD Form 368 Conditional Release.

E5.1.1.8.  All OPRs/OMPF microfiche or copies of DD Form 214, NGB Form 22, OERs, etc.

E5.1.1.9.  Official Photograph; or full body photo.

E5.1.1.10.  Birth Certificate and Driver's license.

E5.1.1.11.  Credit Check AETC Form 1325-AF.

E5.1.1.12.  Chaplain Interview-Army, Navy: NC1100/13; 3 to 5 Letters of Recommendation-AF; Navy: minimum of 3 letters.

E5.1.1.13.  Family Member Information Document (Typed on plain bond paper; Biography/Resume).

E5.1.1.14.  Certificate of Ecclesiastical Endorsement; Ordination Certificate.

*DODI 1304.28, June 11, 2004*

E6.  ENCLOSURE 6

## DD FORM 2088, "STATEMENT OF ECCLESIASTICAL ENDORSEMENT"

| STATEMENT OF ECCLESIASTICAL ENDORSEMENT | Form Approved<br>OMB Number 0704-0190<br>Expires Feb 28, 2006 |
|---|---|

The public reporting burden for this collection of information is estimated to average 45 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to the Department of Defense, Executive Services and Communications Directorate (0704-0190). Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number.

**PLEASE DO NOT RETURN YOUR COMPLETED FORM TO THE ABOVE ORGANIZATION. RETURN COMPLETED FORM TO CHIEF OF CHAPLAINS (ITEM 2).**

**PRIVACY ACT STATEMENT**

**AUTHORITY:** Title 10, U.S. Code, Sections 532 and 12201; EO 9397.
**PRINCIPAL PURPOSE(S):** To verify the professional and ecclesiastical qualifications of Religious Ministry Professionals for initial appointment or chaplains change of career status appointments as chaplains in the Military Service. This form is an essential element of a chaplain's professional qualifications and will become part of a chaplain's military personnel record.
**ROUTINE USE(S):** None.
**DISCLOSURE:** Voluntary; however, failure to provide all the information requested may significantly delay the processing of this endorsement.

**1. FROM**

| a. TYPED OR PRINTED NAME OF RELIGIOUS ORGANIZATION GRANTING RELIGIOUS MINISTRY PROFESSIONAL ENDORSEMENT<br><br>Ecclesiastical Fellowship of Worshippers | b. DATE OF CURRENT INTERNAL REVENUE CODE (IRC) 501(c)(3) EXEMPT STATUS<br>January 1, 1990 | c. EMPLOYER IDENTIFICATION NUMBER (IRC)<br>39-1234567 |
|---|---|---|
| | d. TELEPHONE *(Include Area Code)*<br>200-111-2222 | e. FAX NUMBER *(Include Area Code)*<br>200-111-3333 |

| f. ADDRESS. (1) STREET *(Include apartment or suite number)*<br>123 Main Street | (2) CITY<br>Anytown | (3) STATE<br>OH | (4) ZIP CODE<br>40005 |
|---|---|---|---|
| g. E-MAIL ADDRESS<br>fellows@lifthands.net | h. WEB SITE<br>www.lifthands.net | | |

**2. TO**

| a. CHIEF OF CHAPLAINS *(X appropriate block)* | X | (1) ARMY | b. ADDRESS. (1) STREET *(Include apartment or suite number)*<br>2511 Jefferson Davis Hwy, Suite 12500 Presidential Towers | | |
|---|---|---|---|---|---|
| | | (2) NAVY | (2) CITY<br>Arlington | (3) STATE<br>VA | (4) ZIP CODE<br>22202-3907 |
| | | (3) AIR FORCE | | | |

**3. APPLICANT INFORMATION.**  a. IS THIS AN INITIAL ENDORSEMENT? *(X one)* → | X | YES | | NO

| b. TYPED OR PRINTED NAME *(Last, First, Middle Initial)*<br>Chaplain, Wannabee A. | c. SSN<br>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 | d. TELEPHONE *(Include Area Code)*<br>300-222-3333 |
|---|---|---|

| e. ADDRESS. (1) STREET *(Include apartment or suite number)*<br>2004 Oak Street | (2) CITY<br>West Lake | (3) STATE<br>VA | (4) ZIP CODE<br>24444 |
|---|---|---|---|

| f. E-MAIL ADDRESS  wannabee@cxnet.org |
|---|

| g. NUMBER OF YEARS OF PROFESSIONAL MINISTRY EXPERIENCE APPLICANT HAS COMPLETED<br><br>3 | h. NUMBER OF MONTHS OF PRIOR ACTIVE MILITARY SERVICE APPLICANT HAS COMPLETED | | |
|---|---|---|---|
| | (1) OFFICER<br>0 | | (2) ENLISTED<br>4 |

| i. APPLICATION IS FOR *(X one)* | | (1) RESERVE *(Non-Active Duty)* | | (4) EXTENDED ACTIVE DUTY *(Indefinite)* |
|---|---|---|---|---|
| | X | (2) NATIONAL GUARD | | (5) REGULAR COMMISSIONED OFFICER |
| | | (3) INITIAL ACTIVE DUTY *(3 years)* | | (6) RESERVE (AGR) |

**4. ECCLESIASTICAL ENDORSING AGENT**

| a. AS THE ECCLESIASTICAL ENDORSING AGENT AUTHORIZED TO REPRESENT  Ecclesiastical Fellowship of Worshippers |
|---|

*(Name of religious organization) (Item 1)*

I HEREBY VERIFY THE ABOVE APPLICANT TO BE PROFESSIONALLY QUALIFIED AS A RELIGIOUS MINISTRY PROFESSIONAL FOR THE MILITARY CHAPLAINCY.

| b. TYPED OR PRINTED NAME *(Last, First, Middle Initial)*<br>Scott, Barney T. | c. E-MAIL ADDRESS<br>btscott@lifthands.net |
|---|---|

| d. ADDRESS. (1) STREET *(Include apartment or suite number)*<br>9876 White House Lane | (2) CITY<br>Sometown | (3) STATE<br>GA | (4) ZIP CODE<br>30005 |
|---|---|---|---|

| e. TELEPHONE *(Include Area Code)*<br>400-444-5555 | f. FAX NUMBER *(Include Area Code)*<br>400-444-4444 | g. SIGNATURE | h. DATE SIGNED *(YYYYMMDD)*<br>20040331 |
|---|---|---|---|

**5. COMMENTS**
Applicant is a Phi Beta Kappa, graduated cum laude and is an All-American track star. Exceptional ability and leadership skills.

**DD FORM 2088, MAR 2004**　　　PREVIOUS EDITION IS OBSOLETE.

19　　　　　　　　　　　　　　　　　　　　　　　　　ENCLOSURE 6

# Exhibit 3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Chaplain Gordon James Klingenschmidt | ) )  ) |
| Plaintiff, | ) ) |
| v. | ) )    Civil No.: 06CV 1832 (HHK) |
| | )    **DECLARATION OF CAPTAIN** |
| | )    **GREGORY S. PARKER,** |
| | )    **U.S. NAVY** |
| DONALD C. WINTER, | ) ) |
| Defendant | ) |

I, Captain Gregory S. Parker, U.S. Navy, pursuant to
28 U.S.C. § 1746, declare:

1.    I am a Captain in the United States Navy and the
head of the Career Progression Division ("PERS 48") of
the Navy Personnel Command ("NPC"). I make this
declaration based on my personal knowledge, information
reviewed in the course of my official duties, and personnel
records of Plaintiff, Gordon James Klingenschmidt
("Plaintiff").

2.    As head of PERS 48, my responsibilities include
supervising: (1) officer and enlisted promotion boards;

(2) officer and enlisted unfavorable and favorable separations; (3) post selection board adverse information reviews; (4) officer retirements; (5) retire/retain requests; (6) Fleet Reserve requests; and (6) the Temporary and Permanent Disability Lists.

3.    I was made aware of a complaint and request for injunctive relief filed by the Plaintiff in the above-captioned matter seeking to discontinue his ongoing separation proceedings.

4.    On November 15, 2006 Assistant Secretary of the Navy for Manpower and Reserve Affairs ("ASN M&RA") directed that the Plaintiff be separated from the Naval Service. That decision was forwarded to PERS 48 for implementation. PERS 48 informed the Plaintiff of the separation via memo dated November 16, 2006 and prepared written separation orders directing Plaintiff's detachment and separation no later than January 31, 2007.

5.    Consistent with SECNAVINST 1920.6C, Plaintiff will not be required to or forced to detach prior to the last day of January 2007. He may, if he so chooses, complete his separation process and detach any time prior to January 31, 2007, following receipt of his orders. Navy members are generally given one to two months to execute the administrative process to separate. This process can be

DECLARATION OF CAPTAIN GREGORY S. PARKER, U. S. NAVY

done with relative speed if the member wants to or has a
need to depart earlier than the allotted time.  Once orders
are issued, however, the member must separate by the end of
the month designated.  If the member believes he or she
requires more time to complete the separation process, he
or she may request a modification to, or cancellation of,
the original separation orders.  Such a modification or
cancellation may be approved if the member demonstrates
good cause to justify the request.  In Plaintiff's case,
such a request would have to be received, processed, and
approved prior to the last day of the January 2007.

    I declare under penalty of perjury that the foregoing
is true and correct.  Executed on November 21, 2006.

