UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CHAPLAIN GORDON JAMES KLINGENSCHMITT ) | |
| ) | |
| ) | |
| Plaintiff, ) | Civil No.: 06CV 1832 (HHK) |
| v. ) | |
| ) | |
| DONALD C. WINTER ) | |
| ) | |
| Defendant, ) | |
| ) | |

**DECLARATION OF CHAPLAIN KLINGENSCHMITT IN SUPPORT OF PLAINTIFF'S**

**REPLY IN SUPPORT OF HIS MOTION FOR A TEMPORARY**

**RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

I Chaplain Gordon James Klingenschmitt, have personal knowledge of the following facts and could and would testify competently thereto:

1.   I am the Plaintiff in the above matter.

2.   I have been educated in military regulations and rules during the past 20.5 years of my

military service to our nation. I am extensively familiar with Navy regulations and instructions, especially those concerning religious expression, as required by my job as a Navy Chaplain.

3. I began my military career at the United States Air Force Academy on July 1st 1986, and rose through the ranks becoming a Major in the United States Air Force by March 2002.

4. In September 2002 I volunteered for a demotion in rank and pay-cut, and switched branches to become a Navy Chaplain, in which position I've now served over four years.

5. I would be guaranteed eligibility for retirement after one final tour of duty.

6. If separated now, I will be deprived of my retirement benefits at this late stage of my career, robbing me of my life's work, for the crime of praying in Jesus name, and quoting the Bible in the chapel, and appealing my commander's religious harassment to the President, all against the Navy's (illegal) efforts to silence me.

7. My family will be evicted from military housing and lose all medical benefits.

8. I want to stay in the Navy, even though the Navy harms me by telling fellow officers that I have committed a crime by praying publicly to Jesus, and that I should be excluded from opportunities granted to other chaplains who don't pray "in Jesus name," and they have punished me repeatedly for my religious expression.

9. Having been defamed and criminalized by my employer, it is now impossible for me to find employment in the Evangelical Episcopal Church, and unlikely I can find employment (as a religious minister of any kind) with a federal conviction on my record, prosecuted for a "religious speech crime" for praying "in Jesus name" in uniform, but even if I could find other employment, the greatest punishment for me is that I can (obviously) never again find employment as a military chaplain.

10. This destroys and deprives me of my life-long ambition, that specialized career field for which I dedicated 11 years of education and preparation, after five years at a service academy (of which one I served as a missionary), and now four additional years of experience as a chaplain, winning six chaplain awards for community service in the last four years, earning many other medals and recognitions during my 20.5 total years of military service.

11. In September 2002 I attended Naval Chaplain School, and heard mandatory lectures taught by the school director, Captain (Chaplain) Bertram Moore, that directly pressured me and all junior chaplains to censor the content of our public prayers. I also received copies of a 1998 prayer policy signed by then Chief of Navy Chaplains Rear Admiral Byron Holderby, suggesting that chaplains who pray "in Jesus name" ought to exclude themselves from participation in public ceremonies. I complained about these discriminatory and religiously oppressive academic lectures and policies by writing an academic paper, citing my rights under US Code Title 10 Section 6031, to pray "in Jesus name" and conduct public worship according to the manner and forms of the church of which I'm a member. Captain Moore remembered my paper, and one year later he complained about my paper to the commanding officer of my first ship, Captain Carr, who informed me of that complaint against me, because of my academic resistance to Chaplain Moore's prayer lectures.

12. In March 2003 I was assigned to USS ANZIO, as the only chaplain aboard a cruiser with 350 crewmembers.

13. In my first year aboard I received two superior "early promote" evaluations, just like I'd always received superior ratings over my 11 year career as an Air Force Officer. Captain Nesselrode and Captain Carr, each commanding officers of USS ANZIO, signed these outstanding evaluations. My chaplain programs aboard USS ANZIO won six awards for outstanding community

service, including "best in Navy."

14. In June 2004 I preached a sermon at an optionally-attended Christian memorial service attended by Captain James Carr, who was responsible for evaluating my performance as an officer in the Navy, but had no legal authority over religious or sacramental matters, which I practiced according to the traditions of my civilian endorsing bishop.

15. Captain Carr informed me that my sermon was personally offensive to him, and to other members of the crew who voluntarily attended the chapel service, because I had quoted "exclusive" Bible verses (like John 3:36) which claim Jesus is the way to heaven.

16. Captain Carr falsely reported that 70% of the crew had written negative comments about me on a command survey, when the survey administrator confirmed his numbers were false, and actually 84% of the crew agreed "The Command Chaplain cares for all denominations, regardless of faith or belief." My version of the survey results was later verified by Navy investigators, and the investigator reported that Captain Carr retracted his false statement under oath.

