

DEPARTMENT OF THE NAVY
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON, D. C. 20350-2000

IN REPLY REFER TO
5819
Ser N097/888625
23 Aug 05

From: Chief of Navy Chaplains (OPNAV N097)
To: Vice Chief of Naval Operations

Subj: REDRESS OF WRONGS UNDER ARTICLE 1150, U.S. NAVY REGULATIONS (1990) BY LT G. J. KLINGENSCHMITT, CHC, USNR

Ref: (a) LT Gordon J. Klingenschmitt Request for Redress dated 06 June 2005
(b) LT Gordon J. Klingenschmitt Request for Redress dated 09 June 2005
(c) Article 1150, U.S. Navy Regulations (1990)
(d) JAGMAN, Chapter III

1. As an initial matter, it should be noted that I viewed the requests in references (a) and (b) as formal complaints of wrongs under Article 1150, U.S. Naval Regulations 1990, as there is no right to redress from officers not in a service-member's chain of command. Accordingly, my findings and recommendations have been forwarded to you in accordance with the provisions of references (c) and (d), and copied to the complainant.

2. In reference (a), the complainant has alleged that I have personally acted unjustly, arbitrarily, capriciously, and in a discriminatory manner. Specifically, the complainant cites specific examples that he believes show that I have been negligent in my leadership role by failing to prevent alleged religious discrimination and fostering favoritism of one religion over others. In doing so, the complainant asserts that my endorsement of the concept that religious tolerance and neutral prayer language should be offered by chaplains at certain services which include Sailors and Marines of many different faiths, resulted in an apparent harm or injury to the complainant, namely discrediting his character and suppression of his free exercise of religion. Those claims are addressed herein.

3. First, the complainant cites my endorsement of a May 26, 1998 memorandum and talking paper on "Public Prayer in Military Ceremonies and Civic Occasions" written by my predecessor, RADM Byron Holderby, CHC, USN, as evidence of my alleged discrediting of the complainant's character and discrimination against his

Subj: REDRESS OF WRONGS UNDER ARTICLE 1150, U.S. NAVY REGULATIONS (1990) BY LT G. J. KLINGENSCHMITT, CHC, USNR

faith. To the contrary, the utilization of this "Talking Paper" in a graduate level academic setting at the Naval Chaplains School is not a statement of religious discrimination but is an example of religious tolerance that is essential to the role of all Navy chaplains worldwide. When considering that any chaplain can conduct services on his/her own as he or she sees fit, in accordance with their own beliefs, it is not discriminatory to suggest that those chaplains should use discretion in conducting certain services that involve many junior officers and enlisted personnel who do not hold to the beliefs of that one chaplain. Chaplains serve in the Navy first and foremost to provide for and facilitate the religious and spiritual needs of all Sailors and Marines. Pursuant to those duties, the exercise of proper discretion is necessary for all naval officers in the Chaplain Corps in certain situations. Those who conduct public prayer in a military society have to be sensitive to the large diversity of faiths of many service members and of those of no religious preference. While respectful of the complainant's choice of faith, any chaplain's continued insistence on ending public prayers "in Jesus' name" in all situations, without using discretion or regards to the venue or audience, could reasonably tend to denigrate those with different forms of faith. Additionally, as dictated by the Establishment Clause of the First Amendment, the U.S. Navy must be vigilant in not appearing to endorse one particular religious faith over another. Conducting public prayer in a pluralistic and often civic setting in the fashion insisted on by the complainant runs contrary to the well-established principle of inclusivity regardless of the particular chaplain's faith or the name of the god worshipped by the officer. For a senior officer to address errors in judgment made by a junior officer is not to discredit his or her character, rather it is to help develop their character, leadership, and decision-making capabilities as a potential future leader and officer of the United States Navy.

