# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| CHAPLAIN GORDON JAMES KLINGENSCHMITT, )<br><br>Plaintiff, )<br><br>v. )<br><br>DONALD C. WINTER<br>In his Official Capacity as Secretary,<br>DEPARTMENT OF THE NAVY, )<br><br>Defendant. ) | Civil Action No. 06-01832 (HHK) |

**DEFENDANT'S SUR-REPLY IN OPPOSITION TO PLAINTIFF'S MOTIONS FOR A PRELIMINARY INJUNCTION AND AN EXPEDITED DISCOVERY SCHEDULE**

Defendant Donald C. Winter, Secretary of the Navy ("Defendant"), files this sur-reply brief to highlight key factual and legal inaccuracies contained in Plaintiff's Reply In Support of His Motion for An Expedited Discovery Schedule ("Pls. Disc. Reply") and Plaintiff's Reply In Support of His Motion For a Temporary Restraining Order and/or Preliminary Injunction ("Pls. Prelim. Inj. Reply"). In those briefs, Plaintiff repeatedly accuses the Navy of violating a regulation that it cancelled in January 2005, misstates material facts regarding the loss of Plaintiff's ecclesiastical endorsement, introduces an irrelevant, unreliable, and untimely affidavit from a purported expert witness, and erroneously accuses Defendant of "conceding" arguments that Plaintiff failed to raise in his motion for a preliminary injunction.

-1-

**ARGUMENT**

**I.     PLAINTIFF RELIES ON A REGULATION CANCELLED TWO YEARS AGO**

Plaintiff maintains that his separation constitutes unconstitutional religious discrimination and retaliation for his free exercise of religion.  Defendant's Brief in Opposition to Plaintiff's Motion for a Preliminary Injunction ("Def. Prelim. Inj. Opp.") illustrates that these claims are meritless; the Navy was required to institute separation proceedings against Plaintiff after he voluntarily resigned his ecclesiastical endorsement.  See Def. Prelim. Inj. Opp. at 13-19.  As part of those proceedings, the Secretary exercised his discretion not to approve Plaintiff's new ecclesiastical endorsement because of his conviction by court martial, his lack of chain of command support, and his negative performance evaluation.  See id. at 14.

In an attempt to undermine the lawfulness of the procedures the Navy employed, Plaintiff claims the Navy misapplied its own regulations by processing Plaintiff for separation due to his loss of ecclesiastical endorsement.  Specifically, he contends that the Navy ignored SECNAVINST 1900.10A, which precluded the separation of a chaplain based on loss of ecclesiastical endorsement when other reasons for separation exist.  See Pls. Disc. Reply at 2, 13, 14; Pls. Prelim Inj. Reply at 7.  The main flaw with this argument – and there are many[1] – is that this regulation no longer exists.  The Navy cancelled SECNAVINST 1900.10A almost two years

---

[1] Even if SECNAVINST 1900.10A had not been repealed, Plaintiff's argument would still be frivolous.  His argument fails to recognize the important distinction between the reasons for initiating the separation proceedings, and the reasons that the Secretary gives for exercising his discretion as part of those proceedings.  The Navy has never contended that it initiated these proceedings for any reason other than Plaintiff's loss of ecclesiastical endorsement.  The Secretary's stated reasons represent only his considered judgment on why Plaintiff's new ecclesiastical endorsement should not be recognized; they do not represent the Navy's reasons for subjecting him to that process in the first place.

ago.  In January 2005, the Secretary of the Navy cancelled SECNAVINST 1900.10A because "the information [it] contain[ed] is already covered by another SECNAV or service instruction[]."  See Exh. 1 (Instruction cancelling, inter alia, SECNAVINST 1900.10A).

Plaintiff knew this language was no longer operative when he filed his reply brief.  The documents he attached to his reply brief on the motion for expedited discovery reveal that knowledge.  On October 16, 2006, Plaintiff wrote a letter to the Commander, Naval Personnel Command ("CNP") quoting the language he repeatedly cites in his brief and questioning whether his separation proceedings for loss of ecclesiastical endorsement were proper.  The CNP responded to that letter, informing Plaintiff that Plaintiff had mistakenly quoted from SECNAVINST 1920.6B, which was cancelled by SECNAVINST 1920.6C.  Plaintiff appended those letters to his own reply brief on the motion for expedited discovery as Exhibit H.  Hence, Plaintiff clearly knew that the language he quoted from SECNAVINST 1900.10A – the same language contained in the now-cancelled SECNAVINST 1920.6B – no longer was in effect.  Rather than admitting his error, Plaintiff compounded it by going further back in time to unearth the regulation that was deemed obsolete in light of the now-cancelled 1920.6B.  In so doing, Plaintiff misstated the basis for Defendant's actions.

## II.    PLAINTIFF ERRONEOUSLY ASSERTS THAT HE NEVER LOST HIS ECCLESIASTICAL ENDORSEMENT

In addition to relying on outdated regulations, Plaintiff also misstates material facts.  Plaintiff asserts that he never lost his ecclesiastical endorsement.  See Pls. Disc. Reply at 5.  In fact, Plaintiff goes so far as to assert that "for two days Chaplain Klingenschmitt had two ecclesiastical endorsers during his transition between churches."  Id.; see also Pls. Prelim. Inj.

Reply at 2, 18.  The only authority he cites for the proposition that he never lacked an endorsement is Defendant's Brief in opposition to his motion for a preliminary injunction.  See Pls. Disc. Reply at 5.  That brief in no way supports his contention.

Although he does not spell out this argument, Plaintiff seems to be relying on the fact that the letter from the Evangelical Episcopalian Church, received September 27, 2006, stated that his endorsement was withdrawn effective October 1, 2006.  See Compl. ¶ 9.  By Plaintiff's logic, then, the September 29, 2006 fax from the Chaplaincy of Full Gospel Churches ("CFGC") means that he was never without a valid endorsement.  See Pls. Disc. Reply at 5.  The flaw in this logic is that the CFGC endorsement did not automatically become a valid endorsement when received by the Navy; first, it had to be approved by the Secretary.  See Def. Prelim. Inj. Opp. at 15-19. Put another way, the mere fact that CFGC is a recognized endorsing agency does not mean that each person who it endorses is automatically entitled to serve as a chaplain.  DODI 1304.28 gives the Secretary discretion over whether to approve a new endorsement.  See id.  Because the Secretary never approved that new endorsement – and because, in any event, Plaintiff did not formally request approval of the CFGC endorsement until October 14, 2006, see Compl. ¶ 19; First Parker Decl. ¶ 12[2] – Plaintiff lost his endorsement on October 1, 2006.  For him to assert otherwise is patently incorrect.[3]

---

[2] References to the "First Parker Decl." pertain to the declaration of Captain Parker filed on Oct. 30, 2006 in opposition to Plaintiff's request for a temporary restraining order and/or a preliminary injunction.  Captain Parker submitted a second affidavit along with Defendant's brief in opposition to Plaintiff's motion for a preliminary injunction on Nov. 23, 2006.