                              GREGORY S. PARKER

# Exhibit 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GORDON JAMES KLINGENSCHMITT,    )
                                      )
         Plaintiff,    )
                                        )
         v.    )    Civil Action No. 1:06cv01832 (HHK)
                                        )
THE HON. DONALD C. WINTER,    )
Secretary of the Navy,    )
                                        )
        Defendant.    )
                                        )

## DECLARATION OF VERONICA K. BERTO

Pursuant to 28 U.S.C. § 1746, I, Veronica K. Berto, declare as follows:

1. I am a civilian employee of the Department of the Navy. I currently serve as a Program Analyst (GS-12) in the Force Structure (N971) division in the Chief of Navy Chaplains' Office. I have served in this position since December 17, 1991. In my position, I am responsible for monitoring the status, currency, and validity of the ecclesiastical endorsements Chaplain Corps officers are required to maintain as a part of their professional qualifications.

2. As a result of this litigation, I was asked by defendants to provide information regarding the use of the Chaplain Appointment and Recall Eligibility (CARE) Advisory Board as part of the process of considering changes in chaplains' ecclesiastical endorsements. The Chaplain Corps uses the CARE Board to consider chaplains' professional qualifications and suitability for retention on active duty in all cases where a chaplain requests to change his/her ecclesiastical endorsement.

3. I reviewed the records pertaining to CARE Boards on file in the Chief of Chaplains Office to prepare this declaration. Those records indicate that since 1983, CARE Boards have considered proposed changes in ecclesiastical endorsements for 45 chaplains. In each of those 45 cases, the CARE Board provided recommendations to the Chief of Chaplains as to whether the chaplain should be recertified as professionally qualified, and whether the chaplain should be continued on active duty.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed at Arlington, Virginia, this _22nd_ day of November, 2006.

VERONICA K. BERTO

# Exhibit 5

ALNAV XXX/06

SUBJYRELIGIOUS MINISTRIES IN THE DEPARTMENT OF THE NAVY//

REF/A/DOC/FY07    NATIONAL    DEFENSE    AUTHORIZATION    ACT

CONFERENCE

REPORT//

REF/B/DOC/SECNAV/21FEB2006//

REF/C/DOC/SECNAV/12OCT2000//

REF/D/DOC/SECNAV/31DEC1997//

NARR/REF A IS CONFERENCE REPORT LANGUAGE FROM THE 2007 NATIONAL

DEFENSE    AUTHORIZATION    ACT.    REF B    IS    SECNAVINST    1730.7C

RELIGIOUS

MINISTRIES WITHIN THE DEPARTMENT OF THE NAVY.    REF C IS SECNAVINST

1730.7B RELIGIOUS MINISTRY SUPPORT WITHIN THE DEPARTMENT OF THE NAVY.

REF D IS SECNAVINST 1730.8A ACCOMODATION OF RELIGIOUS PRACTICES.

RMKS/1. IN RESPONSE TO REF A, REF B IS RESCINDED. REF C AND D

ARE HEREBY REINSTATED.

2.    RELEASED BY THE HONORABLE DONALD C. WINTER, SECRETARY OF THE

NAVY.

NOV 2 12006

Released by Donald
C. Winter

# Exhibit 6



**DEPARTMENT OF THE NAVY**
OFFICE OF THE SECRETARY
1000 NAVY PENTAGON
WASHINGTON, DC 20350-1000

SECNAVINST 1730.7C
N097
February 21, 2006

SECNAV INSTRUCTION 1730.7C

From:  Secretary of the Navy

Subj:  RELIGIOUS MINISTRY WITHIN THE DEPARTMENT OF THE NAVY

Ref:   (a) Title 10, United States Code
       (b) U.S. Navy Regulations, 1990
       (c) DOD Directive 1304.19 of 11 Jun 2004
       (d) DOD Instruction 1304.28 of 11 Jun 2004
       (e) DOD Directive 5120.8 of 20 Mar 1995
       (f) Manual for Courts-Martial, United States 2005
       (g) DOD Directive 1300.17 of 3 Feb 1988
       (h) DOD Directive 7000.14-R, Vol. 7A
       (i) DOD Directive 5154.24 of 28 Oct 1986

Encl:  (1) Definitions
       (2) Confidential Communication to Chaplains and Religious
           Program Specialists
       (3) Accommodation of Religious Practices

1. <u>Purpose</u>.  To implement policy and procedures for religious
ministry and the accommodation of religious practices in the
Department of the Navy.  This instruction has been
administratively revised and should be reviewed in its entirety.

2. <u>Cancellation</u>.  SECNAVINST 1730.7B and SECNAVINST 1730.8A.

3. <u>Scope</u>.  This instruction applies throughout the Department
of the Navy (DON), including the Coast Guard when operating as a
service in the Navy under Title 14, U.S. Code, Section 3.

4. <u>Definitions</u>.  Enclosure (1) contains definitions of terms
used in this instruction.

5. <u>Organization and Role of Chaplain Corps</u>

    a.  The <u>Chief of Chaplains of the Navy</u> is appointed in
accordance with section 5142 of reference (a) and serves in the
grade of rear admiral (upper half) as principal advisor,
community leader, and sponsor on matters concerning Chaplain

SECNAVINST 1730.7C
February 21, 2006

Corps (CHC) officers and Religious Program Specialists (RP) per
Article 1009 of reference (b). As Director of Religious Ministry
for the DON, the Chief of Chaplains:

     (1) Advises the Secretary of the Navy on all matters
pertaining to the free exercise of religion within the naval
service.  The Chief of Chaplains shall provide regular and
frequent advice on:

          (a) Religious, ethical, spiritual, and moral
implications of all DON policies and actions.

          (b) Religious faith-group policies and positions
affecting the DON.

          (c) All matters pertaining to the organization and
utilization of the CHC as a staff corps of the Navy.

          (d) All matters pertaining to the organization and
utilization of RPs.

          (e) Policy formulation and oversight pertaining to
the implementation of religious ministry plans, programs,
personnel, and facilities.

     (2) Advises the Chief of Naval Operations (CNO) on all
matters pertaining to the free exercise of religion within the
Navy, serves as community leader for the Chaplain Corps and
Religious Program Specialists, and otherwise assists the CNO.
In this capacity, the Chief of Chaplains:

          (a) Directs CHC officers, RPs, and all other
designated persons engaged in religious ministry within the
Navy, the USMC, and other governmental agencies receiving
religious ministry from Navy chaplains.

          (b) Serves as program sponsor for the professional
development, education, and training of CHC officers and RPs.

          (c) Provides technical advice for the acquisition,
operation, and maintenance of religious ministry support
facilities, collateral equipment, and other logistical support
both ashore and afloat.

          (d) Reports to and is supported by the Chief of
Naval Personnel with respect to all duties pertaining to the

SECNAVINST 1730.7C
February 21, 2006

2

procurement, distribution, and support of CHC officers and RP personnel.

(3) Serves on the <u>Armed Forces Chaplains Board (AFCB)</u> per reference (e).  As a member of the AFCB, the Chief of Chaplains represents the Secretary of the Navy to:

(a) The Department of Defense (DOD).

(b) The Chiefs of Chaplains/Chaplain Services of other DOD components.

(c) The nation's religious organizations.

(4) Advises the <u>Commandant of the Coast Guard</u> on religious ministry matters relative to the use of Navy chaplains in the Coast Guard.

b.  The <u>Deputy Chief of Chaplains</u> is an officer selected by a board to the billet, from officers of the Chaplain Corps, who serves in the grade of rear admiral (lower half) and performs such duties as prescribed by the Secretary of the Navy and law. The Deputy Chief of Chaplains:

(1) Serves as principal assistant to the Chief of Chaplains and Deputy Director for Religious Ministry for the DON.

(2) Serves as Chaplain of the Marine Corps, advising the Commandant of the Marine Corps (CMC) on religious ministry matters in reference to support, plans, programs, policy, personnel, and facilities within the USMC.

(3) In accordance with reference (e), serves as a member of the AFCB.

c.  The <u>Deputy Chief of Chaplains for Reserve Matters</u> is an officer selected by a board to the billet, from reserve officers of the Chaplain Corps, who serves in the grade of rear admiral (lower half), in the reserve component, and performs such duties as prescribed by the Secretary of the Navy and law. The Deputy Chief of Chaplains for Reserve Matters:

(1) Serves as the principal assistant to the Chief of Chaplains for Reserve Matters.

(2) Advises the Chief of Chaplains on religious ministry

SECNAVINST 1730.7C
February 21, 2006

3

matters in reference to administration, supervision, training, and mobilization of chaplains and Religious Program Specialists in the Reserve component.

    d.  <u>Chaplains</u>

        (1) Chaplains are Qualified Religious Ministry Professionals (RMPs) endorsed by a Department of Defense (DOD)-listed Religious Organization (RO) and commissioned as CHC officers.

        (2) As a condition of appointment, every RMP must be willing to function in a pluralistic environment in the military, where diverse religious traditions exist side-by-side with tolerance and respect. Every RMP must be willing to support directly and indirectly the free exercise of religion by all military members of the DON, their family members, and other persons authorized to be served, in cooperation with other chaplains and RMPs. Chaplains are trained to minister within the specialized demands of the military environment without compromising the tenets of their own religious tradition.