17. Captain Carr followed the advice of Chaplain Steve Gragg, and punished me in writing three times for that one sermon, including a 7 Jul 04 letter of instruction, a 31 Jan 05 downgraded performance evaluation, and a 7 Mar 05 letter to a Navy board recommending they deny renewal of my contract.

18. Captain Carr also began pressuring me to censor the content of my public prayers during "the evening prayer" onboard USS ANZIO over the ship's public address microphone. He complained that my New Testament prayers "made something squirm inside of him."

19. I offered to stop saying the evening prayer altogether, or to "take turns and share the prayer" with Sailors of diverse faith traditions. I gave him a written proposal, eye-witnessed by the

executive officer, to allow my Catholic, Muslim, Jewish, and other Sailors to write and offer evening prayers in my place. Captain Carr denied my proposal, instead directing me to pray Old Testament Jewish prayers.

20. I obeyed Captain Carr for the next eight months, and prayed only from the Old Testament Psalms, but I continued to end my prayers with the phrase "<u>we</u> pray to you, Almighty God, and <u>I</u> pray in Jesus name, Amen" as a means to include all listeners, yet remain faithful to my tradition.

21. In March 2005, Captain Carr wrote to a Navy board to "not renew" my contract, stating in writing that I'd over-emphasized my own faith system, in my sermons and prayers.

22. During my final outbrief, Captain Carr told me he'd also considered and incorporated the negative report about me he'd heard from Captain Bert Moore, because of the academic paper I'd written at the chaplain school, insisting on my right to pray "in Jesus name" in public.

23. I was transferred to shore one month early, and denied the customary medals given to all other war veteran officers who departed USS ANZIO.

24. I filed a religious harassment complaint against Captain Carr under UCMJ Article 138, and the Navy investigated my claims for over 9 months without resolution.

25. I also filed formal Article 1150 complaints against the Chief of Navy Chaplains and the Chaplain School Director, stating that their policies had defamed me before my peers and my commanding officer, by telling everybody I prayed the wrong way. Chaplain Iasiello wrote back to me, defending his predecessor's 1998 prayer policy, and stating that I shouldn't pray "in Jesus name" because that denigrated other faiths. (These two complaints are still unresolved, now after 15 months). Still today they teach lectures and distribute that memo to my peers, telling them I pray the

wrong way.

26.     My contract was due to expire on 31 Dec 05, and my complaints were ignored, until I reported these events to newspaper reporters (off-duty, wearing civilian clothes) outside of the White House on 20 Dec 05. Two days later, on 22 Dec 05, the Navy informed me my contract would be renewed.

27.     But on 11 January 2006, Rear Admiral Ruehe concluded the Navy's investigation by confirming that I was properly punished by Captain Carr for quoting the Bible in the chapel, and that Captain Carr had properly censored my prayers on the ship, because commanders have authority, even in religious matters, to evaluate my performance within the religious content of my prayers and sermons.

28.     On 16 Dec 05 my new Commanding Officer, Captain Loyd Pyle, ordered me not to wear my uniform at any event (religious or otherwise) where media reporters might be present. I felt this order inhibited my religious expression and naval uniform regulations by prohibiting me from saying public prayers in uniform, so I immediately appealed this unlawful order to the President of the United States, citing my constitutional right to petition the government for redress of wrongs.

29.     On 29 Dec 06, my immediate supervisor Captain Norm Holcomb threatened to have me transferred to Iraq, because I was appealing to the President. My co-worker LCDR Rich Inman eye-witnessed these threats of reprisal, and later testified to that regard, but this threat of reprisal was swept under the rug when I reported it to Captain Pyle and the executive officer Captain Crow.

30.     Captain Pyle never forwarded my 16 Dec 05 appeal of his unlawful order up the chain of command to the President, instead he downgraded my Mar 06 evaluation to punish me for appealing to the President, and for questioning the religious authority of senior officers, including the

Chief of Navy Chaplains. Captain Pyle and Captain Crow told me in writing that "You show disdain and insubordination toward a specific superior commissioned officer by accusing him of personally disregarding the Constitution and considering himself above the law," and directly referred to my whistleblower complaints to the President against the Chief of Navy Chaplains.

31.    On 6 Jan 06 the executive officer Captain Crow issued a written clarification (modification) of the 16 Dec 05 order, giving me written permission to say prayers in uniform in public, even when media are present. I exercised this permission on 7 Jan 06 by wearing my uniform to say prayers in front of the White House, then changed into civilian clothes to answer questions from the media. I was never punished for wearing my uniform at this event, since I had written permission to do so, and the 16 Dec 05 order was modified by the 6 Jan 06 clarification.