4. Second, the complainant's evangelical faith was not suppressed due to my denial of his proposal to share evening prayer with members of diverse faiths. In all Chaplain Corps training there is no attempt to teach an organized system of religion, but rather there is a concerted effort to be religiously inclusive. The complainant's comments that the Chaplain Corps teaches and endorses a Harvard University "Unitarian Universalist" faith is not true and is contrary to

Subj: REDRESS OF WRONGS UNDER ARTICLE 1150, U.S. NAVY REGULATIONS (1990) BY LT G. J. KLINGENSCHMITT, CHC, USNR

the approved Naval Chaplains Basic Course curriculum. Furthermore, I am a Roman Catholic priest of the Franciscan order, and did not attend theological training at Harvard as alleged by the complainant. Leading public prayer in a religiously pluralistic and often civic setting is both a privilege and a responsibility. Those leading public prayer in our pluralistic military society must be sensitive to the service-members gathered together who represent a diversity of faiths.

5. Third, for the reasons stated above as incorporated, the complainant's feelings of intimidation are unfounded and do not warrant my recusal from all junior chaplain promotion boards within the Chaplain Corps. All seven promotion board members consider the performance and accomplishments of naval officers as set forth by their respective commanding officers in their fitness reports. Board members are naval officers who take an oath to be fair and impartial, and personal beliefs and theology are not considered. The promotion board members strictly follow the precepts of the selection board. Also, there is no official indicator on the chaplains "Officer Service Record" that is projected up in "the tank" during the selection process that individually identifies the religious faith group of the chaplain being considered for promotion.

6. In reference (b), the complainant alleges he has suffered harm because I have mismanaged the Chaplain Corps. Specifically, he claims that I have attempted to re-organize the Chaplain Corps in order to punish religious diversity and suppress the complainant's First Amendment rights. This claim is also without merit. The *Sea Chaplaincy 21* model for managing the Chaplain Corps, including its shape and structure within the various command and operational environments, was developed to ensure that, to the greatest extent possible, the religious needs of all Sailors, Marines, and other authorized personnel can be met by the chaplain or the chaplains assigned. Command religious programs are administered by the chaplain or chaplains assigned to the operational commanders, who bear ultimate responsibility for those programs. Because it is the duty of every chaplain to ensure that, to the greatest extent possible, the military and spiritual needs of all are met, it is an appropriate exercise of my authority as the Chief of Chaplains to suggest and implement personnel policies that facilitate the

Subj: REDRESS OF WRONGS UNDER ARTICLE 1150, U.S. NAVY REGULATIONS (1990) BY LT G. J. KLINGENSCHMITT, CHC, USNR

maximum coverage of the religious and spiritual needs of all DON and USCG personnel. This approach of implementing a human capital strategy for Religious Ministry is essential to best provide for the needs of all DON and USCG personnel in a military setting where regularly planned deployment schedules are giving way to more dynamic, reactive unit deployments.

7. Additionally, the complainant's requests for redress are not actionable claims under references (c) and/or (d). Reference (d) states that such redress must restore "rights, privileges, property or status [the complainant] would have been entitled to had the wrong not occurred." The complainant seeks a written public apology, a written personal letter of apology, and publication, in the curriculum at the Naval Chaplain School, a paper he has written. Each of these requests for redress, however, is not considered a restoration of any "rights, privileges, property, or status" and, therefore, are not proper requests under the JAGMAN.

8. For the reasons stated above, it is my recommendation that you find the complaints of wrongs against me unsubstantiated, and find that the requested relief is inappropriate under reference (c). By copy of this letter, the complainant has been advised of my recommendation in response to references (a) and (b).

L. V. IASIELLO

Copy to:
LT G. J. Klingenschmitt

# Congress Asks White House to Allow Chaplain Prayer

**By David Brody** ***Capitol Hill Correspondent***

CBN.com –WASHINGTON - More than 160,000 petition signatures are being delivered to the White House today.

It is an effort to get the President to issue an executive order that would allow military chaplains to pray according to their faith.