[3] Moreover, DODI 1304.28 does not require the Secretary to wait until the loss of ecclesiastical endorsement becomes effective before starting separation proceedings; the regulation orders the Secretary to start such proceedings "immediately upon such notification" of the withdrawal of an endorsement.  See DODI 1304.28 ¶ 6.5, Def. Prelim. Inj. Opp., Exh. 2

**III.    PLAINTIFF'S PURPORTED EXPERT AFFIDAVIT IS UNRELIABLE AND IRRELEVANT TO THIS LITIGATION, AND WAS FILED WITHOUT THE REQUIRED LEAVE OF THIS COURT**

For the first time in this litigation, Plaintiff now offers statistical evidence from a purported expert who likens the findings of CARE boards to random tosses of a coin.  Dr. Leuba is, as he states, no stranger to military chaplain litigation.  He has offered similar affidavits in other cases; one of those affidavits was described as "provid[ing] no evidence or argument beyond baseless speculative conclusions," and was completely discounted by that court in ruling on a summary judgment motion.  Sturm v. United States Navy, No. 99-2272, slip op. at 7 n.2 (S.D. Cal. June 18, 2002) (attached as Exh. 2).  Because Dr. Leuba's affidavit in this case is equally speculative, is irrelevant to the appropriate standard of review, and was filed after the time permitted under the local rules, this court should disregard it.

First, Dr. Leuba's analogy is entirely inapposite to this case.  Dr. Leuba concluded from his "coin toss" analogy that Plaintiff's termination "could not have occurred by random chance." Leuba Decl. ¶ 9.  That is exactly right.  Plaintiff's termination was not the result of random chance but, instead, the outcome of a considered decision-making process committed to the Secretary's discretion.  The Secretary articulated the specific reasons for reaching that decision. See Def. Prelim. Inj. Opp. Exh. 1.  That is why, as noted in Defendant's brief in opposition, the question this court must ask is whether the Secretary's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  See 5 U.S.C. § 706 (2000); Def. Prelim. Inj. Opp at 19-22.  Dr. Leuba also contends that this "coin toss" analysis illustrates that the Secretary's reasons must be pretext.  See Leuba Decl. ¶ 9.  That is a frivolous and

_____

(emphasis added).

unsupported assertion. Dr. Leuba simply compared the <u>outcomes</u> of CARE board proceedings without establishing (as would be true in a coin toss) that the two possible outcomes of a CARE board proceeding – recommending approval or recommending denial – are equally likely to occur. Because he ignores the differences in the chaplains' professional qualifications, service records, and chain of command support, he cannot draw any meaningful conclusions about whether the Secretary's stated reasons are pretext. Nor is he entitled to any discovery on that point, absent a strong showing of bad faith. <u>See</u> Def. Prelim. Inj. Opp. at 21-22. Dr. Leuba's irrelevant affidavit falls far short of that required showing.

Second, Dr. Leuba has not established that his data set contains all the information relevant to this litigation. Dr. Leuba simply assumes that his data, which was gathered for the <u>Larsen</u> litigation, encompasses all of the CARE boards convened to consider applications for approval of a new ecclesiastical endorsement. There is no basis for that assumption. <u>Larsen</u> concerned only "accession decisions" – <u>i.e.</u>, applications for first time admission into the chaplain corps. <u>See</u> <u>Larsen v. United States Navy</u>, 346 F. Supp. 2d 122, 124 (D.D.C. 2004). CARE boards are sometimes convened only to consider applications for changes in ecclesiastical endorsement. None of those CARE board reports would have been relevant to the <u>Larsen</u> litigation and, thus, there is no reason to assume they would be captured in that data set.[4]

_____

[4] In reviewing Dr. Leuba's affidavit, the Navy identified three chaplains whose request for a change in ecclesiastical endorsement was inadvertently omitted from Ms. Berto's calculation in offering her initial declaration. In order to correct the record in this case, Defendant submits the attached affidavit from Ms. Berto ("Second Berto Decl.") clarifying that there have been at least forty eight (48) chaplains whose request for approval of a new endorsement was submitted to a CARE board. <u>See</u> Second Berto Decl. ¶ 4 (attached as Exh. 3). For the reasons noted in text, Defendant does not believe that this court should consider Dr. Leuba's declaration in ruling on Plaintiff's motion for a preliminary injunction. However, to the extent the court decides to grant Plaintiff leave to file that affidavit and considers it, Defendant would request that the court also

Third, this affidavit is inappropriately invoked in support of Plaintiff's motion for expedited discovery even though it – like almost everything in Plaintiff's reply brief on that motion – is concerned not with discovery but with the <u>merits</u> of Plaintiff's ultimate case. Plaintiff nevertheless attempts to cast his discovery request as an attempt to meet the "likelihood of success" prong of the preliminary injunction standard.  <u>See</u> Pls. Disc. Reply at 13.  If that were a sufficient reason to expedite discovery, every plaintiff could make a motion for a preliminary injunction and use its pendency to expedite complete discovery and a decision on the merits. "But, that is not the purpose of a preliminary injunction, nor of the limited discovery that the courts traditionally permit a plaintiff to have to secure it."  <u>Disability Rights Council of Greater Washington v. Washington Metro. Transit Auth.</u>, 234 F.R.D. 4, 7 (D.D.C. 2006).

Fourth, Plaintiff violates the local rules of this court by using this declaration in support of his motion for a preliminary injunction.  <u>See</u> Pls. Prelim. Inj. Reply at 15-17.  This court's rules require Plaintiff to submit all affidavits supporting his motion for a preliminary injunction at the time he requests that relief.  <u>See</u> LCvR 56.1(c).  "Supplemental affidavits either to the application or the opposition may be filed <u>only with permission of the court</u>."  <u>Id.</u> (Emphasis added).  Plaintiff filed his affidavit without seeking this court's permission and, thus, should not be allowed to rely on it in his reply brief on the motion for preliminary injunction.  Because it is

---

grant leave to consider ¶¶ 5-6 of Ms. Berto's second declaration.  Those paragraphs make clear that Plaintiff was not the only chaplain to have been "rejected" by a CARE board considering a change in ecclesiastical endorsement, and that almost all the discrepancy between her data and Dr. Leuba's data is due to the different time horizons of the data sets.  <u>See</u> Second Berto Decl. ¶¶ 5-6.  As these paragraphs constitute "supplemental" information not filed along with Defendant's opposition to the motion for a preliminary injunction (as opposed to the clarifying information contained in ¶ 4 of the declaration), Defendant requests that this court grant leave under LCvR 56.1(c) to consider them.

presented by an expert who previously has been found to offer baseless and speculative conclusions, because it relies on data irrelevant to the consideration of whether the Secretary's decision was proper, and because it threatens to obscure Plaintiff's already-convoluted theory of the case, this court should deny Plaintiff leave to introduce this new affidavit.

Finally, it is curious that Plaintiff would even offer this evidence. The entire purpose of Ms. Berto's declaration – which Dr. Leuba attempts to rebut – was simply to counter Plaintiff's baseless assertion that the use of a CARE board to consider a request for an endorsement change is "wholly unprecedented." <u>See</u> Def. Prelim. Inj. Opp. at 17-18. Plaintiff now concedes that such boards have been convened for at least twenty-two chaplains (twenty-three counting Plaintiff himself), thereby undermining his original argument.