        (3) In providing religious ministry, chaplains shall strive to avoid the establishment of religion to ensure that free exercise rights are protected for all authorized personnel.

        (4) Chaplains will provide ministry to those of their own faith, facilitate ministry to those of other faiths, and care for all service members, including those who claim no religious faith. Chaplains shall respect the rights of others to their own religious beliefs, including the right to hold no beliefs.

        (5) Chaplains advise commands in matters of morale, morals, ethics, and spiritual well-being. They also serve as the principal advisors to commanders for all issues regarding the impact of religion on military operations.

        (6) Chaplains are non-combatants. Chaplains are not authorized to obtain weapons qualifications, warfare qualifications, or bear arms; however, chaplains who attained weapons or warfare qualifications during prior service as a combatant are authorized to wear their awards and/or warfare qualifications. Chaplains are eligible to qualify for and to wear the insignia of qualification designations such as Fleet Marine Force, Basic Parachutist, and Navy/Marine Parachutist.

SECNAVINST 1730.7C
February 21, 2006

4

6.  Responsibilities of Commanders

    a.  Commanders shall provide a Command Religious Program
(CRP) in support of religious needs and preferences of the
members of their commands, eligible family members and other
authorized personnel.  The CRP is supported with appropriated
funds at a level consistent with other personnel programs within
DON.

    b.  Chaplains will not be compelled to participate in
religious activities inconsistent with their beliefs.

    c.  Commanders retain the responsibility to provide guidance
for all command functions.  In planning command functions,
commanders shall determine whether a religious element is
appropriate.  In considering the appropriateness for including a
religious element, commanders, with appropriate advice from a
chaplain, should assess the setting and context of the function;
the diversity of faith that may be represented among the
participants; and whether the function is mandatory for all
hands.  Other than Divine/Religious Services, religious elements
for a command function, absent extraordinary circumstances,
should be non-sectarian in nature.  Neither the participation of
a chaplain, nor the inclusion of a religious element, in and of
themselves, renders a command function a Divine Service or
public worship. Once a commander determines a religious element
is appropriate, the chaplain may choose to participate based on
his or her faith constraints.  If the chaplain chooses not to
participate, he or she may do so with no adverse consequences.
Anyone accepting a commander's invitation to provide religious
elements at a command function is accountable for following the
commander's guidance.

    d.  Commanders shall, when in a combat area, only assign,
detail, or permit chaplains, as non-combatants under the Geneva
Convention, to perform such duties as are related to religious
ministry under Art. 1063 of reference (b).

    e.  Commanders shall not assign chaplains collateral duties
that violate the religious practices of the chaplain's religious
organization or that require services in a capacity in which the
chaplain may later be called upon to reveal privileged or
sensitive information.

    f.  Commanders shall not assign chaplains duties to act as
director, solicitor, or treasurer of funds, other than
administrator of a Religious Offering Fund; or serve on a court-
martial; or stand watches other than that of duty chaplain.

SECNAVINST 1730.7C
February 21, 2006

5

7. <u>Confidential Communication to Chaplains and Religious
Program Specialists</u>. Enclosure (2), hereby incorporated by
reference, sets forth DON policy on confidential communication
to chaplains and RPs.

8. <u>Accommodation of Religious Practices.</u> Enclosure (3), hereby
incorporated by reference, sets forth DON policy on
accommodation of religious practices.

9. <u>Responsibilities</u>

    a.  The CNO shall exercise oversight to ensure compliance
with this instruction and shall implement the policy in this
instruction throughout the Navy.  The CNO shall initiate action
with the Commandant of the Coast Guard and the Administrator of
the Maritime Administration to implement this policy when Navy
Chaplains provide religious ministry to those agencies.

    b.  The CMC shall issue orders to implement this instruction
throughout the Marine Corps.


                         Donald C. Winter
                         Secretary of the Navy


Distribution:
Electronic only, via Navy Directives Website
http://neds.daps.dla.mil

SECNAVINST 1730.7C
February 21, 2006

DEFINITIONS

1. <u>Command Religious Program (CRP)</u>.  The comprehensive program of Religious Ministry that is planned, programmed, budgeted, and implemented to meet identified Religious Ministry requirements of a command.

2. <u>Contract Religious Ministry Professional</u>.  A civilian RMP endorsed by a specific DOD-listed RO and contracted on a non-personal services basis using competitive procedures.  These RMPs provide religious ministries for members of the military, their dependents, and other authorized persons of the contract RMP's religious organization.  Commands shall assign a contracting officer's technical representative (COTR) to monitor contract RMP performance.

3. <u>Divine Services</u>.  A term of art used in Section 6031 of reference (a) and Article 0817 of reference (b) to refer to public worship and religious services conducted afloat, in the field, or on military bases and installations by a military chaplain.  Under reference (a), Commanders "shall cause divine services to be performed" and a chaplain has the right to conduct divine services "according to the manner and forms" of his or her religious organization.  Divine Services are command functions, which take place according to the manner and forms of religious organizations.  Participation in Divine Services shall be voluntary, with the exception of personnel present in an official support capacity.

4. <u>Ecclesiastical Endorsing Agent</u>.  An individual authorized by an RO to provide or withdraw ecclesiastical endorsements on its behalf.  Each RO is limited to a single Ecclesiastical Endorsing Agent.  Policy regarding their visits to commands is provided in reference (d).

5. <u>Public Worship</u>.  A term of art used in section 6031 of reference (a) that consists of Divine Services and Religious Services exclusively.  Command functions, other than Divine/Religious Services, that include religious elements do not constitute public worship.

6. <u>Religious Elements</u>.  Includes prayers, invocations, reflections, meditations, benedictions, or other religious or faith-based features traditionally or customarily incorporated in command functions other than Divine or Religious Services.

SECNAVINST 1730.7C
February 21, 2006

7. <u>Religious Ministry</u>.  The entire spectrum of professional duties performed by Navy chaplains, Religious Program Specialists (RPs), and designated personnel; to include providing for and/or facilitating required religious needs and practices.

8. <u>Religious Ministry Professional (RMP)</u>.  An individual endorsed by a DOD-listed RO, per reference (d), to represent the organization and to conduct its religious observances or ceremonies.  An RMP is a fully qualified member of the clergy for those religious organizations that have a tradition of professional clergy or their equivalents.

9. <u>Religious Organization</u> – Under reference (d), an entity that is organized and functions primarily to perform religious ministries to a non-military lay constituency and that has met the religious purposes test of Section 501(c)(3) of Title 26, U.S. Code [2000], and holds current status as a Section 501(c)(3) Schedule "A" organization.  Religious Organizations possess ecclesiastical authority to endorse and withdraw endorsement for Religious Ministry Professionals serving under their authority.

10. <u>Religious Program Specialists (RP)</u>.  RPs support chaplains in the planning, programming, administration, and coordination of the CRP.  RPs are combatants who provide force protection and physical security for chaplains in operational environments.

11. <u>Religious Services</u>.  Worship events conducted in the manner and forms of Religious Organizations and led by Lay Leaders, Contract Civilian Religious Ministry Professionals, or other authorized personnel.  Participation in Religious Services shall be voluntary, with the exception of personnel present in a support capacity.

Enclosure (1)

SECNAVINST 1730.7C
February 21, 2006

CONFIDENTIAL COMMUNICATION TO CHAPLAINS
AND RELIGIOUS PROGRAM SPECIALISTS

1. Discussion. The unconstrained ability to discuss personal matters in complete privacy encourages full and complete disclosure by personnel and family members seeking chaplain assistance. Such disclosure establishes a sacred trust, facilitates increased morale and mission readiness, and benefits both the individual and the institution. The DON benefits from having personnel and family members who trust chaplains. The institution profits from the pastoral care given to its people. Pastoral care can only be done properly under the protection of confidential communications.

2. Definitions

    a. Confidential Communication

        (1) Confidential communication includes acts of religion, matters of conscience, and any other information conveyed to a chaplain in the chaplain's capacity as a spiritual adviser or to an RP in the RP's official capacity and is not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the purpose of the communication or to those reasonably necessary for the transmission of the communication.

        (2) The confidential relationship extends beyond the end of the counseling relationship and beyond the death of the person making the disclosure.

        (3) Confidential communication can be conveyed through oral or written means, including, but not limited to, letters and electronic media.

        (4) All chaplains and RPs have the professional obligation to keep private all confidential communication disclosed to them in their official capacities, intended to be held in confidence, and made as an act of religion or a matter of conscience.

        (5) Confidential communications can be made only to chaplains or RPs in their support role. Communication with Lay Leaders, Directors of Religious Education, and other support personnel are not confidential and are not included in this policy. Lay Leaders, Directors of Religious Education, and support personnel who inadvertently become aware of confidential

Enclosure (2)

SECNAVINST 1730.7C
February 21, 2006

communications must keep such matters confidential, and
immediately refer the matter to a chaplain.

    b. Privileged Communications. Privileged communications, a
subset of confidential communications, is a legal term of art.
The scope of the clergy-penitent privilege is defined in
Military Rule of Evidence (MRE) 503 in reference (f).