32.    On 21 Feb 06 the Secretary of the Navy signed a new policy SECNAVINST 1730.7C requiring "non-sectarian" prayers outside of "divine services," and re-defining "public worship" as only protected by US Code within the confines of Sunday chapel. I immediately filed a formal whistleblower complaint to members of Congress, and my complaint was published on the front page of the 23 Mar 06 Washington Times. 75 Congressmen got involved in fighting against this Navy policy. I later discovered the Chief of Naval Personnel had recommended terminating my career, because of my whistleblower complaint against this new Navy policy of requiring "non-sectarian" prayers, and my reports caused a stir on Capitol Hill.

33.    On 30 Mar 06 I wore my uniform to say prayers "in Jesus name" at another religious observance outside the White House. Obeying the written permission I'd received on 6 January, I limited my remarks, while in uniform, to the bona fide religious observance (saying only prayers and reading scriptures), and again I changed into civilian clothes before answering any questions to the

media. Other men spoke and compared my prayers "in Jesus name" to the courage of Rosa Parks, and called upon the President to rescind the illegal new Navy policy.

34.     The next day Chaplain Holcomb told me that members of my chain of command had enough of my whistleblower activities, and they would punish me at court-martial, for disobeying the 16 Dec 05 orders as originally written. I protested that these orders had been modified in writing on 6 Jan 06, but they now threatened to punish me for disobeying the 16 Dec 05 orders as originally written, even though I had appealed those unlawful orders to the President. They said they didn't care if my prayers in uniform were a "bona fide religious observance" or not, and that uniform regulations authorizing me to wear the uniform during prayers no longer protected me, because the new SECNAVINST 1730.7C now limited "public worship" as only protected during "divine services" inside Sunday chapel.

35.     The court-martial judge agreed, and enforced the new SECNAVINST 1730.7C against me during my court-martial trial, ruling that I'd disobeyed a "lawful" order to stop "worshipping in public" in uniform. He concluded that "public worship" was only safe inside the chapel during "divine service" on Sundays.

36.     To make his ruling, the military judge intentionally ignored Naval Uniform Regulation 6405.4 which states: "CHAPLAINS. Chaplains have the option of wearing their uniform when conducting worship services and during the performance of rites and rituals distinct to their faith groups."

37.     The military judge further ignored Naval Uniform Regulation 1401.3.b.4.b which permits service-members to wear the uniform to conduct religious observances (such as prayers) <u>even at protest rallies</u> (which the 30 Mar 06 event was not): "Members of the Navy and Marine

Corps, including retired members and members of reserve components are prohibited from wearing uniforms of the Naval service while attending or participating in a demonstration, assembly, or activity knowing that a purpose of the demonstration, assembly, or activity supports personal or partisan views on political, social, economic or religious issues, EXCEPT as authorized in advance by competent authority; or incident to attending or participating in a bona fide religious service or observance." [Note that SECNAVINST 1730.7C re-defined "religious observance" as only safe on holy days, effectively criminalizing public prayers on all other days as "not religious observances."]

38.     I fulfilled both exceptions for this policy: 1) I received prior written permission, and 2) I only participated, in uniform, in the "religious observance" of reading common prayers, refusing to make other statements until he had changed into civilian clothes.

39.     The military judge ignored the fact that I obtained prior written permission to wear my uniform whenever participating in a "bona fide religious service or observance" such as the 7 Jan 06 and the 30 Mar 06 events in front of the White House. (See Exhibit O, unlawful order and modification with written permission to wear uniform during prayers).

40.     I obeyed all Navy instructions, by limiting my participation, in uniform, at both 7 Jan 06 and 30 Mar 06 events to reading traditional prayers and reading scriptures, such as the "prayer for the Armed Forces" from the Episcopal Book of Common Prayer, which ends "through Jesus Christ our Lord, Amen."

41.     The military judge ignored the secret emails by the commander's own lawyer and ethics counselor which recognized the 16 Dec 05 order was unlawfully overbroad and restricted my right as a Chaplain to worship in uniform (See Exhibit O, 3 Jan 06 email by CAPT Ed White).

42.     The military judge debased 10 USC 6031 and elevated the illegal (now rescinded)

SECNAVINST 1730.7C to deny me my First Amendment rights to pray to Jesus in uniform.