Navy Chaplain Gordon Klingenschmitt is on a mission. He has come to Capitol Hill to plead his case to lawmakers. He is a Christian, but he has been told by the Navy that he cannot pray in Jesus' name.

Klingenschmitt said, "There is suppression of religious liberty in the military, and I'm concerned about this."

In a memo obtained by CBN News, the chief of navy chaplains said that any chaplain's continued insistence on ending public prayers "in Jesus' name" in all situations, without using discretion or regards to the venue or audience, could reasonably tend to denigrate those with different forms of faith.

Klingenscmitt has challenged that. Now there is a move to kick him out of the military. "I'll be out on the street without a job," Klingenschmitt said. "My family will be evicted from military housing, and I'll have no retirement after 14 years of glowing fitness reports, suddenly terminated from the Navy because I pray in Jesus' name."

That is where lawmakers on Capitol Hill come in. At a news conference on Wednesday, with petitions in hand, they pressed the White House to do something.

Rep.Trent Franks(R-AZ) commented, "I truly believe that the President of the United States, if he fully understood the realities that are present in this circumstance, would respond in an effective and decisive manner."

Dozens of House members have sent a letter to Bush asking him to issue an executive order that would allow all military chaplains to pray in the name of their god.

"He oversees the military as commander-in-chief, and he can say to the Department of Defense, I want the chaplains in this military to have the right to pray as they see fit, based on their religion," said Rep. Walter Jones(R-NC).

Jones said this should not be taken lightly, that this is widespread. There have been hundreds of complaints.

Jones told CBN News, "I've got letters, I have emails, I have telephone calls; it is a serious problem."

The congressmen behind this effort see this as a First Amendment issue. But whether the White House will step in is unclear. Jones' staff says the White House has told them that they may address the issue, but no promises of an executive order.

# Military Wrestles With Disharmony Among Chaplains

By Alan Cooperman
Washington Post Staff Writer
Tuesday, August 30, 2005; A01

The growing influence of evangelical Protestants is roiling the military chaplain corps, where their desire to preach their faith more openly is colliding with long-held military traditions of pluralism and diversity.

After accusations this summer that evangelical chaplains, faculty and coaches were pressuring cadets at the Air Force Academy, the Air Force yesterday issued new guidelines on respect for religious minorities. In the Navy, evangelical Protestant chaplains are fighting what they say is a legacy of discrimination in hiring and promotions, and they are bridling at suggestions they not pray publicly "in the name of Jesus."

Much of the conflict is in two areas that, until now, have been nearly invisible to civilians: how the military hires its ministers and how they word their public prayers. Evangelical chaplains -- who are rising in numbers and clout amid a decline in Catholic priests and mainline Protestant ministers -- are challenging the status quo on both questions, causing even some evangelical commanders to worry about the impact on morale.

"There is a polarization that is beginning to set up that I don't think is helpful. Us versus them," said Air Force Col. Richard K. Hum, an Evangelical Free Church minister who is the executive director of the Armed Forces Chaplains Board. "I don't know whether it's an overflow of what's happening in society. But this sort of thing is so detrimental to what we are trying to do in the chaplaincy."



Lt. Gordon James Klingenschmitt, a chaplain and a priest with the Evangelical Episcopal Church, has accused the Navy of religious discrimination. **Photo Credit:** By Jay Paul Photo

The Rev. MeLinda S. Morton, a Lutheran minister who resigned in June as an Air Force chaplain after criticizing the religious atmosphere at the Air Force Academy, said there has been a palpable rise in evangelical fervor not just among chaplains but also among the officer corps in general since she joined the military in 1982, originally as a launch officer in a nuclear missile silo.

"When we were coneheads -- missile officers -- I would never, ever have engaged in conversations with subordinates aligning my power and position as an officer with my views on faith matters," she said. Today, "I've heard of people being made incredibly uncomfortable by certain wing commanders who engage in sectarian devotions at staff meetings."