**IV.    DEFENDANT HAS NOT CONCEDED ANY ARGUMENTS RAISED IN THE COMPLAINT**

Finally, Plaintiff asserts that Defendant has offered a "concession that Plaintiff's allegations are not covered by the APA, which makes the rest of Defendant's arguments irrelevant and inapplicable." Pls. Disc. Reply at 10. Not so. Plaintiff bases this conclusion on his contention that the Defendant's brief in opposition did not address his claims under the Religious Freedom Restoration Act ("RFRA") and the First Amendment. <u>Id.</u> at 9-10. As to the latter accusation, Plaintiff is just plain wrong; Defendant dedicated an entire section of the brief to arguing why Plaintiff's First Amendment claims are moot, why Plaintiff has no standing to pursue them, and why they are without merit in any event. <u>See</u> Def. Prelim. Inj. Opp. at 25-33. As to the former allegation, Plaintiff is correct that Defendant did not address the RFRA count of the complaint. But that is because Plaintiff's motion for a preliminary injunction <u>never</u> <u>mentioned</u> the RFRA claim. Because he did not specifically ask for an injunction under RFRA,

there was no reason for Defendant to oppose such a request. Defendant will oppose that and all other counts of the complaint in the dispositive motion it plans to file.

In making this argument, Plaintiff continues to conflate (at least) two distinct issues in this case. He repeatedly asserts that the Navy is discharging him because of the content of his prayers and because of his opposition to the now-cancelled SECNAVINST 1730.7C. See Compl. ¶ 99-102; see also Pls. Disc. Reply at 5 (arguing that "the only discipline that Chaplain Klingenschmitt faced has arisen strictly from his exercising his constitutional rights" and that "the Navy has no grounds to dismiss Chaplain Klingenschmitt other than he prayed in the name of Jesus and he removed his uniform when the Navy ordered him not to pray in the name of Jesus in uniform.").[5] But his own pleadings illustrate that he lost his ecclesiastical endorsement, thereby giving rise to the proceedings required by DODI 1304.28. Although Plaintiff vigorously protests that his separation proceedings occurred for other reasons, he simply cannot avoid the controlling regulations, which were followed to the letter. Rather that recognizing the controlling force of DODI 1304.28 (which he has not challenged), Plaintiff vainly attempts to portray an overarching conspiracy to abridge his religious freedoms and encourage the creation of a secular religion. Even if he were correct that he is allowed to allege a such constitutional violations without reference to the APA,[6] that does not mean that his speculative, conclusory allegations

_____

[5] In his reply brief on the motion for a preliminary injunction, Plaintiff offers yet another spin on this theory. He claims that his court-martial violated the First Amendment. See Pls. Prelim. Inj. Reply at 3. As explained in Defendant's brief in opposition to that motion, Plaintiff can not use this proceeding to collaterally attack that court-martial on any ground. See Def. Prelim. Inj. Opp. at 20 n.8.

[6] Plaintiff relies on Webster v. Doe, 486 U.S. 592 (1988), for the proposition that he may elect to bring his case under the Constitution even if APA review is available. That is not what Webster says; that case merely held that a constitutional challenge to an agency action might lie

will be sufficient to survive a dispositive motion on those constitutional claims.  Defendant

directed Plaintiff's attention to the APA in an attempt to illustrate the appropriate method of

challenging the basis of the Secretary's lawful decision.

Finally, Plaintiff's attempt to seek discovery in support of his damages claim, see Pls.

Disc. Reply at 1, is equally misguided.  Defendant's brief in opposition to the motion for a

preliminary injunction did not address those claims because, like the RFRA count, they were not

addressed in that motion.  More importantly, as Defendant will illustrate in its dispositive

motion, those claims are barred by sovereign immunity.  See, e.g., 5 U.S.C. § 702 (2000)

(waiving sovereign immunity only for challenges to agency action "seeking relief other than

money damages" (emphasis added)).[7]

## CONCLUSION

For all of the foregoing reasons, Defendant requests that this court reject Plaintiff's

arguments concerning SECNAVINST 1900.10A, his contention that he never lost his

ecclesiastical endorsement, the affidavit of his purported expert (filed without the leave of this

court), and his accusations that Defendant conceded the merits of his arguments.  Defendant also

---

even though the APA would otherwise preclude review of that action.  If Plaintiff's interpretation
of Webster were correct, any person seeking injunctive relief against the United States – which is
exactly what Plaintiff seeks in this case, see Knowlton v. United States, 111 F. Supp. 2d 1, 6-7
(D.D.C. 1999) ("[A] suit against federal officers in their official capacities is a lawsuit against the
United States.") – could avoid the APA's limitations on discovery simply by alleging a
constitutional violation.

[7] Although Plaintiff has not specifically invoked a waiver of sovereign immunity in his
complaint or motion for a preliminary injunction, for the purposes of responding to that motion
for a preliminary injunction, Defendant addresses the general waiver provided by the APA,
which applies even in non-APA cases. See Chamber of Commerce of the United States v. Reich,
74 F.3d 1322, 1328 (D.C. Cir. 1996).

requests that this court deny Plaintiff's motions for a preliminary injunction and an expedited

discovery schedule.

Dated: <u>December 12, 2006</u>                    Respectfully submitted,

                                                PETER D. KEISLER
                                                Assistant Attorney General

                                                JEFFERY A. TAYLOR
                                                United States Attorney

                                                VINCENT M. GARVEY
                                                Deputy Branch Director

Of Counsel:                                     <u>**/s/ Michael P. Abate**</u>
Lieutenant Commander Thomas Leary               MICHAEL P. ABATE
Lieutenant Katy Pasieta                         Attorney, Civil Division
Office of the Judge Advocate General            U.S. Department of Justice
Department of the Navy                          P.O. Box 883
Washington Navy Yard, Bldg 33                   20 Massachusetts Ave., N.W., Room 7302
1322 Patterson Ave., S.E., Suite 3000           Washington, D.C. 20530
Washington, D.C.  30274-5066                    Telephone: (202) 616-8209

                                                <u>Attorneys for Defendants</u>

Exhibit 1

PRECEDENCE TO: ROUTINE    DTG: 242241Z JAN 05
PRECEDENCE CC: ROUTINE
TYPE: AUTODIN
FROM PLA: SECNAV WASHINGTON DC
SUBJECT: CANCELLATION OF SECRETARY OF THE NAVY INSTRUCTIONS//
TEXT:
RAAUZYUW RUERMFU2189 0242232-UUUU--RUENAVY RUENCGU RUHQCNU.
ZNR UUUUU
R 242241Z JAN 05
FM PTC EMAIL SYSTEM WASH DC
TO RUENAVY/CNO EMAIL CUSTOMER//NAVINSGEN WASHINGTON DC//
INFO RUENAVY/CNO EMAIL CUSTOMER//NAVCOSTCENARLINGTONVA/NAVY IPO/
    NAVAUDSVC/CNOONIPRDA//
R 242232Z JAN 05 PSN 134547K24
FM SECNAV WASHINGTON DC
TO ALNAV
ZEN/ALNAV @ AL ALNAV(UC)
INFO ZEN/CNO CNO
ZEN/CNO SECNAV
BT
UNCLAS SECTION 1 OF 2
SUBJ: CANCELLATION OF SECRETARY OF THE NAVY INSTRUCTIONS//
PASS TO OFFICE CODES:
FM SECNAV WASHINGTON DC
TO ALNAV
    BT
ALNAV 007/05
UNCLAS
MSGID/GENADMIN/SECNAV WASHINGTON DC/-/JAN//
SUBJ/CANCELLATION OF SECRETARY OF THE NAVY INSTRUCTIONS//
REF/A/MSG/SECNAV/011140ZOCT2004//
REF/B/MSG/SECNAV/011953ZNOV2004//
REF/C/MSG/SECNAV/030253ZDEC2004//