3. <u>Policy</u>

    a. The term "confidential communications" includes the
legal recognition of the clergy-penitent privilege, all
communications between uniformed chaplains and those who confide
in them as an act of religion, a matter of conscience, or in
their capacity as spiritual advisors. Commanders and chaplains
are required to honor the confidential relationship between
service personnel and military chaplains. This protection and
obligation extends to military chaplains. This protection and
obligation extends to RPs acting in their supporting role.

    b. The unique role of military chaplains includes a sacred
trust of maintaining absolute confidentiality. Therefore,
chaplains and RPs are bound by this inviolable trust. Neither
the holding of additional professional credentials, nor
requirements imposed by state law, relieve the chaplain of this
responsibility. Any authorized person who has access to a
military chaplain or RP is covered by this policy.

    c. In all relationships, including counseling and advisory,
chaplains will inform all parties, including counselees and
commanders, of the ramifications of this policy on
confidentiality and privileged communication. Counselees have
the right to make decisions pertaining to disclosure, free from
coercion. If a chaplain recommends a referral to another
agency, the chaplain will inform the counselee s/he may not have
the same degree of confidentiality as with the chaplain.

    d. Referrals. Consultation with and referral to another
chaplain is permissible only with the written consent of the
counselee.

    e. Multiple Counselees. When multiple counselees (e.g.,
marriage and family) are parties to the same counseling session,
chaplains will preserve confidentiality unless all parties
consent to disclosure.

SECNAVINST 1730.7C
February 21, 2006

f.  Conscientious Objection.  Conscientious objection assessment interviews directed by the Commanding Officer, are administrative functions, not counseling relationships. Therefore, they are not confidential communications and the interviewee shall be so informed.  A chaplain who has a prior existing counseling relationship with a service member requesting designation as a conscientious objector shall not be appointed to evaluate that service member.

g.  Supervisory Role.  Chaplains may have responsibilities that involve administrative and disciplinary action with those whom they supervise.  To safeguard confidential and privileged communication, chaplains in supervisory roles are to avoid entering into such communications with personnel they supervise. At the onset of the supervisory relationship, supervisors will inform those they supervise of these limitations on pastoral relationships.  Personnel under the supervision of a chaplain are encouraged to make their confidential communication to a chaplain outside their chain of command.

h.  Counseling Records.  Records or notes compiled by a chaplain in his/her counseling duties are "work product" and considered confidential.  As such, chaplains must secure any such records, in whatever medium or format, containing confidential communication.  When no longer needed, they will be destroyed.  When current or former counselees are referenced in consultation, supervision, or education, their identities must be thoroughly protected.

i.  Subpoena of Records.  If a subpoena or other demand for documents or media containing confidential communication is received, the chaplain or a representative will immediately contact, at a minimum, the servicing legal office, the chain of command, and the Chief of Chaplains.

4.  Responsibilities

a.  The Chief of Naval Operations and the Commandant of the Marine Corps shall implement the policies in this enclosure.

b.  The Chief of Chaplains shall ensure that training occurs at entry level and periodically thereafter.  Such training will enable chaplains to:

(1) Regularly brief their command structure on the ramifications of this policy.

3                              Enclosure (2)

(2) Train personnel under their supervision including those not bound by this policy (such as volunteers, contractors, etc.).

c. Commanders are required to honor the confidential relationship between service personnel and military chaplains. Commanders shall:

(1) Not penalize a chaplain or RP for abiding within the parameters of this policy.

(2) Upon the death of a chaplain, appoint only a chaplain to review the decedent's files and destroy any confidential communications.

5. Action. Actions inconsistent with this policy may result in administrative or disciplinary action. Consequences may include, but are not limited to, loss of chaplain or RP credentials, and/or action under applicable provisions of the Uniform Code of Military Justice or the Military Personnel Manual.

SECNAVINST 1730.7C
February 21, 2006

ACCOMMODATION OF RELIGIOUS PRACTICES

1.  Purpose.  To provide policy and guidance for the
accommodation of religious practices within the DON under
reference (g).

2.  Applicability.  The policies and procedures in this
instruction apply solely to the accommodation of religious
practices within the DON and no other context.

3.  Definitions

    a.  Department of the Navy.  The DON, for purposes of this
enclosure, includes applicants for entry to and members of the
Navy, Navy Reserve, Marine Corps, Marine Corps Reserve, as well
as midshipmen at the U.S. Naval Academy and Reserve Officer
Training Corps, and officers and officer candidates in all
officer accession programs.

    b.  Religious Observance.  Religious observances include
participating in worship services and following other doctrinal
requirements on Sabbath and holy days.

    c.  Religious Dietary Observances.  Religious dietary
observances include doctrinal or traditional requirements on
types of foodstuffs or the means of preparation.

    d.  Religious Apparel.  Religious apparel is defined as
articles of clothing worn as part of the doctrinal or
traditional observance of the religious faith practiced by the
service member.  Hair and grooming practices required or
observed by religious groups are not included within the meaning
of religious apparel.

    e.  Religious Medical Practices.  Religious medical
practices include doctrinal or traditional objections to
receiving immunizations and providing Deoxyribonucleic Acid
(DNA) specimen samples.

4.  Policy.  DON policy is to accommodate the doctrinal or
traditional observances of the religious faith practiced by
individual members when these doctrines or observances will not
have an adverse impact on military readiness, individual or unit
readiness, unit cohesion, health, safety, discipline, or mission
accomplishment.

Enclosure (3)

SECNAVINST 1730.7C
February 21, 2006

    a.  Accommodation of a member's religious practices cannot be guaranteed at all times but must depend on military necessity.  Determination of necessity rests entirely with the commanding officer.

    b.  The guidelines in this instruction shall be used in the exercise of command discretion concerning the accommodation of religious practices.  Nothing in these guidelines, except as expressly provided herein, shall be interpreted to require a specific form of accommodation in individual circumstances.

5.  Religious observances shall be accommodated, except by reason of necessity, as provided in reference (b).  Except by reason of necessity commanders should avoid scheduling conflicts with major religious observances.

6.  <u>Dietary Observance</u>.  Commanders normally accommodate religious dietary requirements through subsistence in kind.  Subsistence in kind includes serving of appropriate meals or issuing of Meals Ready to Eat, Religious, specifically designed to meet religious requirements.  Commanders may authorize separate rations within the guidelines of reference (h).  In acting on requests for separate rations, the religious doctrines and traditions of the member's religious faith should be considered on the same basis as other personal reasons for separate rations.  To the extent that health, safety, or readiness in the unit is not compromised, commanding officers may authorize individuals to provide their own supplemental food rations at sea or in the field environment to accommodate the doctrinal or traditional observances of their religious faith.

7.  <u>Immunizations</u>.  Immunization requirements may be waived when requested by the member based on the doctrinal or traditional practices of the religious faith practiced by the service member.

    a.  The religious objection of the service member must be balanced against the medical risk to the member and the military unit, and military requirements such as alert status, deployment potential, and availability of the member for reassignment to units requiring full medical readiness.  To provide for consistent application of these guidelines, immunization waivers will be decided by the Surgeon General of the Navy or headquarters level designee.  Individual requests shall be submitted to Chief, Bureau of Medicine and Surgery (MEDCOM-24), via the commanding officer and Chief of Naval Operations (CNO) (N1/NT) or Commandant of the Marine Corps (CMC) (DCS (M&RA)), as appropriate.

Enclosure (3)

SECNAVINST 1730.7C
February 21, 2006

b.  Commanding officers may subsequently revoke waivers for service members at imminent risk of disease due to exposure or to conform to international health regulations incident to foreign travel or unit deployment.  The guidance in paragraph 11.b on irresolvable differences must be considered in such circumstances.

8.  Deoxyribonucleic Acid (DNA) Specimen Sampling

a.  Requests for waiver of the DNA specimen sample requirement will be decided by CNO (N1/NT) or CMC (DCS (M&RA)). Individual requests shall be submitted to CNO (N1/NT) or CMC (DCS (M&RA)), as appropriate, via the commanding officer.

b.  When determining whether to grant a request for waiver on religious grounds, the five factors contained in paragraph 11.a as supplemented by the following shall be considered:

(1) DNA analysis fulfills the military requirement of quickly and accurately identifying the remains of service members under reference (i).  DNA analysis is not conducted on the specimen unless necessary for identification of remains or for other narrowly defined purposes.  The specimen sample will be destroyed at the request of the member upon completion of service.

(2) Regarding the cumulative impact of repeated accommodations of a similar nature and previous treatment of similar requests, consider whether granting an accommodation sets a precedent that could adversely impact on other Department of Defense medical policies and programs, including mandatory pre-deployment processing, medical screening activities, HIV testing and medical surveillance program serum collection.

9.  Uniforms

a.  Religious items or articles not visible or otherwise apparent may be worn with the uniform, provided they do not interfere with the performance of the member's military duties or interfere with the proper wearing of any authorized article of the uniform.

b.  Visible items of religious apparel may be authorized for wear with the uniform, except when the item is not neat and conservative, its wearing will interfere with the performance of the member's military duties or is specifically prohibited in

SECNAVINST 1730.7C
February 21, 2006

subparagraphs 10d and 10e.  In the context of the wearing of a
military uniform, "neat and conservative" items or religious
apparel are those that:

(1) Are discreet, tidy, and not dissonant or showy in
style, size, design, brightness or color.

(2) Do not replace or interfere with the proper wearing
of any authorized article of the uniform.