43. Judge Lewis Booker wrote: "Much of the weakness of LT Klingenschmitt's argument is his insistence on reading 'public worship' as that term is used in Section 6031 of title 10, United States Code, and the current Religious Ministries instruction, to mean the same thing as 'worship in public.' It is clear, however, from testimony offered by two chaplains and from the Religious Ministries instruction (SECNAVINST 1730.7C), that 'public worship' is a term of art: it describes a combination of setting, teaching, and interpretation that constitutes a 'divine service.' One who reads a biblical verse or who recites a prayer at The Speaker's Corner in Hyde Park is not engaged in 'public worship,' although he may be worshiping in public."

44. The Navy convicted me of the federal (misdemeanor) crime of "worshipping in public" in uniform, against "lawful" orders, so now I have been punished by the Navy at criminal court-martial for saying a prayer in uniform in the presence of media.

45. In his closing argument to the jury, the prosecutor argued I'd violated the 16 Dec 05 order as originally written, not the 16 Dec 05 order as later modified by the 6 Jan 06 letter, which gave me express permission to wear my uniform during prayers. The judge allowed this, despite earlier agreeing the 16 Dec 05 order was unlawfully restrictive without the 6 Jan 06 modification.

46. I was found guilty of disobeying a "lawful" order, because I prayed in Jesus name in uniform outside of Sunday chapel.

47. To this day I have never publicly criticized the Navy in uniform, nor will I do so.

48. After my conviction I drove to Washington DC and reported to several Congressmen, including Senator John Warner's chief of staff, how the Navy had enforced SECNAVINST 1730.7C to punish me for "worshipping in public" in uniform outside of Sunday chapel. 600 newspapers

reported my story that week. The next night Senator Warner gave a speech on the floor of the Senate confirming he was "besieged" with telephone calls supporting a chaplain's right to pray publicly in Jesus name, and so he personally called the Secretary of Defense, who agreed to "not enforce" that Navy policy, which was then rescinded by an act of Congress the following week.

49.     Because I was convicted of a (misdemeanor) federal crime based on that policy, I was criminally discredited and defamed by my employer, causing me irreparable injury, and therefore I was unable to maintain my priestly covenant with the Evangelical Episcopal Church (EEC).

50.     I resigned from the Evangelical Episcopal Church and joined the Chaplaincy of Full Gospel Churches (Full Gospel Church).

51.     My resignation from EEC was mandated by the terms of my priestly covenant, triggered only by the Navy's court-martial criminalization of my prayers.

52.     My resignation letter stated: "I hereby offer my immediate resignation of my ordination, endorsement and membership in The Evangelical Episcopal Church. I sincerely regret any reproach that my recent court-martial conviction has brought upon our denomination. Proper maintenance of my priestly covenant with you requires that my actions must be above reproach. While of course I intend to appeal the alleged 'lawfulness' of the order I am convicted of disobeying, I will do so in my own name, and under the authority of a different endorser, without bringing further discredit upon EEC."

53.     The Navy's criminalization of me (for praying to Jesus in uniform) properly necessitated my resignation from the EEC, as any reasonable man would also be forced to resign, causing my "constructive discharge" which now triggers the Navy separating me from the military.

54.     I am informed that the Navy had accepted a change in ecclesiastical endorsers in

every single situation prior to mine. I am the first ever to be denied recertification.

55. Under Navy regulations, procedures and practices, no chaplain can be fired under DoDI 1304.28 para 6.5 for changing ecclesiastical endorsers.

56. SECNAVINST 1900.10a, specifically forbids separation due to loss of ecclesiastical endorsement when other factors are additionally considered.

57. If the Navy provides other reasons for separation other than the removal of ecclesiastical endorsement, processing under SECNAVINST 1900.10a is not authorized, but the Navy is using that procedure anyway.

58. The Navy has informed me that they have four excuses for separating me: (1) the change in ecclesiastical endorsers; (2) the 2006 fitness report; (3) the special-court martial conviction, and the (4) loss of support from my chain of command.

59. Navy regulations are not authorized under SECNAVINST 1900.10a because the Navy now admits that there are other "causes for consideration" to separate me from the military.

60. The Navy's failure to adjudicate whether there are "unusual circumstances" in this case, when the defendant instead claims this is routine business which is "consistently enforced" and "automatically triggered" further violates that same Navy policy.

61. Mrs. Berto's Affidavit does not address that that all 45 chaplains were automatically recertified, since OPNAV 1120.9 directs the Chief of Chaplains "recertify upon receipt of a new endorsement."

62. The Navy's violation of their well entrenched policy to recertify all chaplains was committed against me only after I was punished for praying in the name of Jesus.