**Diversity Without Quotas**

The tradition of chaplains in the U.S. military goes back to George Washington, who first sought a minister for his Virginia regiment in 1756. In the early days of the republic, commanders simply chose a chaplain who shared their beliefs. But with the expansion of the military in World War II, the armed services set quotas for chaplains of various faiths, attempting to match the proportion of each denomination in the general population.

In a class-action lawsuit -- filed in 1999 in U.S. District Court for the District of Columbia and still in the discovery, or evidence-gathering, stage -- more than 50 Navy chaplains contend that the formula became a rigid and discriminatory "thirds rule": one-third Catholics, one-third mainline Protestants and one-third everybody else.

According to Hum, the military abandoned numerical targets about 20 years ago, partly for legal reasons and partly because the proliferation of religious groups made the system unworkable. Although chaplains are paid by the armed services, they must be ordained and "endorsed," or nominated, by religious organizations. The number of endorsers has grown from about 10 denominations in 1945 to more than 240 groups today, Hum said.

Like college admissions officers, Pentagon officials now say they seek diversity without using quotas.

"We don't actually say we want to have four rabbis this year, or 20 Catholic priests. What we do is, we look at who is sent to us by our endorsers throughout the country and . . . then we bring the best qualified into the chaplain corps," Rear Adm. Louis V. Iasiello, a Catholic priest and the chief of Navy chaplains, said in an interview at the Pentagon's Navy Annex.

Pentagon data analyzed by The Washington Post show a substantial rise in the number of evangelical chaplains in the past decade, along with a modest decline in mainline Protestant ministers and a precipitous drop in Catholic priests, mirroring a nationwide priest shortage.

Of the approximately 1.4 million people on active duty in the military, 21.5 percent list their religion as Roman Catholic. But of the 2,860 active-duty chaplains, 355 -- or 12.4 percent -- are Catholic priests.

By far the largest single provider of chaplains to the military is now the Southern Baptist Convention, with 451 chaplains, one for every 40 service members who list their denomination as Southern Baptist.

Although the military has had growing difficulty recruiting ministers from mainline Protestant seminaries, many evangelical denominations place a high priority on supplying chaplains to the military. The Church of God in Christ, for example, has 109 active-duty chaplains. The Full Gospel churches have 61, the Church of the Nazarene has 68, and the Cleveland, Tenn.-based Churches of God have 58.

The chief endorser of chaplains for the National Association of Evangelicals said he believes that the bias against evangelicals, though once real, is gone.

"When you look at the Navy today, you see evangelicals at the top of the hierarchy," said retired Col. Stephen W. Leonard, a former Army chaplain. He points to the deputy chief of Navy chaplains, Rear Adm. Robert F. Burt, who belongs to the Open Bible Standard Church, and to the previous chief of Navy chaplains, the Rev. Barry C. Black, a Seventh-day Adventist who became chaplain of the Senate after retiring from the Navy.

"There probably were chaplains that didn't get selected [for promotion] that probably should have been selected. But we're past that now. Let bygones be bygones," Leonard said.

**How to Preach**

With the growth in evangelicals, heated disputes are occurring over public prayers.

Iasiello said chaplains are free to preach however they wish in their base chapels or at sectarian worship services. But when they have a multi-faith audience at staff meetings, change-of-command ceremonies, ship commissionings and other public events, they are encouraged to offer more generic, inclusive prayers, he said.

"We train our people to be sensitive to the needs of all of God's people. We don't direct how a person's going to pray. Because everyone's own denomination or faith group has certain directives or certain ways of doing things, and we would never -- it's that whole separation-of-church-and-state thing -- we would never want to direct institutionally that a person could or couldn't do something," Iasiello said.

But the model of chaplaincy advocated by older chaplains such as Iasiello, which hinges on self-restraint, is increasingly under challenge by younger ones, such as Lt. Gordon James Klingenschmitt, 37.