PAGE 02 RUERMFU2189 UNCLAS
NARR/REF A IS ALNAV 081/04. REF B IS ALNAV 088/04. REF C IS ALNAV
093/04//
RMKS/1.  SECNAV INSTRUCTION REVIEWS ARE NOW COMPLETED. REFS A,
B AND C, AND THIS ALNAV DOCUMENT THE PROGRESS MADE TO IMPROVE
THE EFFECTIVENESS AND EFFICIENCY OF THE DEPARTMENT.  INCLUDING
THESE LISTED BELOW, OUR REVIEWS HAVE IDENTIFIED OVER 150
INSTRUCTIONS FOR CANCELLATION FROM THE INITIAL LIBRARY OF 550.
2. I HEREBY CANCEL THESE OUTDATED AND NO LONGER RELEVANT

INSTRUCTIONS:
SECNAVINST 1740.3A   DON CONSUMER AFFAIRS PROGRAM
SECNAVINST 3400.3   SAFETY PROGRAM FOR CHEMICAL AGENTS AND WEAPONS
          SYSTEMS
SECNAVINST 3900.8A   THE TECHNICAL COOPERATION PROGRAM (TTCP)
SECNAVINST 4410.20B  IDENTIFICATION, CONTROL AND UTILIZATION OF
          SHELF- LIFE ITEMS
SECNAVINST C4900.42B CONTINENTAL UNITED STATES SUPPORT OF US-FEDERAL
          REPUBLIC OF GERMANY LOGISTIC PROGRAMS (U)
SECNAVINST C4900.43A UNITED STATES-FEDERAL REPUBLIC OF GERMANY
          LOGISTIC PLANNING (U)
SECNAVINST 5000.28E  DEFENSE SYSTEMS MANAGEMENT COLLEGE (DSMC)


PAGE 03 RUERMFU2189 UNCLAS
SECNAVINST 5200.36A  DEPARTMENT OF THE NAVY POLICY ON PRODUCTIVITY
          GAIN SHARING
SECNAVINST 5300.25   SUGGESTIONS FROM RETIREES FOR IMPROVING THE
          ACQUISITION PROCESS
SECNAVINST 5510.29A  CHEMICAL AGENT SECURITY PROGRAM
SECNAVINST 5510.33   PROTECTION OF CLASSIFIED NATIONAL SECURITY
          COUNCIL AND INTELLIGENCE INFORMATION
SECNAVINST 5511.36A  AUTHORITY OF MILITARY COMMANDERS UNDER
          INTERNAL SECURITY ACT OF 1950 TO ISSUE SECURITY
          ORDERS AND REGULATIONS FOR THE PROTECTION OR
          SECURITY OF PROPERTY OR PLACES UNDER THEIR
          COMMAND
SECNAVINST 5527.1A   DOD INVESTIGATIVE MANAGEMENT INFORMATION
SYSTEM
SECNAVINST 5710.20B  COORDINATION WITHIN THE NAVY DEPARTMENT
          REGARDING OFFICIAL VISITS TO THE UNITED NATIONS
          OR ATTENDANCE AT OTHER INTERNATIONAL
          CONFERENCES, ORGANIZATIONS, MEETINGS, AND
          NEGOTIATIONS
SECNAVINST 8500.1    UNDERWATER EXPLOSION TESTING IN NAVIGABLE
          WATERS OF THE CHESAPEAKE BAY REGION


PAGE 04 RUERMFU2189 UNCLAS
3. ADDITIONALLY, THE FOLLOWING INSTRUCTIONS ARE CANCELED SINCE
INFORMATION THEY CONTAIN IS ALREADY COVERED BY OTHER SECNAV
OR SERVICE INSTRUCTIONS:
SECNAVINST 1421.7B   PROMOTION AND SELECTIVE RETENTION OF WARRANT

AND CHIEF WARRANT OFFICERS ON INACTIVE
DUTY IN THE NAVAL RESERVE
SECNAVINST 1730.3G  EMPLOYMENT OF CIVILIAN CLERGY
SECNAVINST 1900.10A  ADMINISTRATIVE SEPARATION OF CHAPLAINS UPON
REMOVAL OF PROFESSIONAL QUALIFICATIONS
SECNAVINST 2093.1   NAVY-MARINE CORPS MILITARY AFFILIATE RADIO
SYSTEMS (MARS)
SECNAVINST 4045.1A  DON POLICY FOR NATO LOGISTICS
SECNAVINST 4101.1    SECRETARY OF THE NAVY ENERGY CONSERVATION
AWARDS PROGRAM
SECNAVINST 4860.44F  COMMERCIAL ACTIVITIES
SECNAVINST 5061.12C  HONORARY AWARDS TO PRIVATE CITIZENS AND
ORGANIZATIONS
SECNAVINST 5090.5   MANAGEMENT AND ELIMINATION OF OZONE
DEPLETING SUBSTANCES
SECNAVINST 5290.1B  NAVAL IMAGING PROGRAM (NAVIMP)


PAGE 05 RUERMFU2189 UNCLAS
SECNAVINST 5510.13B  SECURITY EDUCATION AND TRAINING
SECNAVINST 5510.25A  SECURITY REVIEW OF DEPARTMENT OF THE NAVY
INFORMATION; RESPONSIBILITY FOR
SECNAVINST 5580.1   NAVY AND MARINE CORPS SUBMISSION
PROCEDURES FOR SUSPECT FINGERPRINT CARDS AND
FINAL DISPOSITION REPORTS
SECNAVINST 5760.16  DEPARTMENT OF THE NAVY (DON) STARBASE-ATLANTIS
PROGRAM
SECNAVINST 7220.38E  REMISSION OF INDEBTEDNESS OR WAIVER OF THE
GOVERNMENT'S CLAIM ARISING FROM ERRONEOUS
PAYMENTS MADE TO OR ON BEHALF OF MEMBERS OF THE
NAVAL SERVICE
SECNAVINST 7220.52B  WAIVER OF RECOVERY OF PAY ADVANCED TO
PERSONNEL WHOSE DEPENDENTS ARE EVACUATED FROM A
DANGER AREA
4. I AM ALSO CANCELING THE FOLLOWING INSTRUCTIONS SINCE DOD
DIRECTIVES GOVERNING THESE ACTIVITIES PROVIDE SUFFICIENT POLICY
TO GUIDE OUR DEPARTMENT:
SECNAVINST 1200.1A  FULL-TIME SUPPORT (FTS) PERSONNEL IN THE
NAVAL AND MARINE CORPS RESERVE