(3) Are not temporarily or permanently affixed or
appended to any article of the uniform.

c.  The standards in subparagraph 10b, and the prohibitions
in subparagraphs 10d and 10e, are intended to serve as a basis
for determining a service member's entitlement to wear religious
apparel with the uniform.  For example, unless prohibited by
subparagraph 10d or 10e, religious headgear of a style and size
that can be completely covered by standard military headgear may
be worn with the uniform whenever a military cap, hat, or other
headgear is not prescribed.  It may also be worn underneath
military headgear as long as it does not interfere with the
proper wearing, functioning, or appearance of the prescribed
headgear.

d.  Whether an item of a religious apparel interferes with
the performance of the service member's military duties depends
on the characteristics of the item, the circumstances of its
intended wear, and the particular nature of the member's duties.
Factors in determining if an item of religious apparel
interferes with the military duties include, but are not limited
to, whether the item may;

(1) Impair the safe and effective operation of weapons,
military equipment, or machinery.

(2) Pose a health or safety hazard to the wearer or
others.

(3) Interfere with the wearing or proper functioning of
special or protective clothing or equipment (e.g., helmets, flak
jackets, flight suits, camouflage uniforms, gas masks, wet
suits, and crash and rescue equipment).

(4) Otherwise impair the accomplishment of the military
mission.

SECNAVINST 1730.7C
February 21, 2006

e.  Visible items of religious apparel shall not be worn while wearing historical or ceremonial uniforms; participating in review formations, parades, honor or color guards and similar ceremonial details and functions.

f.  Jewelry bearing religious inscriptions or otherwise indicating affiliation or belief may be worn subject to the same uniform regulations prescribed for jewelry that is not of a religious nature.

g.  Chaplains may wear any religious apparel required by their religious organizations with the uniform while conducting worship services and during the performance of rites and rituals distinct to their faith groups.

h.  Service members may wear any required religious apparel distinct to their faith group with the uniform while in attendance at organized worship services.

i.  To ensure consistency of application, the CNO and CMC may authorize visible items of religious apparel, within the guidelines in this instruction.  This authority may be delegated within their headquarters staffs.  Requests to authorize a type of religious apparel not previously authorized shall be submitted to service headquarters for approval under procedures specified by CNO or CMC.  CNO and CMC will provide an information copy of the approval or denial to the Assistant Secretary of the Navy (Manpower and Reserve Affairs) (ASN (M&RA)).

j.  Subject to the guidelines in subparagraph 4d, and the limitations in subparagraphs 10b, 10d, 10e and 10i, commanding officers may approve individual requests for wearing authorized visible religious apparel with the uniform.  In any case in which a commanding officer denies a request to wear an item of religious apparel with the uniform, the member shall be advised of the right to request a review of that refusal by CNO or CMC, as appropriate, via the chain of command.  When such review is requested, the review shall occur within 30 days following the date of request for cases arising in the United States, and within 60 days for all other cases.  Exceptions to these deadlines shall be limited to unusual circumstances.  Visible items of religious apparel may not be worn with the uniform until approved.

10.  Responsibilities

a.  Commanders will respond to requests for accommodation in a just and timely manner, supporting religious freedom and

SECNAVINST 1730.7C
February 21, 2006

respect for religious diversity within the Sea Services.

b.  Commanders and commanding officers may approve requests for religious accommodation within the guidelines of this instruction.  To promote standard procedures for resolving difficult questions involving accommodation of religious practices, commanding officers shall consider the following factors:

(1) The importance of military requirements, including individual readiness, unit readiness, unit cohesion, health, safety, morale, and discipline.

(2) The religious importance of the accommodation to the requester.

(3) The cumulative impact of repeated accommodations of a similar nature.

(4) Alternative means available to meet the required accommodation.

(5) Previous treatment of the same or similar requests, including treatment of similar requests made for other than religious reasons.

c.  When requests are precluded by military necessity, commanders should seek reasonable alternatives.

d.  When requests for accommodation are not in the best interests of the unit but continued tension between the unit's requirements and the individual's religious beliefs is apparent, administrative action is authorized, but not limited to:

(1) Reassignment, reclassification or separation consistent with Secretary of the Navy (SECNAV) and Service regulations.

(2) Nothing in this instruction precludes action under the Uniform Code of Military Justice in appropriate circumstances.

11.  Information and Education

a.  The CNO and CMC shall provide DON policy on accommodation of individual religious practices and military requirements in paragraphs 5 and 5a of this enclosure to

SECNAVINST 1730.7C
February 21, 2006

applications for commissioning, enlistment and reenlistment, and shall require the member's signature acknowledging the DON policy.

b.  The CNO and CMC shall incorporate relevant materials on religious traditions, practices, policies, this instruction, and reference (a), in curricula for command, judge advocate, chaplain and similar courses of instruction and orientations.

12.  Action

a.  ASN (M&RA) is responsible for overall policy control and program execution.

b.  The CNO and CMC shall implement the policies and procedures in this enclosure.

c.  The CNO and CMC shall revise Service regulations governing uniforms, food service, separate rations, immunizations, and DNA sampling to conform to this instruction within 90 days from the date of this instruction.  Provide copies of each such regulation revision to ASN (M&RA).

Exhibit 7

DEPARTMENT OF THE NAVY
OFFICE OF THE SECRETARY
1000 NAVY PENTAGON
WASHINGTON, DC 20350-1000

IN REPLY REFER TO

SECNAVINST 1730.7B
N097
12 October 2000

SECNAV INSTRUCTION 1730.7B

From:  Secretary of the Navy

Subj:  RELIGIOUS MINISTRY SUPPORT WITHIN THE DEPARTMENT OF THE
       NAVY

Ref:   (a) DoD Directive 1304.19 of 18 Sep 93 (NOTAL)
       (b) U.S. Navy Regulations, 1990
       (c) Title 10, United States Code
       (d) DoD Directive 5120.8 of 20 Mar 95 (NOTAL)

1.  Purpose.  To assign responsibilities for religious ministry
support within the Department of the Navy.  This revision should be
reviewed in its entirety.

2.  Cancellation.  SECNAVINST 1730.7A.

3.  Applicability.  This instruction applies to all members of the
Department of the Navy.

4.  Definitions

    a.  Chaplains.  As commissioned officers, Navy chaplains are
professionally qualified clergy of a certifying faith group who
provide for the free exercise of religion for all military members of
the Department of the Navy, their family members, and other authorized
persons, in accordance with reference (a).  Chaplains advise commands
in matters of morale, morals and spiritual well being.  In accordance
with Article 1063 of reference (b), chaplains shall be detailed or
permitted to perform only such duties as are related to religious
ministry support.  Chaplains shall not bear arms.  Chaplains shall not
be assigned collateral duties which violate the religious practices
of the chaplain's faith group, require services as director, solicitor,
or treasurer of funds other than administrator of a Religious Offering
Fund, serve on a court-martial or stand watches other than that of
duty chaplain.

    b.  Chief of Chaplains.  The Chief of Chaplains in accordance with
Section 5142 of reference (c) is appointed by the President to perform
such duties as described by the Secretary of the Navy and law.  In
this capacity, the Chief of Chaplains serves as the Director of
Religious Ministry Support for the Department of the Navy.  The

SECNAVINST 1730.7B
12 October 2000

Chief of Chaplains in accordance with Article 1009 of reference (b) is
principal advisor and sponsor on matters concerning Chaplain
Corps officers and Religious Program Specialists, and as head of the
Chaplain Corps is the primary spokesperson regarding professional
matters with the military and civilian communities.

c.  Deputy Chief of Chaplains.  The Deputy Chief of Chaplains as
Deputy Director for Religious Ministry Support in the Department of
the Navy is detailed by the Secretary of the Navy in accordance with
Section 5142a of reference (c) to perform such duties as prescribed by
the Secretary of the Navy, and serves as Chaplain of the Marine Corps.

d.  Department of the Navy.  The Naval Organization is organized
under the Secretary of the Navy and consists of the following:  The
Office of the Secretary of the Navy; the Office of the Chief of Naval
Operations; the Headquarters, U.S. Marine Corps; the entire operating
forces, including naval aviation, of the Navy and of the Marine Corps,
including the reserve components of such forces; all field activities,
headquarters, forces, bases, installations, activities and functions
under the control or supervision of the Secretary of the Navy; and the
U.S. Coast Guard when operating as a part of the Navy under law.

e.  Religious Ministry Support.  The entire spectrum of
professional duties, performed by Navy chaplains and Religious Program
Specialists, to include providing for or facilitating required
religious needs and practices.

f.  Command Religious Program (CRP).  A CRP provides religious
ministry support that is planned, programmed, budgeted, and
implemented to meet identified religious ministry support
requirements.

5.  Policy.  It is Department of the Navy policy that commanding
officers shall provide Command Religious Programs (CRPs) in support of
the religious needs and preferences for all members of the naval
service, eligible family members and other authorized personnel.  The
Chief of Chaplains, as the Director of Religious Ministry Support for
the Department of the Navy, shall advise the Secretary of the Navy on
policy formulation and oversight pertaining to the implementation of
religious ministry support, plans, programs, and facilities.

a.  Organizational Placement and Responsibilities

(1) The Chief of Chaplains, as Director of Religious Ministry
Support for the Department of the Navy:

SECNAVINST 1730.7B
12 October 2000

(a) Advises the Secretary of the Navy on all matters pertaining to the free exercise of religion within the naval service in accordance with Article 1009 of reference (b) and Section 5142 of reference (c). The Chief of Chaplains shall provide regular and frequent advice on:

<u>1</u>. Religious, ethical and moral implications of all Department of the Navy policies and actions.