63. The word "shall recertify" is used in the Navy as making it mandatory for the Chief of

Naval Chaplains to accept a change in ecclesiastical endorsers.

64.    If I am separated all military chaplains will suffer irreparable harm, because the Navy's criminalization of my prayers will cause all other chaplains to fear they must stop praying publicly to their Christian God if they want to keep their jobs.

65.    I have been repeatedly instructed by the Navy to refrain from praying publicly to Jesus, and repeatedly punished for continuing to pray publicly "in Jesus name."

66.    The Navy instructed me join their pluralistic religion or face repercussions.

67.    When I refused to join the Navy's pluralistic religion (or stop praying at all in uniform) they court-martialed me for failing to adhere to that order.

68.    When I refused to join the Navy's pluralistic religion they punished me with downgraded evaluations which are still in my record today.

69.    When I appealed their religious harassments and unlawfully prohibitive religious orders to the President, the Navy punished me with downgraded evaluations directly because of my protected whistleblower speech.

70.    Now they've begun the process to terminate me by January 31, 2006.

71.    I am aware from personal experience, knowledge, and now as a personal eye-witness, that no religious representative who values his or her continued reputation within the military, or Chaplain position in the Navy, will refuse to practice the Navy's pluralistic religion.

72.    The government's criminal sanctions against my religious practice is ruining my "reputation and effectiveness in the community" because I have been labeled a criminal for daring to pray publicly in uniform "in Jesus name" in violation of the Navy's pluralistic religion.

73.    The Navy prosecuted my religious speech pursuant to SECNAVINST 1730.7C which

required "non-sectarian" prayers and effectively banned "public worship" outside of Sunday chapel.

74. Despite SECNAVINST 1730.7C being rescinded, the Navy is now separating me for praying to Jesus outside of Sunday chapel in violation of that instruction.

75. The Navy's establishment of their pluralistic religion has denied me the right to pray publicly in the way my religion dictates.

77. The only downgraded evaluations I have received in my long military career have been given to me for praying publicly in the name of Jesus, and reporting religious harassment.

78. When I informed the Navy that I had protected speech rights under 10 USC 1034 and DoDD 7050.6 "Whistleblower Protection Act" and my First Amendment right to petition the government for redress of wrongs, the Navy not only ignored my rights, they continued to punish me directly because of my whistleblower complaints to the President and Congress.

79. Contrary to the Navy's claims that reporting religious harassment to Congress or the President is a sign of "insubordination," no Navy regulations makes it "insubordinate" to report religious harassment and blow the whistle on violators of the Constitution. In fact DoDD 7050.6 protects my right to report, stating: "4.2 No person shall restrict a member of the Armed Forces from making a protected communication. 4.3. Members of the Armed Forces shall be free from reprisal for making or preparing a protected communication. 4.4. No person may take or threaten to take an unfavorable personnel action, or withhold or threaten to withhold a favorable personnel action, in reprisal against any member of the Armed Forces for making or preparing a protected communication." The Navy violates this law and punishes my protected speech.

80. The Navy continues to follow the principles of the now-rescinded SECNAVINST 1730.7C and still today defends Captain Carr for punishing the content of my "evening prayers"

onboard the ship USS ANZIO from July 2004 to March 2005, and punishing in writing my optionally-attended sermons in the chapel.

81. Despite repeated FOIA requests from me and my Congressman for emails and documents about me written by members of my chain of command, of which I'm told thousands of pages of documents exist, less than 1000 pages have been provided to me, all heavily redacted.

82. My reputation is now so damaged and my First Amendment rights so irreparably harmed they can not be corrected by appealing to the Board of Naval Correction of Records, as that board doesn't have any power to rescind the 1998 prayer policy, or issue any injunction to stop the Naval chaplain school from continually defaming my religion, by teaching illegal government lectures on "how to pray a proper non-sectarian prayer." Only a federal court can stop the Navy from continually enforcing its non-sectarian, Unitarian, Pluralistic religion on other chaplains. Only compensatory damages by a civil court can begin to compensate the damage to my criminalized reputation, or begin to reinstate my reputation in the eyes of the Evangelical Episcopal Church.

83. If they succeed in enforcing their prayer policies against me, the Navy will use my case as precedent to remove other chaplains who pray in Jesus name, and reinstate or pursue even more aggressive policies that censor the religious content of chaplains' prayers and more boldly punish their protected speech.

I declare under the penalty of perjury under the laws of the United States that the forgoing is true and correct as of this date, December 8, 2006 and I would testify under oath consistent with this declaration.

_____
Chaplain Gordon James Klingenschmitt