Three years ago, Klingenschmitt left the Air Force, where he had been a missile officer for 11 years, and joined the Navy as a chaplain. He took a demotion and a pay cut to make the switch. But he was joyful.

"I had been serving my country," he said. "I wanted to serve God."

It was not long, however, before disillusionment set in. At the Navy Chaplains School in Newport, R.I., a senior military minister gave Klingenschmitt and other new chaplains a lesson in how to offer prayers in public settings. Classmates who prayed to a generic "God" or "Almighty" won praise. Those who prayed "in the name of Jesus" were counseled to be more sensitive, according to Klingenschmitt.

As a minister from a small evangelical denomination, the Evangelical Episcopal Church, Klingenschmitt bristled at those instructions. He wrote a paper citing a Pentagon regulation that "chaplains shall be permitted to conduct public worship according to the manner and forms of the church of which they are members."

Aboard the USS Anzio, his first post, he backed a Jewish sailor's request to receive kosher meals and tried to get permission for a Muslim crewman to take a turn offering the nightly benediction over the ship's public address system. But Klingenschmitt also insisted on his own right to preach what he believes as a born-again Christian.

In July 2004, he was reprimanded for a sermon at the memorial service of a sailor who died in a motorcycle accident. The sailor, Klingenschmitt said in a recent interview, was a Catholic, "and I had led him to a born-again experience before he died." In the sermon, he said, he emphasized that the sailor was certainly in heaven and "mentioned in passing" that according to John 3:36, those who do not accept Jesus are doomed for eternity.

"My sermon was in the base chapel, it was optional attendance, and it was by invitation. If we can't quote certain scriptures in the base chapel when people are invited to church, where can we quote them?" he said. "Don't paint me as a person who's going around forcing my faith on people. I've never done that."

In March, Klingenschmitt's commander recommended against extending his tour in the Navy, writing that he has "demonstrated recurring confusion concerning a chaplain's role within a military organization."

Klingenschmitt has accused the Navy of religious discrimination, contending in a written complaint to his superiors that he was punished because he refused to practice a "government-sanitized" faith that he calls "Pluralism," with a capital P.

Navy officials declined to discuss Klingenschmitt's case. But they noted that the National Conference on Ministry to the Armed Forces, a private association to which most chaplains belong, says in its code of ethics that each chaplain must "function in a pluralistic environment" and "not proselytize from other religious bodies," though they "retain the right to evangelize those who are not affiliated."

Whether there should be any tacit limits on chaplains' free speech has also been an issue at the Air Force Academy. A team of observers from Yale Divinity School criticized one of the academy's ministers for urging Protestant cadets to tell their classmates that anyone who is "not born-again will burn in the fires of hell."

"Could there possibly be a worse time for this fundamentalist Christianity to be pushed in our military, when we're in a war and the people we are fighting are recruiting their members by saying we're Christian crusaders?" asked Mikey Weinstein, a 1977 Air Force Academy graduate and former Reagan White House official.

His complaints over the past 18 months about religious intolerance led to a Pentagon investigation in June that found "a lack of awareness over where the line is drawn between permissible and impermissible expression of beliefs."

Among other incidents, the academy commandant had urged cadets to use the "J for Jesus" hand signal with the thumb and index finger, the head football coach had told players that he expected to see them in church, and Jewish cadets had experienced anti-Semitic slurs after students were urged to see the Mel Gibson film "The Passion of the Christ."

Lt. Gen. Roger A. Brady, the Air Force's deputy chief of staff for personnel, assured a June 26 congressional hearing that "the clergy pretty much have the political correctness thing down" and that "most of the complaints are with cadets and cadet-led prayers." But Klingenschmitt, who has served in both the Navy and the Air Force, said he thinks they share a basic flaw.

In both services, he said, "the higher-ranking authorities can impose their faith on the junior authorities. It's just that in the Air Force they have more evangelicals in power, and in the Navy they have more pluralists in power."

© 2005 The Washington Post Company