PAGE 06 RUERMFU2189 UNCLAS
SECNAVINST 1571.2   DEPARTMENT OF DEFENSE (DOD) INNOVATIVE

READINESS TRAINING ACTIVITIES IN SUPPORT OF
ELIGIBLE ORGANIZATIONS AND ACTIVITIES OUTSIDE
OF THE DEPARTMENT OF DEFENSE
SECNAVINST 1811.4E   VOLUNTARY RECALL/RETENTION OF RETIRED
OFFICERS TO/ON ACTIVE DUTY
SECNAVINST C2300.1   CONSOLIDATION OF TELECOMMUNICATIONS
CENTERS INVOLVING DEFENSE SPECIAL SECURITY
COMMUNICATIONS SYSTEM AND GENERAL SERVICES
COMMUNICATIONS (U)
SECNAVINST 3062.1B   WARTIME MANPOWER PLANNING POLICIES AND
PROCEDURES
SECNAVINST 3403.1   RULES GOVERNING THE USE OF RIOT CONTROL
AGENTS AND CHEMICAL HERBICIDES IN WAR
SECNAVINST 3820.2D   INVESTIGATIVE AND COUNTERINTELLIGENCE

UNCLAS FINAL SECTION OF 2
SUBJ: CANCELLATION OF SECRETARY OF THE NAVY INSTRUCTIONS//
COLLECTION AND RETENTION GUIDELINES
PERTAINING TO THE DON
SECNAVINST 4950.5   THE DEFENSE INSTITUTE OF SECURITY
ASSISTANCE MANAGEMENT
SECNAVINST 5410.116B SINGLE MANAGER FOR MILITARY EXPLOSIVE
ORDNANCE DISPOSAL TECHNOLOGY AND TRAINING
(EODT&T)
SECNAVINST 5500.33   OBTAINING INFORMATION FROM FINANCIAL
INSTITUTIONS
SECNAVINST 5510.27   DISCLOSURE OF CLASSIFIED MILITARY INFORMATION
TO NATO NATIONS


PAGE 02 RUERMFU2190 UNCLAS
SECNAVINST 5520.4B   DEPARTMENT OF THE NAVY POLYGRAPH PROGRAM
SECNAVINST 5710.8A   INTERNATIONAL INTERCHANGE OF PATENT RIGHT AND
TECHNICAL INFORMATION
SECNAVINST 5711.9A   POLICY ON RATIONALIZATION OF NATO AND NATO
MEMBER TELECOMMUNICATION
SECNAVINST 7010.7   DEPARTMENT OF THE NAVY (DON) PROCEDURES
FOR IMPLEMENTING PUBLIC-PRIVATE VENTURES
(PPVS) FOR MORALE, WELFARE
AND RECREATION (MWR) CATEGORY C REVENUE-
GENERATING ACTIVITIES
SECNAVINST 12990.1   ACTIVE SERVICE DETERMINATIONS FOR CIVILIAN OR
CONTRACTUAL GROUPS
5. ADDITIONALLY, WE IDENTIFIED 79 INSTRUCTIONS TO BE DELEGATED

TO LOWER ECHELON COMMANDS.  THE ASSOCIATED SECNAV
INSTRUCTIONS WILL BE CANCELLED ON PUBLICATION OF THE
APPROPRIATE REPLACEMENT. AS PART OF THIS EFFORT, WE HAVE
INITIATED A NEW DELEGATION OF AUTHORITY DATABASE, DESIGNED TO
CAPTURE AND DOCUMENT THESE AND OTHER DELEGATIONS OF
AUTHORITIES WITHIN THE DEPARTMENT. WE EXPECT TO WEB-PUBLISH
THIS DATABASE IN MARCH, USING TECHNOLOGY TO MORE EFFECTIVELY


PAGE 03 RUERMFU2190 UNCLAS
EMPOWER THE ORGANIZATION.
6. THE REVIEW ALSO IDENTIFIED OVER 250 SECNAV INSTRUCTIONS FOR
CONSOLIDATION AND REVISION. SPONSORS HAVE ALREADY BEGUN
WORK TO MEET MY GOAL OF COMPLETING THESE BEFORE OCTOBER OF
THIS YEAR.
7. I APPLAUD ALL EFFORTS TO STREAMLINE SECNAV INSTRUCTIONS AND
TO MAKE THEM USEFUL AND CURRENT. WE HAVE ALREADY
ACCOMPLISHED A GREAT DEAL. I KNOW I CAN COUNT ON YOU TO
MAINTAIN MOMENTUM TO COMPLETE THIS WORTHWHILE EFFORT.
8. RELEASE AUTHORIZED BY THE SECRETARY OF THE NAVY.//
BT

NAVINSGEN WASHINGTON DC...ACT                    0
NAVCOSTCENARLINGTONVA...INFO                     0
NAVY IPO...INFO                    0
NAVAUDSVC...INFO                    1


NNNN

Exhibit 2

FILED

02 JUN 18 PH 2:44

CLERK. U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIEUTENANT PATRICK M. STURM, CHC, USNR, <br><br> Plaintiff, <br> v. <br><br> UNITED STATES NAVY, et al., <br><br> Defendants. | CASE NO. 99-CV-2272 W (LSP) <br><br> **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Defendant United States Navy ("Defendant") moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff Lieutenant Patrick M. Sturm ("Plaintiff") opposes. All parties are represented by counsel. The Court decides the matter on the papers submitted and without oral argument pursuant to Civil Local Rule 7.1(d.1).

//

//



1    I.    BACKGROUND

2        This Court's June 20, 2001 order significantly narrowed this case's justiciable
3    issues. Because Plaintiff's personal situation has been fully remedied, the only issues
4    remaining for consideration are (1) Defendant's alleged "board stacking" policy and
5    (2) Defendant's alleged "thirds" policy. (*June 20, 2001 Order at p. 6.*)  As this Court
6    unambiguously stated, "[a]ll other claims have either been rendered moot or fails as
7    a matter of law." (*Id. at 11.*)

8        On April 19, 2002 Defendant filed the present motion for summary judgment.
9    This motion is based on Defendant's assertion that it no longer implements either the
10   "board stacking" or "thirds" policy.  Additionally, Defendant argues that it is not
11   constitutionally required to ensure that the Chaplain Corps' religious affiliation
12   percentages proportionately mirror those of Defendant's service members.  For the
13   reasons explained more thoroughly below, the Court agrees.

14   II.    LEGAL STANDARD

15       Summary judgment is appropriate when there is no genuine issue as to any
16   material fact, and the moving party is entitled to judgment as a matter of law.  See
17   FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also
18   Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206, 1210 (9th Cir.
19   2000) (recognizing that where material facts are undisputed, the court only decides the
20   application of relevant law).   A fact is "material" when, under the governing
21   substantive law, it could affect the outcome of the case.  See Anderson v. Liberty
22   Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir.
23   1997).