<u>2</u>. Religious faith-group policies and positions affecting the Department of the Navy.

<u>3</u>. All matters pertaining to the organization and utilization of the Chaplain Corps as a staff corps of the Navy.

<u>4</u>. All matters pertaining to the organization and utilization of Religious Program Specialists.

(b) The Chief of Chaplains serves on the Armed Forces Chaplains Board (AFCB) in accordance with reference (d). As a member of the AFCB, the Chief of Chaplains represents the Secretary of the Navy to:

<u>1</u>. Department of Defense (DoD).

<u>2</u>. Chiefs of Chaplains/Chaplain Services of other DoD components.

<u>3.</u> 3. The Nation's religious faith groups.

(c) Advises the Commandant of the Marine Corps on religious ministry matters in reference to support, plans, programs, policy, personnel and facilities.

(d) Advises the Commandant of the Coast Guard on religious ministry matters relative to the use of Navy Chaplains in the Coast Guard.

(2) The Deputy Chief of Chaplains is the principal assistant to the Chief of Chaplains. He shall also serve as Chaplain of the Marine Corps, supervising religious ministry in the Marine Corps; and in accordance with reference (d) serve as a member of the AFCB.

(3) The Chief of Chaplains, as senior Chaplain in the Navy, advises the Chief of Naval Operations on all matters pertaining to the free exercise of religion within the Navy and assists the Chief of Naval Operations in carrying out his responsibilities in accordance with Article 1009 of reference (b) and Sections 5031 and 5032 of reference (c). In this capacity, the Chief of Chaplains:

SECNAVINST 1730.7B
12 October 2000

(a) Directs officers of the Chaplain Corps, Religious Program Specialists and all other designated persons engaged in Religious Ministry Support within the Navy, the U.S. Marine Corps, and other governmental agencies receiving religious ministry support from Navy chaplains.

(b) Serves as program sponsor for the professional development, education and training of Chaplain Corps officers and Religious Program Specialists.

(c) Serves as program sponsor for the Chaplains Religious Enrichment Development Operation (CREDO).

(d) Provides technical sponsorship for the acquisition, operation, and maintenance of religious ministry support facilities, collateral equipment and other logistical support both ashore and afloat.

(4) The Chief of Chaplains shall, with respect to all duties pertaining to the procurement, distribution and support of Chaplain Corps personnel, report to and be supported by the Chief of Naval Personnel in accordance with Section 5142 of reference (c).

6. <u>Responsibilities</u>

a. The <u>Chief of Naval Operations</u> (CNO) shall exercise oversight to ensure compliance with this instruction and shall implement the policy in this instruction throughout the Navy. CNO shall initiate action with the Commandant of the U.S. Coast Guard and the Administrator of the Maritime Administration to implement this policy when using Navy Chaplains to provide religious ministry support.

b. The <u>Commandant of the Marine Corps</u> (CMC) shall issue orders to implement this instruction throughout the Marine Corps.

7. <u>Action</u>. CNO and CMC shall forward implementing instructions to CNO (N097).

Richard Danzig

Distribution:
SNDL A1 (SECNAV)
    A2 (Department of the Navy Staff Offices)
    A3 (CNO)
    A5 (CHNAVPERS)
    A6 (CMC)
    B5 (COGUARD)(Commandant only)

# Exhibit 8



**DEPARTMENT OF THE NAVY**
OFFICE OF THE SECRETARY
1000 NAVY PENTAGON
WASHINGTON, D.C. 20350-1000

SECNAVINST 1730.8A
N097
31 December 1997

SECNAV INSTRUCTION 1730.8A

From:   Secretary of the Navy
To:     All Ships and Stations

Subj:   ACCOMMODATION OF RELIGIOUS PRACTICES

Ref:    (a) DOD Directive 1300.17 of 3 Feb 88 (NOTAL)
        (b) SECNAVINST 1730.7A (NOTAL)
        (c) U.S. Navy Regulations, 1990
        (d) DOD Pay Manual, Article 30101ff
        (e) DOD Directive 5154.24 of 28 Oct 96 (NOTAL)

1. <u>Purpose</u>. To provide revised policy and guidance for the accommodation of religious practices within the Department of the Navy under reference (a).

2. <u>Cancellation and Supersession</u>. SECNAVINST 1730.8 is hereby cancelled. This instruction supersedes provisions of all previously issued regulations and memoranda giving guidance on religious accommodations other than guidance on the exercise of religion in references (b) and (c).

3. <u>Applicability</u>

    a. This instruction applies to all members of the Navy, Naval Reserve, Marine Corps, Marine Corps Reserve, midshipmen at the U.S. Naval Academy and Reserve Officer Training Corps, officers and officer candidates in all officer accession programs and applicants for entry into military service with the Department of the Navy.

    b. The policies and procedures in this instruction apply solely to the accommodation of religious practices within the Department of the Navy and no other context.

4. <u>Policy</u>. Department of the Navy policy is to accommodate the doctrinal or traditional observances of the religious faith practiced by individual members when these doctrines or observances will not have an adverse impact on military readiness, individual or unit readiness, unit cohesion, health, safety or discipline.

SECNAVINST 1730.8A
3 1 DEC 1997

a.  Accommodation of a member's religious practices cannot be guaranteed at all times but must depend on military necessity. Determination of necessity rests entirely with the commanding officer.

b.  The guidelines in this instruction shall be used in the exercise of command discretion concerning the accommodation of religious practices.  Nothing in these guidelines, except as expressly provided herein, shall be interpreted to require a specific form of accommodation in individual circumstances.

5.  Religious Observance.  Worship services and observance of Sabbath and holy days shall be accommodated, except by reason of necessity, as provided in reference (b).  A calendar of significant holy days and days of religious observance is published under reference (b) bi-annually for command use in applying this guideline.

6.  Dietary Observance.  Enlisted personnel normally will be subsisted in kind, but may be authorized separate rations within the guidelines of reference (d).  In acting on requests for separate rations, the religious doctrines and traditions of the member's religious faith should be considered on the same basis as other personal reasons for separate rations.  To the extent that health, safety, or readiness in the unit is not compromised, commanding officers may authorize individuals to provide their own supplemental food rations at sea or in the field environment to accommodate the doctrinal or traditional observances of their religious faith.

7.  Immunizations.  Immunization requirements may be waived when requested by the member based on the doctrinal or traditional practices of the religious faith practiced by the member.

a.  The religious objection of the member must be balanced against the medical risk to the member and the military unit, and military requirements such as alert status, deployment potential, and availability of the member for reassignment to units requiring full medical readiness.  To provide for consistent application of these guidelines, immunization waivers will be decided by the Surgeon General or headquarters level designee. Individual requests shall be submitted to Chief, Bureau of Medicine and Surgery (Medcom-24) via the commanding officer and Chief of Naval Operations (CNO)(N1) or Commandant of the Marine Corps (CMC)(DCS (M&RA)), as appropriate.

2

SECNAVINST 1730.8A
3 1 DEC 1997

b.  Commanding officers may subsequently revoke waivers for members at imminent risk of disease due to exposure or to conform to international health regulations incident to foreign travel or unit deployment.  The guidance in paragraph 10b on unresolvable differences must be considered in such circumstances.

8.  DNA Specimen Sampling

a.  Requests for waiver of the DNA specimen sample requirement will be decided by CNO (N1) or CMC (DCS (M&RA)). Individual requests shall be submitted to CNO (N1) or CMC (DCS (M&RA)), as appropriate, via the commanding officer.

b.  When determining whether to grant a request for waiver on religious grounds, the five factors contained in paragraph 10a as supplemented by the following shall be considered:

(1) Regarding the importance of the military requirement, the Armed Forces DNA Repository is designated to carry out the military need to quickly and accurately identify remains of service members.  The Repository fulfills a particularly strong purpose for service members assigned to combat units and hazardous duty positions, or who are in a deployment status.

(2) Regarding the religious importance of the accommodation to the requester, emphasis should be placed on evidence, particularly that provided by third parties, of the member's well established adherence to religious beliefs that conflict with the provision of specimen samples to the DNA Repository.  Also consider that the overriding use of the specimen sample in the Repository is for the identification of remains, that DNA analysis is not conducted on the specimen unless necessary for identification of remains or for other narrowly defined purposes, and that the specimen sample will be destroyed at the request of the member upon completion of service.

(3) Regarding the cumulative impact of repeated accommodations of a similar nature and previous treatment of similar requests, consider whether granting an accommodation sets precedent that could adversely impact on other Department of Defense medical policies and programs, including mandatory pre-deployment processing, medical screening activities, HIV testing and medical surveillance program serum collection.