24       A party seeking summary judgment always bears the initial burden of
25   establishing the absence of a genuine issue of material fact.  See Celotex, 477 U.S. at
26   323. The moving party can satisfy this burden in two ways: (1) by presenting evidence
27   that negates an essential element of the non-moving party's case or (2) by
28   demonstrating that the nonmoving party failed to make a showing sufficient to

-2-                        99cv2272

1  establish an element essential to that party's case on which that party will bear the

2  burden of proof at trial. See id. at 322-23.

3      However, once the moving party meets this initial burden, the non-moving

4  party cannot defeat summary judgment by merely demonstrating "that there is some

5  metaphysical doubt as to the material facts." See Matsushita Elec. Indus. Co., Ltd. v.

6  Zenith Radio Corp., 475 U.S. 574, 586 (1986); Triton Energy Corp. v. Square D Co.,

7  68 F.3d 1216, 1221 (9th Cir. 1995) (citing Anderson, 477 U.S. at 252) ("The mere

8  existence of a scintilla of evidence in support of the non-moving party's position is

9  not sufficient."). Rather, the non-moving party must "go beyond the pleadings and

10 by her own affidavits, or by 'the depositions, answers to interrogatories, and

11 admissions on file,' designate 'specific facts showing that there is a genuine issue for

12 trial.'" Celotex, 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e)).

13     When making this determination, all inferences drawn from the underlying

14 facts must be viewed in the light most favorable to the party opposing the motion.

15 See Matsushita Elec. Indus. Co., 475 U.S. at 587. "Credibility determinations, the

16 weighing of the evidence, and the drawing of legitimate inferences from the facts are

17 jury functions, not those of a judge, [when] he [or she] is ruling on a motion for

18 summary judgment." Anderson, 477 U.S. at 255.

19     Finally, "the district court may limit its review to the documents submitted for

20 the purposes of summary judgment and those parts of the record specifically

21 referenced therein." Carmen v. San Francisco Unified School Dist., 237 F.3d 1026,

22 1030 (9th Cir. 2001).

23 //

24 //

25

26

27

28

III. ANALYSIS

A. DEFENDANT'S ACTIONS RENDER PLAINTIFF'S "BOARD STACKING"
ALLEGATIONS MOOT[1]

The first issue for the Court's resolution is whether Defendant engages in "board stacking." According to Plaintiff, Chaplain selection boards are unfairly stacked in favor of Liturgical Protestant Chaplains to the detriment of Non-Liturgical Protestant Chaplains. As a result, according to Plaintiff, Non-Liturgical Chaplains are far less likely to be promoted within the Chaplain ranks.

This argument fails as a matter of law for several reasons. First, Defendant has changed its selection board composition such that only 2 of the 7 Chaplain Corps selection board members are chaplains – the remaining 5 members are non-chaplain Naval Officers. (*Buckley Decl., Def. Ex. 15, at ¶ 3.*) As such, Plaintiff's assertion that chaplains of certain faiths could dominate the board and discriminate against chaplains of other faiths is now statistically impossible.

Second, Defendant has removed the Additional Qualification Designator ("AQD") from all Chaplain materials submitted to the Chaplain selection board, and has done so for the last two years. (*Sill Decl., ¶ 5.*) The AQD codes identify Chaplain Corps officers' endorsing agency or denominational faith. (*Sill Decl., ¶¶ 4-5.*) Without these AQD codes, chaplain selection boards cannot know a candidate's faith denomination, and cannot therefore engage in *any* form of discrimination against *any* denomination, let alone Non-Liturgical Protestants. Even if the Court were to assume *arguendo* that Chaplain selection boards wanted to discriminate, the absence of identifying AQD codes renders such discriminatory conduct impossible. Plaintiff's claim therefore fails as a matter of law.

---

[1] The Court has already resolved all issues related to standing such that they need not be discussed here. *See June 20, 2001 Order* ("Accordingly, the Court concludes that Plaintiff's allegations sufficiently demonstrate that Plaintiff has met the 'case or controversy' prerequisite to retain valid subject matter jurisdiction over this claim.").

1       Moreover, the undisputed evidence before the Court demonstrates that
2 Liturgical and Non-Liturgical Protestants, as well as Roman Catholics, have
3 maintained similar percentages on the Chaplain selection boards for quite some time.
4 For example, from Fiscal Year 1994 to Fiscal Year 2002 Liturgical Protestants
5 comprised 35.57% of the Chaplain selection board. Non-Liturgical Protestant
6 Chaplain selection board membership totaled 31.96% and Roman Catholic selection
7 board membership was 23.71%. (*Def. Ex. 14*.) Additionally, only one board in Fiscal
8 Years 1994-2002 did not have at least one Non-Liturgical Chaplain. Incidentally, that
9 board promoted all officers considered. (*Id*) At best, this undisputed evidence reveals
10 minor statistical variation among the various religious faiths – but certainly does not
11 establish Defendant's alleged religious discrimination.

12       Selection and promotion rate data also supports summary judgment. Chaplain
13 promotion rates are as follows: Roman Catholic 52.2%; Liturgical Protestant 53.6%;
14 Non-Liturgical Protestant 53.1%. (*Def. Ex. 17*.) Indeed, when comparing promotion
15 rates categorized by rank, Non-Liturgical Protestants are promoted at a *higher*
16 percentage than either Roman Catholics or Liturgical Protestants. At the Lieutenant
17 Commander rank, Non-Liturgical Protestants are promoted at a 56.7% rate, while
18 Roman Catholics are promoted at a 53.8% rate. When evaluating Commander
19 selection rates, Non-Liturgical Protestants are promoted at a 53.0% rate, with
20 Liturgical Protestants promoted at a 52.0% rate. Furthermore, Captain promotion
21 rates for Non-Liturgical Protestant are 44.2%, while Roman Catholic rates are 43.3%.
22 (*Id*) No jury could reasonably rely on this evidence to find religious discrimination.

23       Finally, Chaplain candidates considered for promotion are determined solely
24 by seniority. (*Gwaltney Decl. at ¶ 7*.) Additionally, this selection process cannot be
25 modified to prevent exclusion of any faith group. (*Id. at ¶¶ 7-10*.) These facts
26 conclusively demonstrate that any form of institutionalized discrimination is not only
27 improbable, but for all practical purposes, impossible.