9.  Uniforms

a.  Religious items or articles not visible or otherwise apparent may be worn with the uniform, provided they do not

3

SECNAVINST 1730.8A
3 1 DEC 1997

interfere with the performance of the member's military duties or
interfere with the proper wearing of any authorized article of
the uniform.

b.  Visible items of religious apparel may be authorized for
wear with the uniform, except when the item is not neat and
conservative, its wearing will interfere with the performance of
the member's military duties or is specifically prohibited in
subparagraphs 9d, 9f, and 9g.

c.  Religious apparel is defined as articles of clothing worn
as part of the doctrinal or traditional observance of the
religious faith practiced by the member.  Hair and grooming
practices required or observed by religious groups are not
included within the meaning of religious apparel.

d.  In the context of the wearing of a military uniform,
"neat and conservative" items or religious apparel are those
that:

    (1) Are discreet, tidy, and not dissonant or showy in
style, size, design, brightness, or color.

    (2) Do not replace or interfere with the proper wearing
of any authorized article of the uniform.

    (3) Are not temporarily or permanently affixed or
appended to any article of the uniform.

e.  The standards in subparagraph 9d, and the prohibitions in
subparagraphs 9f and 9g, are intended to serve as a basis for
determining a member's entitlement to wear religious apparel with
the uniform.  For example, unless prohibited by subparagraph 9f
or 9g, a yarmulke may be worn with the uniform whenever a
military cap, hat, or other headgear is not prescribed.  It may
also be worn underneath military headgear as long as it does not
interfere with the proper wearing, functioning, or appearance of
the prescribed headgear.

f.  Whether an item of religious apparel interferes with the
performance of the member's military duties depends on the
characteristics of the item, the circumstances of its intended
wear, and the particular nature of the member's duties.  Factors
in determining if an item of religious apparel interferes with
the military duties include but are not limited to, whether the
item may:

4

SECNAVINST 1730.8A

3 1 DEC 1997

(1) Impair the safe and effective operation of weapons, military equipment, or machinery.

(2) Pose a health or safety hazard to the wearer or others.

(3) Interfere with the wearing or proper functioning of special or protective clothing or equipment (e.g., helmets, flack jackets, flight suits, camouflage uniforms, gas masks, wet suits, and crash and rescue equipment).

(4) Otherwise impair the accomplishment of the military mission.

g. Visible items of religious apparel shall not be worn while wearing historical or ceremonial uniforms; participating in review formations, parades, honor or color guards, and similar ceremonial details and functions.

h. Jewelry bearing religious inscriptions or otherwise indicating religious affiliation of belief may be worn subject to the same uniform regulations prescribed for jewelry that is not of a religious nature.

i. Chaplains may wear any religious apparel required by their faith groups with the uniform while conducting worship services and during the performance of rites and rituals distinct to their faith groups.

j. Service members may wear any required religious apparel distinct to their faith group with the uniform while in attendance at organized worship services.

k. To ensure consistency of application, the CNO and CMC may authorize visible items of religious apparel, within the guidelines in this instruction. This authority may be delegated within their headquarters staffs. Requests to authorize a type of religious apparel not previously authorized shall be submitted to service headquarters for approval under procedures specified by CNO or CMC. CNO and CMC will provide an information copy of the approval or denial to the Assistant Secretary of the Navy (Manpower and Reserve Affairs) (ASN (M&RA)).

l. Subject to the guidelines in subparagraph 9c, and the limitations in subparagraphs 9d, 9f, and 9g, commanding officers may approve individual requests for wearing authorized visible

5

SECNAVINST 1730.8A
3 1 DEC 1997

religious apparel with the uniform.  In any case in which a
commanding officer denies a request to wear an item of religious
apparel with the uniform, the member shall be advised of the
right to request a review of that refusal by CNO or CMC, as
appropriate, via the chain of command.  When such review is
requested, the review shall occur within 30 days following the
date of request for cases arising in the United States, and
within 60 days for all other cases.  Exceptions to these
deadlines shall be limited to unusual circumstances.  Visible
items of religious apparel may not be worn with the uniform until
approved.

10. Procedures

     a.  Commanders and commanding officers may approve requests
for religious accommodations within the guidelines of this
instruction.  To promote standard procedures for resolving
difficult questions involving accommodation of religious
practices, commanding officers shall consider the following
factors.  These factors recognize that each command may be
affected by different conditions and require individual
consideration of each request.  These factors are:

     (1) The importance of military requirements, including
individual readiness, unit readiness, unit cohesion, health,
safety, morale, and discipline.

     (2) The religious importance of the accommodation to the
requester.

     (3) The cumulative impact of repeated accommodations of a
similar nature.

     (4) Alternative means available to meet the requested
accommodation.

     (5) Previous treatment of the same or similar requests,
including treatment of similar requests made for other than
religious reasons.

     b.  When requests for accommodation are not in the best
interest of the unit but continued tension between the unit's
requirements and the individual's religious beliefs is apparent,
administrative action is authorized, but not limited to:

6

SECNAVINST 1730.8A

3 1 DEC 1997

     (1) Reassignment, reclassification, or separation consistent with Secretary of the Navy (SECNAV) and Service regulations.

     (2) Nothing in this instruction precludes action under the Uniform Code of Military Justice in appropriate circumstances.

11. Information and Education

    a.  The CNO and CMC shall provide the statement of DON policy on accommodation of individual religious practices and military requirements in paragraphs 4 and 4a of this instruction to applicants for commissioning, enlistment and reenlistment, and shall require the member's signature acknowledging the DON policy.

    b.  The CNO and CMC shall incorporate relevant materials on religious traditions, practices, policies, this instruction, and reference (a), in curricula for command, judge advocate, chaplain, and similar courses of instruction and orientations.

12. Responsibility.  ASN (M&RA) is responsible for overall policy control and program execution.

13. Action

    a.  The CNO and CMC shall implement the policies and procedures in this instruction.

    b.  The CNO and CMC shall revise Service regulations governing uniforms, food service, separate rations, immunizations, and DNA sampling, to conform with this instruction within 90 days from the date of this instruction.  Provide copies of each such regulation revision to ASN (M&RA).

Jerry M. Hultin
Secretary of the Navy
Acting

7

SECNAVINST 1730.8A
3 1 DEC 1997

Distribution:
SNDL Parts 1 and 2
MARCORPS PCN 71000000000 and 71000000100

Order from:
SECNAV/OPNAV Directive Control Office
Washington Navy Yard, Bldg. 200
901 M Street, SE
Washington, DC  20374-5074

8

# Exhibit 8



**DEPARTMENT OF THE NAVY**
OFFICE OF THE SECRETARY
1000 NAVY PENTAGON
WASHINGTON, D.C 20350-1000

SECNAVINST 1730.8A
N097
31 December 1997

SECNAV INSTRUCTION 1730.8A

From:   Secretary of the Navy
To:     All Ships and Stations

Subj:   ACCOMMODATION OF RELIGIOUS PRACTICES

Ref:    (a) DOD Directive 1300.17 of 3 Feb 88 (NOTAL)
        (b) SECNAVINST 1730.7A (NOTAL)
        (c) U.S. Navy Regulations, 1990
        (d) DOD Pay Manual, Article 30101ff
        (e) DOD Directive 5154.24 of 28 Oct 96 (NOTAL)

1.  Purpose.  To provide revised policy and guidance for the
accommodation of religious practices within the Department of the
Navy under reference (a).

2.  Cancellation and Supersession.  SECNAVINST 1730.8 is hereby
cancelled.  This instruction supersedes provisions of all
previously issued regulations and memoranda giving guidance on
religious accommodations other than guidance on the exercise of
religion in references (b) and (c).

3.  Applicability

    a.  This instruction applies to all members of the Navy,
Naval Reserve, Marine Corps, Marine Corps Reserve, midshipmen at
the U.S. Naval Academy and Reserve Officer Training Corps,
officers and officer candidates in all officer accession programs
and applicants for entry into military service with the
Department of the Navy.

    b.  The policies and procedures in this instruction apply
solely to the accommodation of religious practices within the
Department of the Navy and no other context.

4.  Policy.  Department of the Navy policy is to accommodate the
doctrinal or traditional observances of the religious faith
practiced by individual members when these doctrines or
observances will not have an adverse impact on military
readiness, individual or unit readiness, unit cohesion, health,
safety or discipline.

SECNAVINST 1730.8A
3 1 DEC 1997

a.  Accommodation of a member's religious practices cannot be guaranteed at all times but must depend on military necessity. Determination of necessity rests entirely with the commanding officer.

b.  The guidelines in this instruction shall be used in the exercise of command discretion concerning the accommodation of religious practices.  Nothing in these guidelines, except as expressly provided herein, shall be interpreted to require a specific form of accommodation in individual circumstances.

5.  Religious Observance.  Worship services and observance of Sabbath and holy days shall be accommodated, except by reason of necessity, as provided in reference (b).  A calendar of significant holy days and days of religious observance is published under reference (b) bi-annually for command use in applying this guideline.

6.  Dietary Observance.  Enlisted personnel normally will be subsisted in kind, but may be authorized separate rations within the guidelines of reference (d).  In acting on requests for separate rations, the religious doctrines and traditions of the member's religious faith should be considered on the same basis as other personal reasons for separate rations.  To the extent that health, safety, or readiness in the unit is not compromised, commanding officers may authorize individuals to provide their own supplemental food rations at sea or in the field environment to accommodate the doctrinal or traditional observances of their religious faith.