28

1   Based on this evidence, the Court finds that no jury could reasonably conclude
2   that Defendant's selection board practices are discriminatory such that entry of
3   summary judgment is appropriate. Defendant's motion for summary judgment on
4   Plaintiff's "board stacking" allegation is therefore **GRANTED.**

5
6   **B.    DEFENDANT'S ACTIONS RENDER PLAINTIFF'S "THIRDS" POLICY**
7   **ALLEGATIONS MOOT**

8   Plaintiff's next claim centers around Defendant's alleged "thirds" policy – that
9   is, a quota requiring that approximately one third of active chaplains be Non-
10  Liturgical, one third Liturgical, and one third Roman Catholic. According to
11  Plaintiff, this "thirds" policy is unconstitutional as a violation of the Establishment
12  Clause. The Court disagrees.
13  Like Plaintiff's board stacking claim, the thirds policy claim fails as a matter of
14  law for several reasons. First, Plaintiff has not provided one shred of evidence to
15  suggest that Defendant currently engages in any "thirds" policy. In contrast,
16  Defendant has provided ample and uncontradicted evidence that religion currently
17  plays no part in determining accession goals. (*Theriot Decl.* at ¶ 2; *Gwaltney Decl.* at ¶ 11.)
18  While Plaintiff may take issue with Defendant's *former* accession practices, "[w]e are
19  not in the business of pronouncing that past actions which have no demonstrable
20  continuing effect were right or wrong." Spencer v. Kemna, 523 U.S. 1, 18 (1998).
21  Accordingly, Defendant's past accession practices are irrelevant and moot for
22  purposes of summary judgment.
23  Plaintiff's claim also fails as a matter of law because Non-Liturgical Protestants
24  are hired more often and constitute a higher chaplaincy percentage than any other
25  denomination. From Fiscal Years 1990-2001, more Non-Liturgical Protestants were
26  accessed to active duty than any other denomination. (*Def. Ex. 20.*) Moreover,
27  Plaintiff's own statistics demonstrate that Non-Liturgical Protestants comprise the
28  highest Navy Chaplain Corps percentage. (*Pl. Opp. at p. 9.*) In sum, Plaintiff has not

99cv2272

1   provided one iota of evidence to suggest that Defendant's hiring practices, or current

2   membership, discriminates in any form against Non-Liturgical Protestants.[2]

3   Plaintiff's "thirds" policy claim fails as a matter of law.[3]

4

5   **C.   DEFENDANT IS NOT REQUIRED TO MAINTAIN A CHAPLAIN CORPS PROPORTIONATE TO THE SERVICEMEMBERS' RELIGIOUS COMPOSITION**

6

7       Having failed to demonstrate any triable issue of material fact on either the

8   "board stacking" or "thirds" policy allegations, Plaintiff now invites this Court to

9   mandate that Defendant's Chaplain Corps be proportionate to the servicemembers'

10  composition.  The Court respectfully declines Plaintiff's invitation.

11      First, the Court would be remiss not to point out Plaintiff's inconsistent legal

12  positions.  Plaintiff initially argues that "the First Amendment does not permit the

13  Government to discriminate between denominations." (*Pl. Opp. at p. 11.*)  Then,

14  Plaintiff demands that Non-Liturgical Protestants be picked over Liturgical

15  Protestants and Roman Catholics because they purportedly satisfy a higher

16  percentage of service members' religious needs.  The Court finds that any argument

17  that promotes non-discrimination through discrimination must be looked at with

18  some level of distrust, and more significantly, certainly does not prevent summary

19  judgment on the undisputed facts before this Court.

20      This Court's limited and proper task is to determine whether the failure to

21

22      [2]   The Court additionally finds that Dr. Lueba's declaration provides no

23  evidence or argument beyond baseless speculative conclusions, to refute or otherwise

    question Defendants' statistical evidence and, thus, provides no basis to overcome

24  Defendant's motion for summary judgment.  See U.S. v. Various Slot Machines on Guam,

25  658 F.2d 697, 700 (9th Cir. 1984) ("in the context of a motion for summary judgment, an

    expert must back up his opinion with specific facts.").

26

27      [3]   The Court rejects Plaintiff's suggestion that strict scrutiny applies in this case.

    As noted above, all relevant hiring and promotion practices take place without any

28  knowledge of the applicants' religious affiliations.  As such, no discrimination could occur

    that would implicate strict scrutiny analysis.

maintain a chaplaincy proportionate to its service members' religious preferences is unconstitutional. The Court finds that the undisputed evidence before this Court overwhelmingly confirms that no constitutional violation arises in this case.

Plaintiff relies primarily on <u>Katcoff v. Marsh</u>, 755 F.2d 223 (2d. Cir. 1985) for the proposition that the Constitution mandates a chaplain corps' adherence to religious quotas. Plaintiff's reliance is misplaced for several reasons. First, Second Circuit decisional law does not bind this Court. Second, to the extent <u>Katcoff</u> is persuasive, Plaintiff grossly misstates its holding. The fundamental question in <u>Katcoff</u> was whether an Army chaplaincy violated the Establishment Clause. <u>Katcoff</u>, 755 F.2d at 224. The Second Circuit found that an Army Chaplaincy was constitutional. <u>Id.</u> Nowhere does <u>Katcoff</u> state that quotas were constitutionally mandated, nor is there any discussion of quotas save one small sentence in the statement of facts. <u>Id.</u> at 225-226 ("In deciding upon the denominations of chaplains to be appointed the Office of the Chief of Chaplains establishes quotas based on the denominational distribution of the population of the United States as a whole.") Plaintiff seizes upon this dicta and concludes therefrom that proportional representation based on Naval service members' religious preferences is constitutionally required in this case. Plaintiff's argument is logically unsound. The fact that quotas may be deemed constitutionally *permissible* does not mean that they are constitutionally *required*. Here, Plaintiff is arguing the latter, while <u>Katcoff</u> supports the former. This distinction is fatal to Plaintiff's argument. Without any other authority, Plaintiff's claim must fail as a matter of law.[4]

In contrast, Defendant provides ample justification to not impose religious quotas within the Navy. First, approximately 30% of Navy personnel do not even maintain a religious preference. (*Black Decl.,* ¶¶ 3-9.) The Court is hard-pressed to

---

[4]    Plaintiff's remaining Establishment Clause claims are predicated on the assertion that religious quotas are constitutionally required. Because the predicate fails as a matter of law, all claims based thereon must also fail.

1  fathom how the Navy would construct a quota system for such a large Navy
2  constituency which has elected to maintain no particular religious belief. Second,
3  even for the remaining personnel which have identified their religious preference, it
4  is undisputed that a broad variety of practices and beliefs exist within each religious
5  tradition. For example, one officer practicing Judaism may prefer contemporary
6  Reformed services whereas another may demand more traditional Orthodox
7  ceremonies. It would be virtually impossible to construct quota guidelines that
8  reasonably met the expectations of all Navy personnel which hale from a host of
9  religious backgrounds and faiths. Third, no Navy regulation bars individuals who
10 associate with one religious tradition from attending the services of another. This
11 ensures a balanced freedom of religious choice among the Navy and permits sailors
12 to alter their religious practice when and how they deem appropriate.

13     Fourth, the very nature of Navy service (being at sea for long periods of time)
14 makes proportional religious quotas impractical. Tours of duty inevitably require the
15 allocation of various chaplains to specific regions throughout the world. Without
16 question, certain religious needs may go temporarily unmet while chaplains are
17 engaged in other assignments. While situations will obviously vary for each region
18 and Navy member, the undisputed fact remains that the Navy maintains a
19 considerable chaplain force which reasonably seeks to meet the needs of all Navy
20 personnel -- even if those meets cannot be met at all times and in all parts of the
21 world. According to Defendant, Navy servicemembers and their family members
22 serve at almost 500 separate, geographically dispersed duty assignments worldwide.
23 In the same regard, many chaplain duties are not limited by specific faith tradition
24 such that a chaplain from one religious denomination can still meet the general
25 religious needs of the Navy population as a whole.