7.  Immunizations.  Immunization requirements may be waived when requested by the member based on the doctrinal or traditional practices of the religious faith practiced by the member.

a.  The religious objection of the member must be balanced against the medical risk to the member and the military unit, and military requirements such as alert status, deployment potential, and availability of the member for reassignment to units requiring full medical readiness.  To provide for consistent application of these guidelines, immunization waivers will be decided by the Surgeon General or headquarters level designee. Individual requests shall be submitted to Chief, Bureau of Medicine and Surgery (Medcom-24) via the commanding officer and Chief of Naval Operations (CNO)(N1) or Commandant of the Marine Corps (CMC)(DCS (M&RA)), as appropriate.

2

SECNAVINST 1730.8A
3 1 DEC 1997

b.  Commanding officers may subsequently revoke waivers for members at imminent risk of disease due to exposure or to conform to international health regulations incident to foreign travel or unit deployment.  The guidance in paragraph 10b on unresolvable differences must be considered in such circumstances.

8.  DNA Specimen Sampling

a.  Requests for waiver of the DNA specimen sample requirement will be decided by CNO (N1) or CMC (DCS (M&RA)). Individual requests shall be submitted to CNO (N1) or CMC (DCS (M&RA)), as appropriate, via the commanding officer.

b.  When determining whether to grant a request for waiver on religious grounds, the five factors contained in paragraph 10a as supplemented by the following shall be considered:

(1) Regarding the importance of the military requirement, the Armed Forces DNA Repository is designated to carry out the military need to quickly and accurately identify remains of service members.  The Repository fulfills a particularly strong purpose for service members assigned to combat units and hazardous duty positions, or who are in a deployment status.

(2) Regarding the religious importance of the accommodation to the requester, emphasis should be placed on evidence, particularly that provided by third parties, of the member's well established adherence to religious beliefs that conflict with the provision of specimen samples to the DNA Repository.  Also consider that the overriding use of the specimen sample in the Repository is for the identification of remains, that DNA analysis is not conducted on the specimen unless necessary for identification of remains or for other narrowly defined purposes, and that the specimen sample will be destroyed at the request of the member upon completion of service.

(3) Regarding the cumulative impact of repeated accommodations of a similar nature and previous treatment of similar requests, consider whether granting an accommodation sets precedent that could adversely impact on other Department of Defense medical policies and programs, including mandatory pre-deployment processing, medical screening activities, HIV testing and medical surveillance program serum collection.

9.  Uniforms

a.  Religious items or articles not visible or otherwise apparent may be worn with the uniform, provided they do not

3

SECNAVINST 1730.8A
3 1 DEC 1997

interfere with the performance of the member's military duties or
interfere with the proper wearing of any authorized article of
the uniform.

b.  Visible items of religious apparel may be authorized for
wear with the uniform, except when the item is not neat and
conservative, its wearing will interfere with the performance of
the member's military duties or is specifically prohibited in
subparagraphs 9d, 9f, and 9g.

c.  Religious apparel is defined as articles of clothing worn
as part of the doctrinal or traditional observance of the
religious faith practiced by the member.  Hair and grooming
practices required or observed by religious groups are not
included within the meaning of religious apparel.

d.  In the context of the wearing of a military uniform,
"neat and conservative" items or religious apparel are those
that:

(1) Are discreet, tidy, and not dissonant or showy in
style, size, design, brightness, or color.

(2) Do not replace or interfere with the proper wearing
of any authorized article of the uniform.

(3) Are not temporarily or permanently affixed or
appended to any article of the uniform.

e.  The standards in subparagraph 9d, and the prohibitions in
subparagraphs 9f and 9g, are intended to serve as a basis for
determining a member's entitlement to wear religious apparel with
the uniform.  For example, unless prohibited by subparagraph 9f
or 9g, a yarmulke may be worn with the uniform whenever a
military cap, hat, or other headgear is not prescribed.  It may
also be worn underneath military headgear as long as it does not
interfere with the proper wearing, functioning, or appearance of
the prescribed headgear.

f.  Whether an item of religious apparel interferes with the
performance of the member's military duties depends on the
characteristics of the item, the circumstances of its intended
wear, and the particular nature of the member's duties.  Factors
in determining if an item of religious apparel interferes with
the military duties include but are not limited to, whether the
item may:

4

SECNAVINST 1730.8A

3 1 DEC 1997

(1) Impair the safe and effective operation of weapons, military equipment, or machinery.

(2) Pose a health or safety hazard to the wearer or others.

(3) Interfere with the wearing or proper functioning of special or protective clothing or equipment (e.g., helmets, flack jackets, flight suits, camouflage uniforms, gas masks, wet suits, and crash and rescue equipment).

(4) Otherwise impair the accomplishment of the military mission.

g.  Visible items of religious apparel shall not be worn while wearing historical or ceremonial uniforms; participating in review formations, parades, honor or color guards, and similar ceremonial details and functions.

h.  Jewelry bearing religious inscriptions or otherwise indicating religious affiliation of belief may be worn subject to the same uniform regulations prescribed for jewelry that is not of a religious nature.

i.  Chaplains may wear any religious apparel required by their faith groups with the uniform while conducting worship services and during the performance of rites and rituals distinct to their faith groups.

j.  Service members may wear any required religious apparel distinct to their faith group with the uniform while in attendance at organized worship services.

k.  To ensure consistency of application, the CNO and CMC may authorize visible items of religious apparel, within the guidelines in this instruction.  This authority may be delegated within their headquarters staffs.  Requests to authorize a type of religious apparel not previously authorized shall be submitted to service headquarters for approval under procedures specified by CNO or CMC.  CNO and CMC will provide an information copy of the approval or denial to the Assistant Secretary of the Navy (Manpower and Reserve Affairs) (ASN (M&RA)).

l.  Subject to the guidelines in subparagraph 9c, and the limitations in subparagraphs 9d, 9f, and 9g, commanding officers may approve individual requests for wearing authorized visible

5

SECNAVINST 1730.8A
3 1 DEC 1997

religious apparel with the uniform. In any case in which a
commanding officer denies a request to wear an item of religious
apparel with the uniform, the member shall be advised of the
right to request a review of that refusal by CNO or CMC, as
appropriate, via the chain of command. When such review is
requested, the review shall occur within 30 days following the
date of request for cases arising in the United States, and
within 60 days for all other cases. Exceptions to these
deadlines shall be limited to unusual circumstances. Visible
items of religious apparel may not be worn with the uniform until
approved.

10. Procedures

    a. Commanders and commanding officers may approve requests
for religious accommodations within the guidelines of this
instruction. To promote standard procedures for resolving
difficult questions involving accommodation of religious
practices, commanding officers shall consider the following
factors. These factors recognize that each command may be
affected by different conditions and require individual
consideration of each request. These factors are:

        (1) The importance of military requirements, including
individual readiness, unit readiness, unit cohesion, health,
safety, morale, and discipline.

        (2) The religious importance of the accommodation to the
requester.

        (3) The cumulative impact of repeated accommodations of a
similar nature.

        (4) Alternative means available to meet the requested
accommodation.

        (5) Previous treatment of the same or similar requests,
including treatment of similar requests made for other than
religious reasons.

    b. When requests for accommodation are not in the best
interest of the unit but continued tension between the unit's
requirements and the individual's religious beliefs is apparent,
administrative action is authorized, but not limited to:

6

SECNAVINST 1730.8A

3 1 DEC 1997

　　　(1) Reassignment, reclassification, or separation consistent with Secretary of the Navy (SECNAV) and Service regulations.

　　　(2) Nothing in this instruction precludes action under the Uniform Code of Military Justice in appropriate circumstances.

11. Information and Education

　　a.  The CNO and CMC shall provide the statement of DON policy on accommodation of individual religious practices and military requirements in paragraphs 4 and 4a of this instruction to applicants for commissioning, enlistment and reenlistment, and shall require the member's signature acknowledging the DON policy.

　　b.  The CNO and CMC shall incorporate relevant materials on religious traditions, practices, policies, this instruction, and reference (a), in curricula for command, judge advocate, chaplain, and similar courses of instruction and orientations.

12. Responsibility.  ASN (M&RA) is responsible for overall policy control and program execution.

13. Action

　　a.  The CNO and CMC shall implement the policies and procedures in this instruction.

　　b.  The CNO and CMC shall revise Service regulations governing uniforms, food service, separate rations, immunizations, and DNA sampling, to conform with this instruction within 90 days from the date of this instruction.  Provide copies of each such regulation revision to ASN (M&RA).

Jerry M. Hultin
Secretary of the Navy
Acting

7

SECNAVINST 1730.8A
 3 1 DEC 1997

Distribution:
SNDL Parts 1 and 2
MARCORPS PCN 71000000000 and 71000000100

Order from:
SECNAV/OPNAV Directive Control Office
Washington Navy Yard, Bldg. 200
901 M Street, SE
Washington, DC  20374-5074

8

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHAPLAIN GORDON JAMES KLINGENSCHMITT, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Civil Action No. 06-01832 (HHK) |
| DONALD C. WINTER In his Official Capacity as Secretary, DEPARTMENT OF THE NAVY, | ) ) ) ) ) |
| Defendant. | ) ) ) |

**ORDER**

Upon consideration of the Plaintiff's Motion for a Preliminary Injunction, and

Defendant's Opposition thereto, it is hereby ORDERED that the motion for a preliminary

injunction is DENIED.

DATED: _____

_____
HON. HENRY H. KENNEDY
UNITED STATES DISTRICT JUDGE