26     Fifth, a rigid religious quota system would substantially destabilize the
27 recruiting, retention and job security of the chaplain officers as a whole. For
28 example, chaplains practicing a religion with numerous followers today may face the

1  daunting prospect of termination several years later based on the unpredictable shift
2  of the Navy's underlying general population. The constant Navy population
3  fluctuations would cause a similarly unpredictable string of recruitment, hiring and
4  terminations across the Chaplain Corps depending on the Navy population's makeup
5  at the particular time in question. Such a result is simply impractical and unfair to
6  both the chaplains and the Navy population as a whole. Finally, the Court notes that
7  Navy personnel are free to practice their religion off-base or while otherwise enjoying
8  their off-duty recreation time thereby obviating the need for any particular chaplain
9  quota. In sum, the Court finds that the Constitution does not require the Navy to
10  establish a direct proportionality in the faith groups of the Chaplain Corps as the best
11  or only way to meet the Navy's religious needs.

12      Absent any evidence which demonstrates a constitutional violation, this Court
13  must defer to military decisions regarding personnel and management. See United
14  States v. Shearer, 473 U.S. 52, 58 (1985). Here, Plaintiff would have this Court act in
15  a capacity inappropriate for the judiciary; that is, to change otherwise constitutional
16  Naval policies. Those decisions are best left to the legislative and executive branches.
17  This Court should not and will not interfere with decisions that are in full accord
18  with federal law and the Constitution. Because Plaintiff has failed to demonstrate
19  that religious quotas are constitutionally required, summary judgment is appropriate
20  in Defendant's favor against Plaintiff's quota claim.

21      D.   PLAINTIFF'S RULE 56(F) MOTION
22      The Court also denies Plaintiff's request for a continuance and further
23  discovery pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. Plaintiff
24  has failed to provide the Court with sufficiently specific information regarding both
25  the facts sought and their purported ability to defeat summary judgment which
26  would may have otherwise justified a continuance. See FED. R. CIV. P. 56(f); see also
27  Margolis v. Ryan, 140 F.3d 850, 853 (9th Cir. 1998). Here, Plaintiff has provided
28  little more than vague, conclusory allegations, which fail to meet Rule 56(f)'s strict

1    requirements as a matter of law.  See <u>United States v. 5,644,540.00 in U.S. Currency</u>,

2    799 F.2d 1357, 1363 (9th Cir. 1986) ("The non-movant may not simply rely on vague

3    assertions that additional discovery will produce needed, but unspecified, facts[.]")

4    (internal quotes and citations omitted).  Accordingly, Plaintiff's Rule 56(f) motion is

5    **DENIED.**

6    //

7    //

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IV.    CONCLUSION AND ORDER

In light of the foregoing, the Court **GRANTS** Defendant's motion for summary judgment on all remaining claims. (Doc. No. 62-1.)  All remaining motions and objections are **DENIED** as moot.  The Clerk of Court shall close the district court case file.


**IT IS SO ORDERED.**


DATE: June 18, 2002

HON. THOMAS J. WHELAN
United States District Court
Southern District of California

CC:    ALL PARTIES
       HON. LEO S. PAPAS, UNITED STATES MAGISTRATE JUDGE

- 12 -

99cv2272

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GORDON JAMES KLINGENSCHMITT,    )
    )
    Plaintiff,    )
    )
    v.    )    Civil Action No. 1:06cv01832 (HHK)
    )
THE HON. DONALD C. WINTER,    )
Secretary of the Navy,    )
    )
    Defendant.    )
    )

## DECLARATION OF VERONICA K. BERTO

Pursuant to 28 U.S.C. § 1746, I, Veronica K. Berto, declare as follows:

1. I am a civilian employee of the Department of the Navy. I currently serve as a Program

Analyst (GS-12) in the Force Structure (N971) division in the Chief of Navy Chaplains' Office.

I have served in this position since December 17, 1991. In my position, I am responsible for

monitoring the status, currency, and validity of the ecclesiastical endorsements Chaplain Corps

officers are required to maintain as a part of their professional qualifications.

2. As a result of this litigation, I was asked by defendants to provide information regarding the

use of the Chaplain Appointment and Recall Eligibility (CARE) Advisory Board as part of the

process of considering changes in chaplains' ecclesiastical endorsements. The Chaplain Corps

uses the CARE Board in all cases where a chaplain proposes to change his/her ecclesiastical

endorsement. Upon reviewing the records pertaining to CARE Boards on file in the Chief of

Chaplains Office, I concluded that CARE Boards have considered proposed changes in

ecclesiastical endorsements for 45 chaplains, and stated that in my declaration dated November 22, 2006.

3.  To prepare this declaration, I was provided a copy of a declaration signed by Harald R. Leuba, Ph.D., dated December 1, 2006, and a document entitled "Table 1," which lists 22 chaplains and purports to be "All Chaplains in the Navy's C/A/R/E Advisory Group database who requested a change of Endorser (1985-2005)."  I was asked to compare the information reflected in Dr. Leuba's declaration and Table with the data I had provided, and to explain the discrepancy between the two.

4.  First, Dr. Leuba's Table 1 lists three chaplains who were not included in my initial compilation.  Those chaplains are Jerome Cayangyang, Philip Pelikan, and Michael Hogg.  I have reviewed records on file in the Chief of Chaplains Office, and confirmed that CARE Boards considered each of these three chaplains' requests to change ecclesiastical endorsement.  It appears that the omission of these three chaplains from my initial computation resulted from an oversight.  Including these three chaplains, CARE Boards have considered requests for changes in ecclesiastical endorsement from at least 48 chaplains since 1983.

5.  Second, although I cannot account for every discrepancy between my computations and Dr. Leuba's, Dr. Leuba's Table 1 does not include:

        a. In 2006, CARE Boards considered whether to recertify the professional qualifications of 17 chaplains, including Lieutenant Klingenschmitt, after receiving requests for changes in ecclesiastical endorsements;

b. In <u>1983</u> and <u>1984</u>, CARE Boards considered whether to recertify the professional qualifications of <u>4 chaplains</u> after receiving requests for changes in ecclesiastical endorsements;

c. My records indicate that CARE Boards considered whether to recertify the professional qualifications of an additional <u>5 chaplains</u> not included in Dr. Leuba's Table 1 in 1999 (1 chaplain), 2004 (3 chaplains) and 2005 (1 chaplain).

6. Third, I reviewed Dr. Leuba's assertion in Paragraph 9 of his declaration that Lieutenant Klingenschmitt is the only Chaplain to have been "rejected" by the CARE Board considering a requested change in ecclesiastical endorsement. Dr. Leuba's assertion is not accurate. The records I reviewed to prepare this declaration and my previous declaration indicate that CARE Boards have recommended against recertifying the professional qualifications of three (3) chaplains, including Lieutenant Klingenschmitt. The CARE Boards also recommended against continuing each of these three (3) chaplains on active duty in the Navy.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed at Arlington, Virginia, this ___13th___ day of December, 2006.

VERONICA K. BERTO